No. 15-5041
(Consolidated with 15-5043, 15-5060, and 15-5061)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────────────────────────────────────────────

Humane Society of the United States, et al.,

Appellants,

vs.

Sally Jewell, Secretary of the Interior, et al.,

Appellees.

─────────────────────────────────────────────

**On Appeal from the United States District Court for the District of Columbia
No. 13-CV-00186 (BAH)**

─────────────────────────────────────────────

**BRIEF FOR *AMICUS CURIAE* THE STATE OF MINNESOTA**

**FILED IN SUPPORT OF APPELLANTS AND REQUESTING REVERSAL**

─────────────────────────────────────────────

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

KATHRYN LANDRUM
Assistant Attorney General
Minn. Atty. Reg. No. 0389424

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1189 (Voice)
(651) 296-1410 (TTY)

ATTORNEY FOR *AMICUS CURIAE*
STATE OF MINNESOTA

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *Amicus* the State of Minnesota submits the following Certificate of Parties, Rulings, and Related Cases.

**A.    Parties and *Amicus*.**

All parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Appellants Sally Jewell, U.S. Department of the Interior, and the U.S. Fish and Wildlife Service (the "Federal Appellants").

**B.    Rulings Under Review.**

The ruling under review is listed in the Brief for the Federal Appellants.

**C.    Related Cases.**

References to related cases appear in the Brief for the Federal Appellants. This case has not previously been before this Court or any other court.

**D.    Statutes and Regulations.**

Except for those statutes contained in the State of Minnesota's Statutory and Regulatory Addendum, all applicable statutes and regulations are contained in the addendums to the briefs for the Federal Appellants, the State of Michigan, and the Hunter Conservation Coalition.

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

/s/ Kathryn Landrum
KATHRYN LANDRUM
Assistant Attorney General
Minn. Atty. Reg. No. 0389424

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1189 (Voice)
(651) 296-1410 (TTY)

ATTORNEY FOR *AMICUS CURIAE* THE
STATE OF MINNESOTA

## STATEMENT OF IDENTITY, INTEREST AND AUTHORITY TO FILE

For the benefit of its citizenry, the State of Minnesota holds ownership, in its sovereign capacity, over all wild animals within its borders. Minn. Stat. § 97A.025. The Minnesota Department of Natural Resources ("MNDNR") is the agency of the State that has been delegated the authority to "preserve, protect, and propagate desirable species of wild animals," including the Minnesota gray wolf. Minn. Stat. §§ 97A.045, subd. 1; 97A.015, subd. 39.

The Fish and Wildlife Services' Rule (AR 651, Joint Appendix ("JA") at 1119-1180), which removed the Minnesota gray wolf from the "threatened species" list, rightfully returned the management of the Minnesota gray wolf to the State of Minnesota. The district court Opinion and Order, vacating this Rule, withdrew this management authority. Consequently, the State of Minnesota has a significant interest in the outcome of this appeal.

The State of Minnesota is authorized to file its brief as *Amicus Curiae*, without the consent of the parties or leave of court, pursuant to Federal Rule of Appellate Procedure 29(a).

# CERTIFICATE REGARDING NEED FOR SEPARATE BRIEF

The requirement that *amici curiae* join in a single brief does not apply to a governmental entity. *See* Circuit Rule 29(d).

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota


/s/ Kathryn Landrum
KATHRYN LANDRUM
Assistant Attorney General
Minn. Atty. Reg. No. 0389424

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1189 (Voice)
(651) 296-1410 (TTY)

ATTORNEY FOR *AMICUS CURIAE* THE
STATE OF MINNESOTA

**CORPORATE DISCLOSURE STATMENT**

The State of Minnesota, as a government entity, is exempt from filing a corporate disclosure statement.  *See* Fed. R. App. P. 26.1(a).

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATMENT............................................................v

TABLE OF CONTENTS................................................................................vi

TABLE OF AUTHORITIES ................................................................ viii

GLOSSARY......................................................................................................xi

STATEMENT OF THE CASE...................................................................1

I.      The Listing of the Minnesota Gray Wolf. ....................................1

II.     The Recovery of the Minnesota Gray Wolf. ..................................2

III.    Human-Wolf Conflict in Minnesota................................................4

IV.     Minnesota's Wolf Management Plan. ...........................................6

SUMMARY OF ARGUMENT ..............................................................11

ARGUMENT ........................................................................................12

I.      MINNESOTA'S WOLF MANAGEMENT PLAN IS ADEQUATE TO ENSURE
        THAT THE MINNESOTA GRAY WOLF CONTINUES TO THRIVE.........................12

        A.      Zone B is Not an "Unlimited Killing Zone." ......................................13

        B.      Minnesota's Management of Zone B is Consistent with the
                Recovery Plan, Permits Wolves to Expand their Range Where
                Possible, and Provides Needed Tools to Address Human-Wolf
                Conflict. ..............................................................................14

        C.      The FWS Determination Regarding the Adequacy of
                Minnesota's Management of Zone B is Not Arbitrary and
                Capricious............................................................................17

II.    THE MINNESOTA GRAY WOLF IS A RECOVERED "SPECIES" UNDER THE ESA. .................................................................19

    A.    The Minnesota Gray Wolf is a Separate "Species." ...........................19

    B.    The District Court Erred in Failing to Partially Uphold the FWS Rule. ...............................................................................................21

    C.    In the Alternative, The FWS Rule Should Be Upheld, At Least As To The Portion Of The Rule Delisting The Minnesota Gray Wolf. ...............................................................................................23

    D.    The District Court's Finding of Waiver is Incorrect. .........................24

CONCLUSION ...............................................................................................26

CERTIFICATE OF COMPLIANCE ..............................................................28

CERTIFICATE OF SERVICE .......................................................................29

ADDENDUM .................................................................................................30

# TABLE OF AUTHORITIES[1]

Page

CASES

*Addison v. Holly Hill Fruit Products, Inc.*,
 322 U.S. 607 (1944) ..........................................................................23

*Allied-Signal, Inc. v. Nuclear Reg. Comm'n*,
 988 F.2d 146 (D.C. Cir. 1993) .........................................................23

*\*Am. Wildlands v. Kempthorne*,
 530 F.3d 991 (D.C. Cir. 2008) .........................................................17

*Ass'n of Private Colls. & Univs. v. Duncan*,
 870 F. Supp. 2d 133 (D.D.C. 2012) ..................................................24

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
 462 U.S. 87 (1983) ............................................................................17

*Davis Cnty. Solid Waste Mgmt. v. U.S. E.P.A.*,
 108 F.3d 1454 (D.C. Cir. 1997) .......................................................23

*Defenders of Wildlife v. Salazar*,
 729 F. Supp. 2d 1207 (D. Mont. 2010) ...................................... 20, 22

*FPC v. Idaho Power Co.*,
 344 U.S. 17 (1952) ............................................................................23

*\*Friends of Blackwater v. Salazar*,
 691 F.3d 428 (D.C. Cir. 2012) .........................................................16

*Griffin v. Oceanic Contractors, Inc.*,
 458 U.S. 564 (1982) ..........................................................................17

*Hormel v. Helvering*,
 312 U.S. 552 (1941) ..........................................................................26

---

[1] Authorities upon which the State of Minnesota chiefly relies are marked with asterisks.

*March v. Or. Nat'l Res. Council,*
490 U.S. 360 (1989)............................................................................16

*Singleton v. Wulff,*
428 U.S. 106 (1976)............................................................................26

*State of Louisiana ex rel. Guste v. Verity,*
853 F.2d 322 (5th Cir. 1988) ..............................................................16

*State of N.C. v. F.E.R.C.,*
730 F.2d 790 (D.C. Cir. 1984)............................................................23

*Telephone & Data Sys., Inc. v. FCC,*
19 F.3d 42 (D.C. Cir. 1994)................................................................24

*W. Watersheds Project v. Ashe,*
948 F. Supp. 2d 1166 (D. Idaho 2013) ...............................................22

## FEDERAL STATUTES

16 U.S.C. § 1532.......................................................................... 2, 19, 25

16 U.S.C. § 1533.......................................................................... 16, 19, 22

Pub. L. No. 93-205, § 3(11), 87 Stat. 884 (1973)....................................20

## MINNESOTA STATUTES

Minn. Stat. § 97A.025........................................................................ iii

Minn. Stat. 97A.045........................................................................... iii

Minn. Stat. § 97A.015.................................................................... iii, 6, 7

Minn. Stat. § 97A.301 ....................................................................7, 13

Minn. Stat. § 97B.645 ............................................................. 7, 8, 9, 10

Minn. Stat. § 97B.646 ...........................................................................7

Minn. Stat. § 97B.647 ........................................................................10

Minn. Stat. § 97B.671 ....................................................................9, 10

**FEDERAL REGULATIONS**

50 C.F.R. § 424.11 ...................................................................22

40 FR § 145 (1975) ..................................................................26

43 FR § 9607 (1978) ........................................................ 1, 4, 22

43 FR § 9608 (1978) ...............................................................1, 4

43 FR § 9609 (1978) ................................................................ 22

43 FR § 29019-29020 (1978)......................................................5

**ADDITIONAL AUTHORITIES**

*Endangered Species –A Controversial Issue Needing Resolution*, General
　　Accounting Office Report (1979) ........................................19

L. David Mech, Elizabeth K. Harper, Thomas J. Meier, and William J. Paul,
　　*Assessing Factors That May Predispose Minnesota Farms to Wolf*
　　*Depredations on Cattle, Wildlife Society Bulletin* (2000) ....................5

Elizabeth K. Harper, William J. Paul and L. David Mech, *Causes of Wolf*
　　*Depredation Increase in Minnesota From 1979 to 1998*, Wildlife Society
　　Bulletin (2005) ................................................................... 6

A Legislative History of the Endangered Species Act of 1973, as Amended
　　in 1976, 1977, 1978, 1979, and 1980, prepared by the Congressional
　　Research Service (1982) ......................................................20

# GLOSSARY

APA:            Administrative Procedure Act

DPS:            Distinct Population Segment

ESA:            Endangered Species Act

FWS:            United States Fish and Wildlife Service

MNDNR:     Minnesota Department of Natural Resources

AR:              Administrative Record

WGL DPS:  Western Great Lakes Distinct Population Segment

# STATEMENT OF THE CASE

The State of Minnesota provides the following Statement of the Case relevant to the Minnesota gray wolf.

## I. The Listing of the Minnesota Gray Wolf.

At the time the ESA was enacted in 1973, Minnesota was the only state, outside Alaska, sustaining a significant wolf population.  (AR 391 at 11445A, JA at 823); 43 FR § 9607, 9608 (1978).  Recognizing the unique ecological circumstances faced by the Minnesota gray wolf, the FWS listed this population as its own "species" in 1978.  *Id.* at 9610.  The listing provided:

> For purposes of this rulemaking, the gray wolf (*Canis lupus*) group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one 'species', *and the gray wolf group in Minnesota is being considered as another 'species.'*

*Id.* (emphasis added).

This separate listing was based upon "biological" factors, recognizing the "long-established and striking difference between the status of the wolf in Minnesota and all other areas south of the Canadian border."  *Id.* at 9609.  Once defined as its own species, the Minnesota gray wolf was listed as "threatened," while the gray wolves in the remaining 47 conterminous states were listed as "endangered."  *Id.* at 9612.

Based on the separate listing of the Minnesota gray wolf, the FWS implemented a special rule pertaining to the management of this species.  *Id.* at

9611.  This rule recognized the significant problem of human-wolf "conflict" in Minnesota and was promulgated, in substantial part, to reduce the depredations, i.e., the killing, of Minnesota livestock and domestic pets.  *Id.*  The special rule divides Minnesota into five management "Zones."  *Id.* at 9612-14.  In Zones 2-5, depredating wolves may be humanely "taken"[2] by authorized government employees only.  *Id.* at 9611-15.  In Zone 1, the animal's primary habitat, the Minnesota gray wolf cannot be taken absent a threat to human life.  *Id.*

## II.    The Recovery of the Minnesota Gray Wolf.

Since its listing as a threatened species, the Minnesota gray wolf has thrived, increasing its population and range to the point of habitat saturation.  In 1978, the FWS developed a wolf recovery plan pertaining to the Minnesota gray wolf, which was revised in 1992 (the "Recovery Plan").  (AR 1, JA at 130-203.)  The Recovery Plan set a population goal of 1,251 to 1,400 Minnesota wolves.  (AR 1 at 29A, JA at 158.)

In 1973, it was estimated that Minnesota contained between 500 and 1,000 wolves.  (AR 391 at 11445A; JA at 823.)  By 1989, the population goal of 1,400 wolves was reached, and by the mid-1990s, the Minnesota gray wolf population nearly doubled that number.  (AR 391 at 11445A-46A, JA at 823-24; AR 119 at

---

[2] The term "take" is defined by the ESA as follows:  "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

3397A, JA at 792; AR 49 at 1600A, JA at 769-70; Doc. 20-2, ¶¶ 6, 10, JA at 116, 118.)  By 2011, population surveys indicated that the Minnesota gray wolf was numerically stable for over ten years, indicating habitat saturation.  (AR 651 at 19752A, JA at 1130-31; AR 119 at 3398A, JA at 793; Doc. 20-2, ¶ 10, JA at 118; AR 15 at 893A, JA at 719.)

With regard to range, a 1997-98 MNDNR study concluded that the Minnesota gray wolf is using most of the available suitable range, a conclusion verified by similar studies in 2003-04 and 2007-08.  (AR 391 at 11446A, JA at 824.)  By 2011, the estimated wolf range in Minnesota had expanded by a total of 225 percent.  (*Id.* at 11447A, JA at 825.)  This range has remained essentially unchanged since 2004, once again indicating habitat saturation.  (AR 651 at 19752A, JA at 1130-31; AR 119 at 3398A, JA at 793.)  Therefore, "essentially all suitable habitat in Minnesota is now occupied, range expansion has slowed or possibly ceased, and the wolf population within the state has apparently stabilized." (AR 119 at 3399A, JA at 794.)

On March 15, 2010, MNDNR petitioned to remove the Minnesota gray wolf from the threatened species list, stating that the Minnesota gray wolf had long ago achieved and exceeded the requirements set forth in the Recovery Plan.  (AR 15, JA at 715-722.)  After notice and comment rulemaking, the FWS promulgated a rule reclassifying the status of the Minnesota gray wolf on December 28, 2011 (the

"Rule").  (AR 651, JA at 1119-1180.)  The FWS declined to address the status of the gray wolf as set forth in the MNDNR petition.  Rather, the FWS determined that the Minnesota gray wolf species had disbursed beyond the borders of Minnesota to a much larger region, referred to as the WGL DPS.  (AR 651 at 19740A-19741A, JA at 1124.)  Then, after a lengthy assessment of the delisting factors, the FWS determined that the wolves within the WGL DPS were neither threatened nor endangered, requiring removal from the threatened and endangered species lists.  (AR 651 at 19731A, JA at 1120.)  The FWS Rule returned management of the Minnesota gray wolf to MNDNR on January 27, 2012.  (*Id.*) Minnesota successfully managed its wolf population until the delisting was overturned by the district court.

## III.    Human-Wolf Conflict in Minnesota.

The abundance of gray wolves in Minnesota creates human-wolf conflict that is unique in its cost and prevalence.  "Wolves in Minnesota regularly kill and/or wound livestock (cattle, sheep, poultry and occasionally horses) and pets (primarily dogs)."  (AR 157 at 3570A, JA at 803.)  Even at the time of the 1978 listing, the Minnesota gray wolf presented a significant depredation problem.  *See* 43 FR § 9607, 9608 ("Some wolves have entered areas with relatively extensive human settlement and made depredations on domestic animals.").  Indeed, in July of 1978, the FWS noted that some areas of Minnesota contained "many more

wolves than the habitat can or should carry," causing a "highly unusual history of wolf depredation on domestic livestock." 43 FR § 29019, 29020 (1978).

Not unsurprisingly, depredations in Minnesota have only increased in magnitude as the number of wolves has increased and disbursed into areas with more livestock. Indeed, livestock depredations "began significantly increasing" in 1988 as wolves have expanded into more agricultural areas. (AR 1 at 13A, JA at 142.) In 2010, verified wolf conflicts "were up 34% compared to 2009 and up 31% over the 5 year average." (AR 157 at 3571A, JA at 804.)

David Mech, a world-renowned wolf scientist who has studied wolves for over fifty years, states that "depredations on livestock are a serious concern to Minnesota farmers, resource managers, agricultural officials, environmentalists, and state legislators." L. David Mech, *Elizabeth K. Harper, Thomas J. Meier, and William J. Paul, Assessing Factors That May Predispose Minnesota Farms to Wolf Depredations on Cattle, Wildlife Society Bulletin*, 623 (2000).[3] Mech argues that "several factors must be considered" to provide a "complete understanding" of the significance of wolf depredations in Minnesota:

> 1) because it is difficult to verify wolf depredations, far more livestock may be lost to wolves than are verified; 2) to farmers who do suffer damage, the loss is real and significant economically, even though partially offset by state compensation payments for verified

---

[3] Available at http://www.mnforsustain.org/wolf_and_farms_assessing_factors. htm.

losses; 3) over a period of years, livestock from hundreds of farms have been preyed upon; 4) number of farms sustaining such damage is increasing at an accelerating rate; 5) wolf range is currently expanding into some of Minnesota's greatest densities of livestock; and 6) the wolf population has reached a level at which standard hunting and trapping techniques may be unable to prevent increases.

*Id.* at 623-24 (internal citations omitted).

The expansion of the Minnesota gray wolf range has caused wolves to move into agricultural lands and other areas "where road and human densities [are] believed to be too high to sustain wolf populations without considerable conflict with humans." Elizabeth K. Harper, William J. Paul, and L. David Mech, *Causes of Wolf Depredation Increase in Minnesota From 1979 to 1998*, Wildlife Society Bulletin, 888 (2005).[4] Along with this expansion has come significantly increased depredations. *Id.* Indeed, while in 1979 only 12% of the wolf range suffered wolf depredations, 89% of the wolf range suffered depredations in 1989. *Id.* at 891-92.

## IV. Minnesota's Wolf Management Plan.

Minnesota law ensures that the Minnesota gray wolf will continue to thrive after removal from the threatened species list. First, the Minnesota gray wolf is classified as a "protected wild animal," meaning that it is "protected by a restriction in the time or manner of taking[.]" Minn. Stat. § 97A.015, subd. 39. As

_____

[4] Available at http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1100& context=usgsnpwrc.

a protected wild animal, the illegal taking[5] of a wolf is a gross misdemeanor punishable by a fine of up to $3,000 and imprisonment of up to one year. Minn. Stat. § 97A.301, subd. 2. In addition, in anticipation of regaining management authority over the gray wolf, Minnesota enacted legislation in 2000 assuring the continued protection of the species. Minn. Stat. § 97B.645. In 2001, MNDNR also developed a detailed Wolf Management Plan, as required by Minnesota statute.[6] (AR 5 at 296A, JA at 425.)

In creating the Wolf Management Plan, MNDNR obtained extensive public input through meetings and a wolf management "Roundtable." (AR 5 at 289A, JA at 418.) The Plan employs numerous tactics to ensure continued wolf recovery in Minnesota. These tactics include:

(1)     Population monitoring (including radio-collar monitoring);

(2)     Population surveys;

(3)     Population management (including an established minimum population of 1,600 wolves);

---

[5] The term "taking" is defined by Minnesota statute as follows: "pursuing, shooting, killing, capturing, trapping, snaring, angling, spearing, or netting wild animals, or placing, setting, drawing, or using a net, trap, or other device to take wild animals. Taking includes attempting to take wild animals, and assisting another person in taking wild animals." Minn. Stat. § 97A.015, subd. 47.

[6] *See* Minn. Stat. § 97B.646(a) ("The commissioner . . . shall adopt a wolf management plan that includes goals to ensure the long-term survival of the wolf in Minnesota, to reduce conflicts between wolves and humans, to minimize depredation of livestock and domestic pets, and to manage the ecological impact of wolves on prey species and other predators.").

(4)     Depredation management;

(5)     Habitat management[7];

(6)     Prey management;

(7)     Continued research related to population assessment, wolf-livestock interactions, and wolf-prey interactions;

(8)     Disease, parasite, and health monitoring;

(9)     Public education programming;

(10)    Law enforcement and regulatory mechanisms to ensure compliance with the Wolf Management Plan; and

(11)    Increased MNDNR staffing;

(AR 5 at 289A-291A, 306A-321A, JA at 418-20, 435-50.)  The Minnesota Wolf Management Plan allows the number of wolves to naturally expand throughout the State, with no maximum population goal.  (AR 651 at 19805A, JA at 1156.)

The Minnesota Wolf Management Plan mirrors the Recovery Plan's zone-management approach to protecting the Minnesota gray wolf.  (AR 1 at 73A, JA at 202.)  The Minnesota Wolf Management Plan divides the State into two management zones: Zone A, where wolves receive strong protection and where there is less conflict with humans, Minn. Stat. § 97B.645, subds. 5-6; and Zone B,

---

[7] As a part of Minnesota's commitment to wolf habitat management, Minnesota "will continue to identify and manage currently occupied and potential wolf habitat areas to benefit wolves and their prey on public and private land[.]"  (AR 5 at 312A, JA at 441.)

where more conflicts between humans and wolves occur and where there is less suitable habitat. Minn. Stat. § 97B.645, subd. 8. (AR 5 at 309A-310A, JA at 438-39.) Zone A is identical to Recovery Plan Zones 1-4, and Zone B is identical to the Recovery Plan Zone 5. (AR 15 at 894A, JA at 720; AR 651 at 19804A-19805A, JA at 1155.)

In Zone A, encompassing the northeastern part of the State where the habitat is well-suited for wolves, a wolf may be killed by a private citizen only where a wolf poses an *immediate threat*[8] to the person's livestock, guard animals, or domestic animals on land that the person owns, leases, or occupies. Minn. Stat. § 97B.645, subd. 5. In addition, a wolf may be killed if it poses an *immediate* threat to a domestic pet. *Id.* Finally, following a verified loss of a domestic animal, certified predator controllers may kill wolves within a one-mile radius of a depredation area. Minn. Stat. § 97B.671, subd. 4.

Zone B, which includes the remainder of the State, has less suitable habitat than Zone A and presents a much greater risk of conflict between wolves and humans because of farming activity and large population centers. (AR 1 at 21A, JA at 150; AR 5 at 309A, JA at 438; AR 391 at 11471A, JA at 849; AR 651 at

---

[8] An "immediate threat" is defined as "the observed behavior of a wolf in the act of stalking, attacking, or killing livestock, a guard animal, or a domestic pet under the supervision of the owner. If a wolf is not observed stalking or attacking, the presence of a wolf feeding on an already dead animal whose death was not caused by wolves is not an immediate threat." Minn. Stat. § 97B.645, subd. 12(c).

19809A, JA at 1158.) For these reasons, Zone B is managed by MNDNR to provide more options to reduce human-wolf conflict. Thus, in this Zone, a person who owns, leases, or manages land may kill a wolf that poses a threat to livestock or domestic animals. Minn. Stat. § 97B.645, subd. 8. In addition, a wolf may be killed if it poses a threat to a domestic pet. *Id.* An *immediate* threat, however, is not required. *Id.* An individual may also employ a certified predation controller to trap wolves on or within one mile of land owned, leased, or managed by the person to protect livestock, domestic animals, or pets. *Id.*; Minn. Stat. § 97B.671, subd. 4.

Statewide, private individuals may "harass" wolves located within 500 yards of people, buildings, livestock, or domestic pets for protection purposes. Minn. Stat. § 97B.645, subd. 4. "Harassment" does not involve any form of physical injury-- it is intended to prevent the wolf from killing livestock and domestic pets without causing injury to the wolf. *Id.* Wolves may also be killed, statewide, to protect a human life. Minn. Stat. § 97B.645, subd. 3. The killing of a wolf must be reported to MNDNR within 48 hours. Minn. Stat. § 97B.645, subds. 1, 3, 5-6, 8.

Minnesota law does allow for a strictly limited and monitored wolf-hunting season. Minn. Stat. § 97B.647. To participate in wolf hunting, an individual must apply for and receive a license. *Id.*, subds. 1, 6. MNDNR determines the length of the hunting season, the areas where hunting is allowed, and the quota of wolves

that may be killed for the season.  *Id.*, subds. 2-3, 4-5, 7.  When the quota is met, MNDNR closes the season.  *Id.*, subd. 7.  Three prior hunting seasons have not adversely affected the health of Minnesota's gray wolf population.  (Doc. No. 20-2 at ¶¶ 13-14, JA at 119-20; Doc. No. 31-1 at ¶¶ 14-15, JA at 127-28.)

Prior to the most recent delisting, the Minnesota Wolf Management Plan was successfully implemented on two prior occasions.  In 2007, and again in 2009, the Minnesota gray wolf was removed from the threatened species list and management responsibilities were returned to Minnesota.  (AR 651 at 19733A, JA at 1121; Doc. No. 20-2 at ¶ 11, JA at 118.)  During both of these time periods, there was no detrimental impact on the Minnesota gray wolf population.  (Doc. No. 20-2 at ¶ 11, JA at 118.)  In addition, there is no indication that the most recent delisting resulted in any harm to the viability of the Minnesota gray wolf.

## SUMMARY OF ARGUMENT

*Amicus* State of Minnesota supports Appellants in seeking reversal of the district court's December 19, 2014, Opinion and Order.  The district court overstepped its authority in vacating the FWS Rule, which is not arbitrary and capricious.  First, the district court erred in holding that Minnesota's Wolf Management Plan is not adequate to protect the Minnesota gray wolf.  In particular, the district court's characterization of Minnesota's management of Zone

B is exaggerated and factually inaccurate. There is no basis in law or fact to describe Zone B as an "unlimited killing zone."

Second, the district court erred in failing to consider alternative forms of relief. Even if the district court is correct that a DPS designation cannot be used to define and delist a portion of a listed species, it nevertheless had authority to uphold the portion of the FWS Rule that delisted the Minnesota gray wolf, within the original boundaries, as a separately-listed species. It is undisputed that the Minnesota gray wolf is recovered, and therefore, that portion of the FWS Rule should have been upheld, allowing Minnesota to regain management authority over its wolf population.

## ARGUMENT

### I. MINNESOTA'S WOLF MANAGEMENT PLAN IS ADEQUATE TO ENSURE THAT THE MINNESOTA GRAY WOLF CONTINUES TO THRIVE.

While the district court characterized Minnesota's Wolf Management Plan as endangering the continued recovery of the Minnesota gray wolf, the record reflects otherwise. FWS was justified in relying upon MNDNR's demonstrated, long-time commitment to the protection of the Minnesota gray wolf, as well as Minnesota's detailed wolf-management framework, which safeguards the health of Minnesota's wolf population.

## A.   Zone B is Not an "Unlimited Killing Zone."

The district court's primary concern regarding Minnesota's wolf-management scheme relates to Zone B.  The district court referred to Zone B as an "unlimited killing zone," a characterization that is simply untrue and unsupported by the record.  In fact, wolves are not prevented from disbursing into Zone B, where possible.  (AR 5, JA 416-495; AR 15 at 895A, JA at 721 ("Where wolves are not in conflict with humans, they will be left alone[.]")

As described above, Minnesota law only authorizes the killing of a wolf in Zone B by a limited class of persons for the limited purpose of protecting domesticated animals and pets.  The indiscriminate killing of wolves is not allowed, and in fact, the illegal killing of a wolf is a misdemeanor punishable by fine and/or imprisonment, regardless of whether you are in Zone A or B.  Minn. Stat. § 97A.301, subd. 2.   In addition, "the killing of wolves is limited to land owned, leased or managed by the domestic animal owners, or by employing the services of a State certified predator controller."   (AR 5 at 309A, JA at 438.) Accordingly, a private citizen is not authorized to kill wolves on public land or private land owned by others.

There is absolutely no evidence in the record indicating that Minnesota's management of Zone B is in any way harmful to the overall viability of the Minnesota gray wolf.  First, wolves are almost entirely absent from the vast

majority of this Zone, which consists of farmland and areas densely populated by humans.  (AR 5 at 333A, 351A-352A, 354A, JA at 462, 480-81, 483.)  Second, when the Minnesota gray wolf was delisted in 2007, and again in 2009, there is no evidence indicating that a significant number of wolves were killed in Zone B.  Indeed, in 2007-2008, only six wolves were killed in Zone B.  (AR 119 at 3406A, JA at 801.)  In 2009, only one wolf was killed in Zone B.  (*Id.*)

> **B.    Minnesota's Management of Zone B is Consistent with the Recovery Plan, Permits Wolves to Expand their Range Where Possible, and Provides Needed Tools to Address Human-Wolf Conflict.**

Minnesota's wolf-management approach to Zone B is entirely consistent with the FWS Recovery Plan, and in fact, provides even *broader* protection and an increased possibility for range expansion.  (*Compare* AR 1, JA at 130-203, with AR 5, JA at 416-495.)  Indeed, while the Recovery Plan found that Zone B, which is identical to Zone 5, does not contain suitable wolf habitat (AR 1 at 21A, JA at 150), the Minnesota Wolf Management Plan nevertheless allows wolves to expand their range into Zone B in the limited areas where such expansion is possible.  (AR 5 at 309A-310A, JA at 438-39.)

The Recovery Plan describes the "habitat requirements" necessary to sustain a wolf population:

> [The Minnesota gray wolf] cannot survive over the long term without:
> (1) large tracks of wild land with low human densities and minimal

14

accessibility of by humans, and (2) the availability of adequate wild prey, largely ungulates and beaver.

(AR 1 at 5A, JA at 134.)  Under these criteria, Zone B is significantly less suitable for wolves than Zone A and presents an increased risk of human-wolf conflict. Zone B includes "a much higher density of roads, farms, and other human activities and constructions, and is highly accessible."[9]  (AR 1 at 16A, JA at 145.) "Because of the more settled nature of [Zone B], and the potential for wolf-human conflicts there, [FWS determined that] attempts to maximize wolf numbers should be restricted" to Zone A.  (*Id.*)  Indeed, the Recovery Plan recommended that the Minnesota gray wolf be entirely "eliminated" from Zone B, because it "is not suitable for wolves."  (AR 1 at 21A, JA at 150.)  Minnesota's Wolf Management Plan, however, does not require the elimination of the gray wolf in Zone B.  (AR 5 at 308A-310A, JA at 437-39.)  Rather, it allows the Minnesota gray wolf to continue to disperse into Zone B, where possible.  (AR 5 at 316A, JA at 445.)

The district court discounted the significance of the Recovery Plan, holding that it is "largely immaterial," *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d

---

[9] "[W]olf populations usually fail to sustain themselves in areas where rural roads open to the public have densities exceeding 0.93 linear miles of road per square mile of land. Wolf populations in the upper Great Lakes region are generally restricted to large blocks of land which are below this critical road density threshold." (AR 1 at 18A, JA at 147 (citation omitted).)

69, 135 (2014), and virtually ignored the Minnesota Wolf Management Plan. This is erroneous. [10]

Recovery plans are vital to the implementation of the ESA because they provide "objective and measurable steps to guide" a species toward recovery. *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012). Indeed, the ESA *requires* the promulgation of recovery plans. 16 U.S.C. § 1533(f)(1). Included in these recovery plans must be "objective, measurable criteria which, when met, would result in a determination . . . that the species be removed from the list." 16 U.S.C. § 1533(f)(1)(B)(ii). The FWS followed this directive, issuing the Recovery Plan with the objective of "[d]eslisting." (AR 1 at 5A, JA at 134.)

The informed, science-based judgment of the FWS in developing, revising, and following the Recovery Plan involved "a high level of technical expertise" to which the judiciary must defer. *March v. Or. Nat'l Res. Council*, 490 U.S. 360, 377 (1989); *see also*, *State of Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 329 (5th Cir. 1988) ("[D]eference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology."). The district court erred in failing to provide deference to

---

[10] Prior to the 2011 delisting of the Minnesota gray wolf, the FWS reassessed the Recovery Plan and determined its criteria to remain scientifically valid. (AR 651 at 19748A, JA at 1129 ("We, and the Eastern Timber Wolf Recovery Team . . . have concluded that this recovery criterion remains valid.").)

the FWS and its Recovery Plan. Indeed, the district court's holding effectively

moots the recovery plan requirement contained in the ESA. Recovery plans must

have some legal or practical significance regarding recovery and delisting,

otherwise such plans would serve no purpose. This absurd result must be avoided.

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations

of a statute which would produce absurd results are to be avoided[.]").

### C. The FWS Determination Regarding the Adequacy of Minnesota's Management of Zone B is Not Arbitrary and Capricious.

The FWS properly approved Minnesota's Wolf Management Plan, which

provides even greater protection of wolves in Zone B than afforded by the FWS

Recovery Plan. The FWS provided a detailed explanation as to why Zone B is less

suitable habitat for wolves than Zone A and more likely to experience human-wolf

conflict, thereby justifying a different management approach.

The FWS explanation is based on biological/ecological fact and is not

arbitrary and capricious. *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,

462 U.S. 87, 105 (1983) (holding that an agency decision cannot be arbitrary and

capricious if the agency "considered the relevant factors and articulated a rational

connection between the facts found and the choice made"). "The rationale for

deference is particularly strong when the agency is evaluating scientific data within

its technical expertise." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C.

Cir. 2008).

Four factors on wolf habitat suitability were considered by the FWS in promulgating the Rule: road density, human density, prey base, and size. (AR 651 at 19780A-19781A, JA at 1144.) Upon assessment of these factors, the FWS determined that Zone B is not suitable for wolves:

> "[O]ther areas within the DPS are unsuitable habitat, or the potentially habitat that is too small or too fragmented to be suitable for maintaining a viable wolf population." (*Id.* at 19781A, JA at 1144.)

> Zone B "is predominantly agricultural land, with high road densities, and high potential for wolves to depredate on livestock." (*Id.* at 19845A, JA at 1176.)

> "It appears that essentially all suitable habitat in Minnesota is now occupied, range expansion has slowed or possibly ceased, and the wolf population within the State has stabilized." (*Id.* at 19779A, JA at 1143.)

> "Wolves have successfully colonized most, perhaps all, suitable habitat in Minnesota." (*Id.* at 19744A, JA at 1127.)

Indeed, the FWS noted that wolves have not meaningfully expanded their range in Minnesota since 1998, indicating habitat saturation. (*Id.* at 19752A, JA at 1130-31.) These well-supported scientific findings, demonstrating the adequacy of Minnesota's Wolf Management Plan, should not have been disturbed by the district court.

## II.   THE MINNESOTA GRAY WOLF IS A RECOVERED "SPECIES" UNDER THE ESA.

### A.   The Minnesota Gray Wolf is a Separate "Species."

The FWS is authorized to list and delist threatened or endangered "species," as that term is defined by the ESA.  16 U.S.C. § 1533.  Consistent with this authority, the FWS classified the Minnesota gray wolf as a separate "species" in March of 1978 and listed it as threatened.[11]  The district court, however, ignored this critical fact and wholly denied its legal significance.  In addition, and without legal authority to do so, the district court affirmatively declared that the gray wolf (both inside and outside of Minnesota), must be fully recovered within its entire historical range before it can be delisted.  This eradicates the separate legal treatment that should be afforded to the Minnesota gray wolf as a result of its separate listing.

_____

[11] This geographic listing of a segment of a species population is consistent with then FWS practice to list portions of a species for different levels of protection in confined geographic areas without evidence of genetic variation or geographic isolation, including both the grizzly bear and the alligator.  *Endangered Species – A Controversial Issue Needing Resolution*, General Accounting Office Report, pp. 51-52 (1979) ("GAO Report").  The GAO Report was particularly critical of the grizzly bear listing in the lower forty-eight states because, like the wolf, the grizzly bear was not threatened in Alaska.  Rather than eliminating this practice, Congress codified it when it adopted the DPS policy some seven months after the Minnesota wolf population had been identified as a separate species apart from the grey wolf species in the coterminous forty-eight states. Pub. Law 95-632, § 2 (16) (Nov. 10, 1978) codified as amended at 16 U.S.C. § 1532(16).

As originally enacted in 1973, the ESA defined the term "species" as "any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Pub. L. No. 93-205, § 3(11), 87 Stat. 884, 886 (1973). This definition was intended to provide "flexibility" in listing *populations* of animal for federal protection. *See* A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980, prepared by the Congressional Research Service, at 150 (1982) ("Leg. Hist.") (House Report noting that the term "species" is "defined broadly enough to include any subspecies of fish or wildlife or plants, *or any population of such species*.") (emphasis added). Indeed, the legislative history of the 1973 ESA demonstrates that the listing of the Minnesota gray wolf as a separate "species" was expressly contemplated. Leg. Hist. at 478 (discussing whether the ESA would provide authority to "designate the timber wolf as an endangered species in all States of the Union except Minnesota").[12]

The district court's opinion is inconsistent with the historical application of the ESA and the ESA's legislative history. The ruling does not give effect to the Minnesota gray wolf's status as an independent species. It improperly conflates

---

[12] At least one other court has acknowledged that the Minnesota gray wolf is a separate "species." *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1227 (D. Mont. 2010) (noting that the 1978 rule identified the Minnesota gray wolf "as a separate species under the ESA").

the word "species," a legal term of art, with the words "taxon" and "*Canis lupus*," which are scientific terms. While acknowledging that the Minnesota gray wolf belongs to the same taxon as gray wolves in the other 47 coterminous states (*Canis lupus*), the FWS unambiguously classified the Minnesota gray wolf as its own "species," as the phrase was then defined by the ESA. The district court ignores this fact, indicating that <u>all</u> gray wolves were listed together with merely "a lower level of listing protection" afforded to the Minnesota gray wolf. *Humane Soc'y*, 76 F. Supp. 3d at 119. This is incorrect.

The district court's holding harms the State of Minnesota because it forecloses delisting absent country-wide recovery. Indeed, the district court held that the gray wolf cannot be delisted anywhere, even in Minnesota, without "comprehensive evaluation of [the wolf] throughout its historical range." *Humane Soc'y*, 76 F. Supp. 3d at 124. This holding is erroneous. Because the Minnesota gray wolf was *separately* listed, it can be *separately* delisted without consideration of wolves outside the listing.

### B. The District Court Erred in Failing to Partially Uphold the FWS Rule.

The FWS rightfully recognized that the Minnesota gray wolf expanded its range since 1978, populating large territories of Michigan and Wisconsin. (AR 651 at 19741A, JA at 1124.) Accordingly, the State of Minnesota agrees that the FWS was correct in designating a larger segment of wolf territory (the WGL DPS)

and delisting that segment as recovered. However, if this Court finds that the FWS is prohibited from expanding the Minnesota gray wolf listing, it should nevertheless hold that the FWS was correct in delisting the Minnesota gray wolf species within its original boundaries.

The Minnesota gray wolf is recovered under the plain language of the ESA and the Recovery Plan. *See* 50 C.F.R. § 424.11(d). Indeed, this fact is undisputed. As noted above, the Recovery Plan's criteria for the recovery of the Minnesota gray wolf have been satisfied for over ten years. Delisting is therefore appropriate.[13] *See W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1171 (D. Idaho 2013) ("The ultimate goal of the ESA is to recover listed species to the point where they no longer need ESA protection.").[14]

---

[13] The five delisting factors, set forth in 16 U.S.C. § 1533(a)(1), were analyzed in great detail by FWS for the entire WGL DPS, which includes the whole of Minnesota. (AR 651 at 19776A-19846A, JA at 1142-1177.) The district court erred in discounting this thorough, scientific analysis as arbitrary and capricious, as described in detail by the Federal Appellants. (Fed. Br. at 65-84.) The delisting factors all support the delisting of the Minnesota gray wolf.

[14] The delisting of the Minnesota gray wolf does not violate FWS policy or the ESA regarding political boundaries. *See Defenders*, 258 F.3d at 1145 (noting that territory designated under the ESA "need not coincide with national or state political boundaries, although they can"). The Minnesota gray wolf population was listed as a separate species, within the boundaries of the State of Minnesota, for "biological" reasons. 43 FR § 9607, 9609.

**C. In the Alternative, The FWS Rule Should Be Upheld, At Least As To The Portion Of The Rule Delisting The Minnesota Gray Wolf.**

Courts reviewing an agency rule may uphold a portion of the rule when appropriate. "Whether an administrative agency's order or regulation is severable, permitting a court to affirm it in part and reverse it in part, depends on the issuing agency's intent." *State of N.C. v. F.E.R.C.*, 730 F.2d 790, 795-96 (D.C. Cir. 1984) (citing *FPC v. Idaho Power Co.*, 344 U.S. 17, 20-21 (1952) and *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 618-19 (1944)).[15]

In this case, while FWS intended to delist the entire WGL DPS, it also clearly intended to delist the Minnesota gray wolf. The foundation of the WGL DPS is the expansion of the Minnesota gray wolf listing. If the FWS were aware that a legal impediment would invalidate the recognition of this expansion, it would still find the Minnesota gray wolf to be recovered within its original boundaries. Accordingly, upholding the portion of the Rule that delisted the Minnesota gray wolf, within the boundaries of the State of Minnesota, is appropriate. *See Davis Cnty. Solid Waste Mgmt. v. U.S. E.P.A.*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (finding an EPA rule to be severable because if the EPA had

---

[15] If this Court does not uphold the Rule of a matter of law, or partially uphold the Rule as to the Minnesota gray wolf, Minnesota agrees with the State of Wisconsin that vacatur of the entire Rule, as ordered by the district court, is inappropriate. (Wis. Br. at 18-26.) Rather, the Rule should be remanded back to FWS for further explanation in light of this Court's opinion. *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

not erroneously interpreted a statute, it nevertheless would have passed the portion of the rule that did not violate the statute).

Moreover, the factual findings related to the recovery of the Minnesota gray wolf are not inexplicably "intertwined" with other portions of the Rule. *Telephone & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994); *see also*, *Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 156 (D.D.C. 2012) ("The disclosure requirements are not so intertwined with the reporting requirements as to raise 'a substantial doubt that a partial affirmance would comport with the [agency's] intent.'"). Indeed, when addressing the ESA delisting factors, the Minnesota gray wolf was individually assessed in great detail. (AR 651 at 19750A-19753A, 19804A-19810A, 19835A-19837A, JA at 1129-31, 1155-59, 1172.)

### D.     The District Court's Finding of Waiver is Incorrect.

While the district court dedicated a great deal of attention to the issue of whether the Minnesota gray wolf constitutes a "de-facto DPS," *Humane Soc'y*, 76 F. Supp. 3d at 115-17, it spent no time on the issue of whether the Minnesota gray wolf is its own species. Rather, the district court erroneously held that the issue was waived. *Id.* at 114, n.25. The district court's finding of waiver is erroneous for several reasons.

First and foremost, as *amicus* below, MNDNR asserted that the Minnesota gray wolf is a separate species.[16] (Doc. No. 31 at 6 ("[T]he USFWS had listed the wolf in Minnesota as a species separate from wolves located throughout the remaining 48 conterminous states[.]".) Second, the argument that the Minnesota gray wolf is a "de-facto" DPS, an issue extensively briefed below, is simply another way of asserting that the Minnesota gray wolf is a separate species. *See* 16 U.S.C. § 1532(16) (defining the term "species" to include a DPS). Third, there cannot be a waiver in this case because the district court implicitly addressed the issue, eviscerating the Minnesota gray wolf's status as a separate "species" under the ESA. Accordingly, because the district court incorrectly held that the Minnesota gray wolf is the same "species" as wolves in the remaining conterminous 47 states, the issue must be addressed on appeal.

Finally, and most importantly, even if a waiver is found, the argument that the Minnesota gray wolf is a separate species must be addressed by this Court in the interests of justice. Indeed, in "lean[ing] forward from the bench to let an agency know, in no uncertain terms, that enough is enough," *Humane Soc'y*, 76 F. Supp. 3d at 75, the district court published a voluminous opinion, which if

---

[16] MNDNR's March 15, 2010, petition to the FWS was not based upon a DPS approach. (AR 15 at 890A, JA at 716.) Rather, the MNDNR requested the delisting of the Minnesota gray wolf precisely as it was listed in 1978, as a separate species under the ESA. (*Id.* at 890A, n.1, JA at 716, n.1.)

followed by other courts, would abrogate the important biological and legal distinction between the Minnesota gray wolf and the wolves in the lower 47 coterminous states and could undermine the management of other species such as the grizzly bear. 40 FR § 145 (1975). This expansive opinion was unexpected, particularly because the district court did not hear oral argument. *Humane Soc'y*, 76 F. Supp. 3d at 75 n.3.

The State of Minnesota is directly harmed by the district court opinion itself, and should be able to obtain redress in this Court in the interests of justice. *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, . . . where injustice might otherwise result.") (internal quotation marks and citation omitted); *Hormel v. Helvering*, 312 U.S. 552, 558 (1941). Accordingly, the issue of the Minnesota gray wolf's independent status as a species is appropriately considered by this Court.

## CONCLUSION

For these reasons, the State of Minnesota requests that that district court be reversed and the Rule upheld in its entirety. In the alternative, Minnesota requests that the Rule be partially upheld such that the Minnesota gray wolf is delisted within its original boundaries.

Dated:  June 6, 2016

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

/s/ Kathryn Landrum
KATHRYN LANDRUM
Assistant Attorney General
Minn. Atty. Reg. No. 0389424

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1189 (Voice)
(651) 296-1410 (TTY)

ATTORNEY FOR *AMICUS CURIAE* THE
STATE OF MINNESOTA

## CERTIFICATE OF COMPLIANCE

1.      Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1), the brief contains 6,516 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  June 6, 2016

/s/ Kathryn Landrum
KATHRYN LANDRUM
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2016, I electronically filed the foregoing Brief for *Amicus Curiae* the State of Minnesota in support of Appellants with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/EFC system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: June 6, 2016

/s/ Kathryn Landrum
KATHRYN LANDRUM
Assistant Attorney General

# STATUTORY AND REGULATORY ADDENDUM

Minn. Stat. § 97A.015 ................................................................. A01

Minn. Stat. § 97A.301 ................................................................. A06

Minn. Stat. § 97B.645 ................................................................. A07

Minn. Stat. § 97B.646 ................................................................. A10

Minn. Stat. § 97B.647 ................................................................. A11

Minn. Stat. § 97B.648 ................................................................. A12

Minn. Stat. § 97B.671 ................................................................. A13

# 2015 Minnesota Statutes

## 97A.015 DEFINITIONS.

**Subdivision 1. Applicability.** The terms defined in this section apply to this chapter and chapters 97B and 97C.

**Subd. 2. Angling.** "Angling" means taking fish with a hook and line. An "angler" is a person who takes fish by angling.

**Subd. 3. Big game.** "Big game" means deer, moose, elk, bear, antelope, and caribou.

**Subd. 3a. Bonus permit.** "Bonus permit" means a license to take and tag deer by archery or firearms, in addition to deer authorized to be taken under regular firearms or archery licenses, or a license issued under section 97A.441, subdivision 7.

**Subd. 3b. Bow fishing.** "Bow fishing" means taking rough fish by archery where the arrows are tethered or controlled by an attached line.

**Subd. 4. Buy.** "Buy" includes barter, exchange for consideration, offer to buy, or attempt to buy.

**Subd. 5. Camp.** "Camp" means the temporary abode of a person fishing, hunting, trapping, vacationing, or touring, while on a trip or tour including resorts, tourist camps, and other establishments providing temporary lodging.

**Subd. 5a. Certifiable diseases.** "Certifiable diseases" has the meaning given it in section 17.4982.

**Subd. 6. Chub.** "Chub" means shortnose cisco, shortjaw cisco, longjaw cisco, bloater, kiyi, blackfin cisco, and deepwater cisco.

**Subd. 7. Cisco.** "Cisco" means Coregonus artedii and includes lake herring and tullibee.

**Subd. 8. Closed season.** "Closed season" means the period when a specified protected wild animal may not be taken.

**Subd. 9. Commercial fishing.** "Commercial fishing" means taking fish, except minnows, for sale.

**Subd. 10. Commissioner.** "Commissioner" means the commissioner of natural resources.

**Subd. 11. Condemnation.** "Condemnation" means the exercise of the power of eminent domain in the manner provided under chapter 117.

**Subd. 12. Contraband.** "Contraband" means:

(1) a wild animal taken, bought, sold, transported, or possessed in violation of the game and fish laws, and all instrumentalities and devices used in taking wild animals in violation of the game and fish laws that are subject to confiscation; and

(2) wild rice and other aquatic vegetation harvested, bought, sold, transported, or possessed in violation of chapter 84.

**Subd. 13. Conviction.** "Conviction" means: (1) a final conviction after a trial or a plea of guilty; (2) a forfeiture of cash or collateral deposited to guarantee an appearance of a defendant in court, if the forfeiture has not been vacated or the court has not reinstated the trial within 15 days after the forfeiture; or (3) a breach of a condition of release without bail.

**Subd. 14. Dark house.** "Dark house" means a structure set on the ice of state waters that is darkened to view fish in the water beneath the structure.

**Subd. 14a. Deer.** "Deer" means white-tailed or mule deer.

**Subd. 15. Designated trout lake; designated trout stream.** "Designated trout lake" or "designated trout stream" means a lake or stream designated by the commissioner as a trout lake or a trout stream under section 97C.005.

# A01

Subd. 16. **Director.** "Director" means the director of any or all of the Divisions of Enforcement, Fisheries, Wildlife, and Ecological Services unless a specific division is identified.

Subd. 17. **Division.** "Division" means any or all of the Divisions of Enforcement, Fisheries, Wildlife, and Ecological Services unless a specific division is identified.

Subd. 18. **Enforcement officer.** "Enforcement officer" means the commissioner, the director of the Enforcement Division, or a conservation officer.

Subd. 19. **Firearm.** "Firearm" means a gun that discharges shot or a projectile by means of an explosive, a gas, or compressed air.

Subd. 20. **Firearms safety certificate.** "Firearms safety certificate" means the certificate issued under section 97B.015 or an equivalent certificate issued by another state or other evidence that meets with the requirements of section 97B.020.

Subd. 21. **Fish house.** "Fish house" means a structure set on the ice of state waters to provide shelter while taking fish by angling.

Subd. 22. **Fur-bearing animals.** "Fur-bearing animals" means mammals that are protected wild animals, except big game.

Subd. 23. **Game.** "Game" means big game and small game.

Subd. 24. **Game birds.** "Game birds" means migratory waterfowl, ring-necked pheasant, ruffed grouse, sharp-tailed grouse, Canada spruce grouse, prairie chickens, gray partridge, bobwhite quail, wild turkeys, coots, gallinules, sora and Virginia rails, mourning dove, sandhill crane, American woodcock, and common snipe.

Subd. 25. **Game fish.** "Game fish" means walleye, sauger, yellow perch, channel catfish, flathead catfish; members of the pike family, Esocidae, including muskellunge and northern pike; members of the sunfish family, Centrarchidae, including largemouth bass, smallmouth bass, sunfish, rock bass, white crappie, black crappie, members of the temperate bass family, Percichthyidae, including white bass and yellow bass; members of the salmon and trout subfamily, Salmoninae, including Atlantic salmon, chinook salmon, coho salmon, pink salmon, kokanee salmon, lake trout, brook trout, brown trout, rainbow (steelhead) trout, and splake; members of the paddlefish family, Polyodontidae; members of the sturgeon family, Acipenseridae, including lake sturgeon, and shovelnose sturgeon. "Game fish" includes hybrids of game fish.

Subd. 25a. **Guardian.** "Guardian" means a legal guardian of a person under age 16, or a person 18 or older who has been authorized by the parent or legal guardian to supervise the person under age 16.

Subd. 26. **Hunting.** "Hunting" means taking birds or mammals.

Subd. 26a. **In-the-round.** "In-the-round" means fish with heads, tails, fins, skins, and scales intact.

Subd. 26b. [Repealed, 1Sp2011 c 2 art 5 s 70]

Subd. 26c. **Immediately released or immediately returned to the water.** "Immediately released" or "immediately returned to the water" means that a fish must not be retained longer than is needed at the site of capture to unhook, identify, measure, or photograph the fish. Placing a fish on a stringer, in a live well, or in a cooler, bucket, or other container is not "immediately released" or "immediately returned to the water."

Subd. 27. **License.** "License" means a license or stamp issued under the game and fish laws.

Subd. 27a. **License identification number.** "License identification number" means a verification number issued under the authority of the commissioner in conjunction with the electronic purchase of a license or stamp and valid until the license is received by the purchaser.

Subd. 27b. [Repealed, 1Sp2011 c 2 art 5 s 70]

Subd. 27c. [Repealed, 1Sp2011 c 2 art 5 s 70]

Subd. 28. **Migratory waterfowl.** "Migratory waterfowl" means brant, ducks, geese, tundra swans, trumpeter swans, and whooper swans.

Subd. 29. **Minnows.** "Minnows" means: (1) members of the minnow family, Cyprinidae, except carp and goldfish; (2) members of the mudminnow family, Umbridae; (3) members of the sucker family, Catostomidae, not over 12 inches in length; (4) bullheads, ciscoes, lake whitefish, goldeyes, and mooneyes, not over seven inches long; (5) leeches; and (6) tadpole madtoms (willow cats) and stonecats.

Subd. 30. **Minnow dealer.** "Minnow dealer" means a person taking minnows for sale, buying minnows for resale, selling minnows at wholesale, or transporting minnows for sale.

Subd. 31. **Minnow retailer.** "Minnow retailer" means a person selling minnows at retail from an established place of business.

Subd. 32. **Motor vehicle.** "Motor vehicle" means a self-propelled vehicle or a vehicle propelled or drawn by a self-propelled vehicle that is operated on a highway, on a railroad track, on the ground, in the water, or in the air.

Subd. 32a. **Muzzleloader season.** " Muzzleloader season" means the deer season open only for legal muzzle-loading firearms, as prescribed by the commissioner.

Subd. 33. **Nonresident.** "Nonresident" means a person who is not a resident.

Subd. 34. **Open season.** "Open season" means the period when a specified protected wild animal may be taken.

Subd. 35. **Person.** "Person" means an individual only if used in reference to issuing licenses to take wild animals, but otherwise means an individual, firm, partnership, joint stock company, association, or public or private corporation.

Subd. 36. **Possession.** "Possession" means both actual and constructive possession and control of the things referred to.

Subd. 37. **Predator.** "Predator" means a wolf, coyote, fox, lynx, or bobcat.

Subd. 37a. **Processing.** "Processing" means rendering a species of aquatic life for food, bait, or other purposes so that it is no longer alive.

Subd. 38. **Protected birds.** "Protected birds" means all birds except unprotected birds.

Subd. 39. **Protected wild animals.** "Protected wild animals" are the following wild animals: big game, small game, game fish, rough fish, minnows, leeches, alewives, ciscoes, chubs, and lake whitefish, and the subfamily Coregoninae, rainbow smelt, frogs, turtles, clams, mussels, wolf, mourning doves, and wild animals that are protected by a restriction in the time or manner of taking, other than a restriction in the use of artificial lights, poison, or motor vehicles.

Subd. 40. **Public access.** "Public access" means an access that is publicly owned and accessible to the public without charge.

Subd. 41. **Public waters.** "Public waters" means waters defined in section 103G.005, subdivision 15.

Subd. 41a. **Regular firearms season.** "Regular firearms season" means any of the firearms deer seasons prescribed by the commissioner that begin in November, exclusive of the muzzleloader season.

Subd. 42. **Resident.** "Resident" means: (1) an individual who is a citizen of the United States or a resident alien, and has maintained a legal residence in the state at least the immediately preceding 60 days; (2) a nonresident under the age of 21 who is the child of a resident; (3) a domestic corporation; or (4) a foreign corporation authorized to do business in the state that has conducted a licensed business at a location within the state for at least ten years.

Subd. 42a. **Restitution value of the wild animals.** "Restitution value of the wild animals" means the total value of the wild animals taken in a violation based on:

(1) the values established under section 97A.345; or

(2) the values determined by the court under section 97A.341, subdivision 4, if the values are not established under section 97A.345.

Subd. 43. **Rough fish.** "Rough fish" means carp, buffalo, sucker, sheepshead, bowfin, burbot, cisco, gar, goldeye, and bullhead.

Subd. 44. **Sale.** "Sale" means an exchange for consideration, and includes barter, offer to sell, and possession with intent to sell.

Subd. 44a. **Shelter.** "Shelter" means any structure, other than a self-propelled motor vehicle, that is set on the ice of state waters to provide shelter.

Subd. 45. **Small game.** "Small game" means game birds, gray squirrel, fox squirrel, cottontail rabbit, snowshoe hare, jack rabbit, raccoon, lynx, bobcat, wolf, red fox and gray fox, fisher, pine marten, opossum, badger, cougar, wolverine, muskrat, mink, otter, and beaver.

Subd. 46. **Sunfish.** "Sunfish" means bluegill, pumpkinseed, green sunfish, orange spotted sunfish, longear sunfish, and warmouth. "Sunfish" includes hybrids of sunfish.

Subd. 47. **Taking.** "Taking" means pursuing, shooting, killing, capturing, trapping, snaring, angling, spearing, or netting wild animals, or placing, setting, drawing, or using a net, trap, or other device to take wild animals. Taking includes attempting to take wild animals, and assisting another person in taking wild animals.

Subd. 48. **Transport, transportation.** "Transport, transportation" means causing or attempting to cause wild animals to be carried or moved by a device and includes accepting or receiving wild animals for transportation or shipment.

Subd. 49. **Undressed bird.** "Undressed bird" means:

(1) a bird, including ducks, with a fully feathered wing intact; or

(2) a pheasant, Hungarian partridge, or wild turkey with one leg and foot intact.

Subd. 50. **Undressed fish.** "Undressed fish" means fish with heads, tails, fins and skins intact, whether entrails, gills, or scales are removed or not.

Subd. 51. **Unloaded.** "Unloaded" means, with reference to a firearm, without ammunition in the barrels and magazine, if the magazine is in the firearm. A muzzle-loading firearm with a flintlock ignition is unloaded if it does not have priming powder in a pan. A muzzle-loading firearm with percussion ignition is unloaded if it does not have a percussion cap on a nipple.

Subd. 52. **Unprotected birds.** "Unprotected birds" means English sparrow, blackbird, starling, magpie, cormorant, common pigeon, Eurasian collared dove, chukar partridge, quail other than bobwhite quail, and mute swan.

Subd. 53. **Unprotected wild animals.** "Unprotected wild animals" means wild animals that are not protected wild animals including weasel, coyote, gopher, porcupine, striped skunk, and unprotected birds.

Subd. 54. **Waters of this state; state waters.** "Waters of this state" and "state waters" include all boundary and inland waters.

Subd. 55. **Wild animals.** "Wild animals" means all creatures, whether dead or alive, not human, wild by nature, endowed with sensation and power of voluntary motion, and includes mammals, birds, fish, amphibians, reptiles, crustaceans, and mollusks.

**History:** *1986 c 386 art 1 s 2; 1987 c 149 art 1 s 2-6; 1988 c 588 s 1; 1990 c 391 art 8 s 21; 1991 c 254 art 2 s 25; 1992 c 462 s 4,5; 1993 c 269 s 4,5; 1994 c 623 art 1 s 20,21; 1Sp1995 c 1 s 15-17; 1996 c 410 s 22,23; 1997 c 216 s 77; 1997 c 226 s 12-14; 2000 c 463 s 22; 2002 c 270 s 1; 2002 c 323 s 2,3; 2004 c 215 s 1; 2005 c 104 s 1; 2005 c 146 s 6,7; 2006 c 214 s 20; 2006 c 281 art 1 s 20; art 2 s 10-16; 2007 c 131 art 1 s 19,20; 2008 c 307 s 11; 2008 c 368 art 2 s 8-10; 2009 c 176 art 2 s 10; 1Sp2011 c 2 art 5 s 15-19; 2012 c 277 art 1 s 19,20,90; 1Sp2015 c 4 art 5 s 9*

Copyright © 2015 by the Revisor of Statutes, State of Minnesota. All rights reserved.

**A05**

# 2015 Minnesota Statutes

## 97A.301 GENERAL PENALTY PROVISIONS.

Subdivision 1. **Misdemeanor.** Unless a different penalty is prescribed, a person is guilty of a misdemeanor if that person:

(1) takes, buys, sells, transports or possesses a wild animal in violation of the game and fish laws;

(2) aids or assists in committing the violation;

(3) knowingly shares in the proceeds of the violation;

(4) fails to perform a duty or comply with a requirement of the game and fish laws;

(5) knowingly makes a false statement related to an affidavit regarding a violation of the game and fish laws; or

(6) violates or attempts to violate a rule under the game and fish laws.

Subd. 2. **Gross misdemeanor.** Unless a different penalty is prescribed, a person convicted of violating a provision of the game and fish laws that is defined as a gross misdemeanor is subject to a fine of not less than $100 nor more than $3,000 and imprisonment in the county jail for not less than 90 days or more than one year.

**History:** _1986 c 386 art 1 s 45; 1991 c 259 s 23_

Copyright © 2015 by the Revisor of Statutes, State of Minnesota. All rights reserved.

# 2015 Minnesota Statutes

## 97B.645 WOLVES.

Subdivision 1. **Use of dogs and horses prohibited; use of guard animals.** Except as provided in this subdivision, a person may not use a dog or horse to take a wolf. A person may use a guard animal to harass, repel, or destroy wolves to protect a person's livestock, domestic animals, or pets. A person whose guard animal destroys a wolf under this subdivision must protect all evidence and report the taking to a conservation officer as soon as practicable but no later than 48 hours after the wolf is destroyed.

Subd. 2. [Repealed, 2012 c 277 art 1 s 91]

Subd. 3. **Destroying wolves in defense of human life.** A person may, at any time and without a permit, take a wolf in defense of the person's own life or the life of another. A person who destroys a wolf under this subdivision must protect all evidence and report the taking to a conservation officer as soon as practicable but no later than 48 hours after the wolf is destroyed.

Subd. 4. **Harassment of wolves.** To discourage wolves from contact or association with people and domestic animals, a person may, at any time and without a permit, harass a wolf that is within 500 yards of people, buildings, dogs, livestock, or other domestic pets and animals. A wolf may not be purposely attracted, tracked, or searched out for the purpose of harassment. Harassment that results in physical injury to a wolf is prohibited.

Subd. 5. **Destroying wolves threatening livestock, guard animals, or domestic animals.** An owner of livestock, guard animals, or domestic animals, and the owner's agents may, at any time and without a permit, shoot or destroy a wolf when the wolf is posing an immediate threat to livestock, a guard animal, or a domestic animal located on property owned, leased, or occupied by the owner of the livestock, guard animal, or domestic animal. A person who destroys a wolf under this subdivision must protect all evidence and report the taking to a conservation officer as soon as practicable but no later than 48 hours after the wolf is destroyed.

Subd. 6. **Destroying wolves threatening domestic pets.** An owner of a domestic pet may, at any time and without a permit, shoot or destroy a wolf when the wolf is posing an immediate threat to a domestic pet under the supervision of the owner. A person who destroys a wolf under this subdivision must protect all evidence and report the taking to a conservation officer as soon as practicable but no later than 48 hours after the wolf is destroyed.

Subd. 7. **Investigation of reported wolf takings.** (a) In response to a reported wolf taking under subdivision 3, 5, or 6, the commissioner shall:

(1) investigate the reported taking;

(2) collect appropriate written and photographic documentation of the circumstances and site of the taking, including, but not limited to, documentation of animal husbandry practices;

(3) confiscate salvageable remains of the wolf killed; and

(4) dispose of any salvageable wolf remains confiscated under this subdivision by sale or donation for educational purposes.

(b) The commissioner shall produce monthly reports of activities under this subdivision.

(c) In response to a reported wolf taking under subdivision 5, the commissioner must notify the county extension agent. The county extension agent must recommend what, if any, cost-conscious livestock best management practices and nonlethal wolf depredation controls are needed to prevent future wolf depredation. Any best management practices recommended by the county extension agent must be consistent with the best management

practices developed by the commissioner of agriculture under section 3.737, subdivision 5.

Subd. 8. **Shooting or trapping wolves to protect livestock, domestic animals, or pets in zone B.** (a) Notwithstanding the provisions of subdivisions 1 and 4 to 7, and season and time of day restrictions in the game and fish laws, but subject to the remaining provisions of the game and fish laws, in zone B, a person may:

(1) shoot a wolf on land owned, leased, or managed by the person at any time to protect the person's livestock, domestic animals, or pets; or

(2) employ a predator controller certified under section 97B.671 to trap a wolf on land owned, leased, or managed by the person or on land within one mile of the land owned, leased, or managed by the person to protect the person's livestock, domestic animals, or pets.

(b) The person must report the wolf shot or trapped under this subdivision to a conservation officer as soon as practicable but no later than 48 hours after the wolf was shot or trapped. The wolf must be disposed of as prescribed by the commissioner.

Subd. 9. **Open season.** There shall be no open season for wolves until after the wolf is delisted under the federal Endangered Species Act of 1973. After that time, the commissioner may prescribe open seasons and restrictions for taking wolves but must provide opportunity for public comment.

Subd. 10. **Release of wolf-dog hybrids and captive wolves.** A person may not release a wolf-dog hybrid. A person may not release a captive wolf without a permit from the commissioner.

Subd. 11. **Federal law.** Notwithstanding the provisions of this section, a person may not take, harass, buy, sell, possess, transport, or ship wolves in violation of federal law.

Subd. 12. **Definitions.** (a) For purposes of this section, the terms used have the meanings given.

(b) "Guard animal" means a donkey, llama, dog, or other domestic animal specifically bred, trained, and used to protect livestock, domestic animals, or pets from wolf depredation.

(c) "Immediate threat" means the observed behavior of a wolf in the act of stalking, attacking, or killing livestock, a guard animal, or a domestic pet under the supervision of the owner. If a wolf is not observed stalking or attacking, the presence of a wolf feeding on an already dead animal whose death was not caused by wolves is not an immediate threat.

(d) "Zone B" means all that part of Minnesota south and west of a line beginning on state Trunk Highway No. 48 at the eastern boundary of the state; thence westerly along state Trunk Highway No. 48 to Interstate Highway No. 35; thence northerly on Interstate Highway No. 35 to state Highway No. 23; thence west one-half mile on state Highway No. 23 to state Trunk Highway No. 18; thence westerly along state Trunk Highway No. 18 to state Trunk Highway No. 65; thence northerly on state Trunk Highway No. 65 to state Trunk Highway No. 210; thence westerly along state Trunk Highway No. 210 to state Trunk Highway No. 6; thence northerly on state Trunk Highway No. 6 to Emily; thence westerly along County State-Aid Highway No. 1, Crow Wing County, to County State-Aid Highway No. 2, Cass County; thence westerly along County State-Aid Highway No. 2 to Pine River; thence northwesterly along state Trunk Highway No. 371 to Backus; thence westerly along state Trunk Highway No. 87 to U.S. Highway No. 71; thence northerly along U.S. Highway No. 71 to state Trunk Highway No. 200; thence northwesterly along state Trunk Highway No. 200 to County State-Aid Highway No. 2, Clearwater County; thence northerly along County State-Aid Highway No. 2 to Shevlin; thence along U.S. Highway No. 2 to Bagley; thence northerly along state Trunk Highway No. 92 to Gully; thence northerly along County State-Aid Highway No. 2, Polk County, to County State-Aid Highway No. 27, Pennington County; thence along County State-Aid Highway No. 27 to state Trunk Highway No. 1; thence easterly along state Trunk Highway No. 1 to County

State-Aid Highway No. 28, Pennington County; thence northerly along County State-Aid Highway No. 28 to County State-Aid Highway No. 54, Marshall County; thence northerly along County State-Aid Highway No. 54 to Grygla; thence west and northerly along state Highway No. 89 to Roseau; thence northerly along state Trunk Highway No. 310 to the Canadian border.

**History:** *1986 c 386 art 2 s 51; 2000 c 463 s 15; 1Sp2011 c 2 art 5 s 51; 2012 c 277 art 1 s 64,90*

Copyright © 2015 by the Revisor of Statutes, State of Minnesota. All rights reserved.

# 2015 Minnesota Statutes

### 97B.646 WOLF MANAGEMENT.

(a) The commissioner, in consultation with the commissioner of agriculture, shall adopt a wolf management plan that includes goals to ensure the long-term survival of the wolf in Minnesota, to reduce conflicts between wolves and humans, to minimize depredation of livestock and domestic pets, and to manage the ecological impact of wolves on prey species and other predators.

(b) The commissioner shall compile a list that is updated quarterly on known wolf deaths, based on reporting by conservation officers. The list must specify the date and location of each wolf death and must be available on the department Web site.

**History:** _2000 c 463 s 16; 2012 c 277 art 1 s 90; 2014 c 290 s 48_

Copyright © 2015 by the Revisor of Statutes, State of Minnesota. All rights reserved.

# 2015 Minnesota Statutes

### 97B.647 TAKING WOLVES.

Subdivision 1. **License required.** Except as provided under section 97B.645 or 97B.671, a person may not take a wolf without a wolf hunting or wolf trapping license.

Subd. 2. **Open seasons.** Wolves may be taken with legal firearms, with bow and arrow, and by trapping. The open season to take wolves with firearms begins each year on the same day as the opening of the firearms deer hunting season. The commissioner may by rule prescribe the open seasons for wolves according to this subdivision.

Subd. 3. **Open areas.** The commissioner may by rule designate areas where wolves may be taken.

Subd. 4. **Daily and possession limits.** The commissioner may establish by rule the daily and possession limits for wolves.

Subd. 5. **Limit on number of hunters and trappers.** The commissioner may by rule limit the number of persons that may hunt or trap wolves in an area, if it is necessary to prevent an overharvest or improve the distribution of hunters and trappers. The commissioner shall establish a method, including a drawing, to impartially select the hunters and trappers for an area.

Subd. 6. **Application for license.** An application for a wolf hunting or wolf trapping license must be made in a manner provided by the commissioner and accompanied by a $4 application fee and proof that the applicant holds a current or previous year hunting license. The $4 application fee shall be credited to the wolf management and monitoring account and appropriated to the commissioner to pay for costs associated with conducting the wolf license drawing and wolf management. A person may not make more than one application for each season as prescribed by the commissioner. If a person makes more than one application, the person is ineligible for a license for that season after determination by the commissioner, without a hearing.

Subd. 7. **Quotas.** The commissioner may by rule set an annual quota for the number of wolves that can be taken by hunting and trapping. The commissioner may establish a method to monitor harvest and close the season when the quota is reached. The commissioner shall reserve a portion of the annual quota for the trapping season.

**History:** _2012 c 277 art 1 s 65_

Copyright © 2015 by the Revisor of Statutes, State of Minnesota. All rights reserved.

# 2015 Minnesota Statutes

**97B.648 WOLVES; UNLAWFUL TAKING; PENALTY.**

A person who unlawfully takes, transports, or possesses a wolf in violation of the game and fish laws, and has one or more prior convictions involving the taking of wolves, is liable for a civil penalty equal to the restitution value for the wolf.

**History:** *2014 c 290 s 45*

Copyright © 2015 by the Revisor of Statutes, State of Minnesota. All rights reserved.

**A12**

# 2015 Minnesota Statutes

## 97B.671 PREDATOR CONTROL PROGRAM.

Subdivision 1. **Authorization to take predators.** If the commissioner determines that predators are damaging domestic or wild animals and further damage can be prevented, the commissioner shall authorize the taking of the predators by predator controllers. The commissioner shall define the area where the predators may be taken, the objectives to be achieved, procedures for notifying predator controllers, payments to be made, the methods to be used, and when the predator control shall cease.

Subd. 2. **Certification of predator controllers.** (a) The commissioner shall certify a person as a predator controller if the person has not violated a provision of this section and meets qualifications of experience, ability, and reliability. The commissioner shall establish application procedures, prescribe forms, and maintain a list of predator controllers. The application procedures must include reports from conservation officers and other department field personnel as to the ability and reliability of the applicants.

(b) The commissioner may revoke a certification if the predator controller violates a provision of sections 97B.601 to 97B.671 or 97B.901 to 97B.945 or a rule of the commissioner relating to fur-bearing animals.

Subd. 3. **Predator control payments.** The commissioner shall pay a predator controller the amount the commissioner determines by written order published in the State Register for each coyote and fox taken. The commissioner may require the predator controller to submit proof of the taking and a signed statement concerning the predators taken. The fees are not subject to the rulemaking provisions of chapter 14, and section 14.386 does not apply.

Subd. 4. **Wolf control.** (a) The commissioner shall provide a wolf control training program for certified predator controllers participating in wolf control.

(b) After the wolf is delisted under the federal Endangered Species Act of 1973, in zone B, as defined under section 97B.645, subdivision 12, if the commissioner, after considering recommendations from an extension agent or conservation officer, has verified that livestock, domestic animals, or pets were destroyed by a wolf within the previous five years, and if the livestock, domestic animal, or pet owner requests wolf control, the commissioner shall open a predator control area for wolves.

(c) After the wolf is delisted under the federal Endangered Species Act of 1973, in zone A, as defined under paragraph (g), if the commissioner, after considering recommendations from an extension agent or conservation officer, verifies that livestock, domestic animals, or pets were destroyed by a wolf, and if the livestock, domestic animal, or pet owner requests wolf control, the commissioner shall open a predator control area for wolves for up to 60 days.

(d) A predator control area opened for wolves may not exceed a one-mile radius surrounding the damage site.

(e) The commissioner shall pay a certified wolf predator controller the amount the commissioner determines by written order published in the State Register for each wolf taken. The certified wolf predator controller must dispose of unsalvageable remains as directed by the commissioner. All salvageable wolf remains must be surrendered to the commissioner. The fees are not subject to the rulemaking provisions of chapter 14, and section 14.386 does not apply.

(f) The commissioner may, in consultation with the commissioner of agriculture, develop a cooperative agreement for wolf control activities with the United States Department of Agriculture. The cooperative agreement activities may include, but not be limited to, wolf control, training for state predator controllers, and control monitoring and

**A13**

record keeping.

(g) For the purposes of this subdivision, "zone A" means that portion of the state lying outside of zone B, as defined under section 97B.645, subdivision 12.

**History:** *1986 c 386 art 2 s 56; 1993 c 231 s 39,40; 2000 c 463 s 17,18; 2012 c 277 art 1 s 67,68*

Copyright © 2015 by the Revisor of Statutes, State of Minnesota. All rights reserved.

**A14**