IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

HUMANE SOCIETY OF THE UNITED STATES, *et al.,*
Plaintiffs-Appellees,

v.

S.M.R. JEWELL, *et al.,*
STATE OF WISCONSIN, *et al.,* and
U.S. SPORTSMEN'S ALLIANCE FOUNDATION, et al.,
Defendants-Appellants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

OPENING BRIEF FOR THE FEDERAL APPELLANTS

———————————

JOHN C. CRUDEN
   *Assistant Attorney General*

*Of Counsel:*
BENJAMIN C. JESUP
SHARON PUDWILL
   *Office of the Solicitor*
   *U.S. Department of the Interior*
   *Washington, DC 20240*

DAVID C. SHILTON
ANDREA GELATT
MICHAEL R. EITEL
JOAN M. PEPIN
   *Environment and Natural*
   *Resources Div.*
   *U.S. Department of Justice*
   *P.O. Box 7415*
   *Washington, D.C. 20044*
   *(202) 305-4626*
   *joan.pepin@usdoj.gov*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

A.  <u>Parties and Amici</u>.  The plaintiffs-appellees are the Humane Society of the United States, Born Free, Help our Wolves Live, and Friends of Animals and Their Environment.  The defendants are Sally Jewell, Secretary of the U.S. Department of the Interior; the U.S. Department of the Interior; and the United States Fish and Wildlife Service.  The federal defendants, though styled appellees in the caption of appeal No. 15-5041, have also appealed from the adverse judgment of the District Court in consolidated appeal No. 15-5043. The State of Wisconsin and the Wisconsin Department of Natural Resources are intervenor-defendants and are appellants in consolidated appeal No. 15-5060.  The State of Michigan and the Michigan Department of Natural Resources are intervenor-defendants and are appellants in consolidated appeal No. 15-5061. The U.S. Sportmen's Alliance Foundation, National Rifle Association, Wisconsin Bear Hunters Association, Michigan United Conservation Clubs, Wisconsin Bowhunters Association, Upper Peninsula Bear Houndsmen Association, Michigan Hunting Dog

Federation, Rocky Mountain Elk Foundation, and the Safari Club International are intervenor-defendants and are the appellants in the lead appeal, No. 15-5041. The State of Minnesota is participating as amicus curiae in support of the defendants.

B. <u>Rulings under Review</u>. The decisions under review were issued by the United States District Court for the District of Columbia (Hon. Beryl A. Howell) in *Humane Society of the United States v. Jewell*, No. 13-186. They are Docket Nos. 52 and 53, the Memorandum Opinion and Order issued on December 19, 2014, granting the plaintiffs' motion for summary judgment, setting aside the final rule under review, and reinstating the prior rule.

C. <u>Related Cases</u>. This case has not been before this or any other court as defined by D.C. Circuit Local Rule 28(a)(1)(C). The pending case of *Defenders of Wildlife v. Jewell*, D.C. Cir. No. 5300, D.D.C. No. 12-1833 (Hon. Amy Berman Jackson) involves some of the same parties and some of the same issues.

s/ Joan M. Pepin

_____
JOAN M. PEPIN

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ..............................i

Table of Contents..................................................................... iii

Table of Authorities ...............................................................vii

Glossary ............................................................................... xi

Introduction ........................................................................... 1

Statement of Jurisdiction.............................................................3

Statement of the Issues.............................................................4

Pertinent Statutes and Regulations ...........................................4

Statement of the Case .............................................................5

    A.    Statutory Background: The Endangered Species
        Act....................................................................5

        1.    The definition of "species" and distinct
                population segments..............................................6

        2.    The definitions of "endangered species" and
                "threatened species" and the meaning of
                "significant portion of its range" ..........................8

        3.    The five factors for determining a species'
                status................................................................9

    II.    The Recovery and Delisting of the Western Great
        Lakes Gray Wolf Population................................................10

        A.    Gray wolf biology .........................................................10

        B.    The listing, recovery, and expansion of the
            Western Great Lakes wolves.......................................11

C.    FWS's efforts to delist the recovered wolf population and ensuing litigation ................................ 16

D.    FWS's 2011 Western Great Lakes rule ........................ 24

E.    Legal challenge in the district court ............................ 28

Summary of Argument ........................................................................ 32

Standard of Review ............................................................................. 34

Argument ............................................................................................. 36

I.    The District Court Erred in Holding that the ESA's Definition of "Species" Operates as a "One-Way Ratchet" Allowing FWS to List, but not Delist, a DPS ........ 36

A.    The ESA unambiguously authorizes FWS to determine whether any species, including a DPS, is endangered or threatened, and to list, delist, or reclassify it accordingly ................................................ 39

B.    In the alternative, Interior's reasonable interpretation is entitled to deference under *Chevron* step two ........................................................ 42

1.    When a species is listed, that listing includes all subspecies and distinct population segments of the listed species ........... 42

2.    The legislative history of the ESA supports FWS's interpretation ......................................... 44

a.    The 1973 legislative history of the substantially similar language in the original ESA strongly supports FWS's interpretation ............................................ 44

        b.    The legislative history of the 1978 amendments is sparse and inconclusive ................................................ 47

        3.    FWS's interpretation is consistent with the ESA's policy objectives ......................................... 49

   C.   The district court erred in holding that FWS cannot recognize a DPS unless it finds that the DPS is endangered or threatened ............................... 51

   D.   The district court erred in holding that FWS cannot designate a DPS if the species at issue is already listed at a broader level .................................. 55

II.   The Rule Did Not Designate a New Species; It Revised the 1978 Listing of Minnesota Wolves ................................. 59

III.   The Record Supports FWS's Finding that the Western Great Lakes DPS Is Neither Endangered Nor Threatened ........................................................................... 65

   A.   The district court erred in rejecting FWS's conclusion that the Western Great Lakes DPS is not "in danger of extinction throughout all or a significant portion of its range" ................................... 67

        1.    FWS reasonably interprets "significant portion of its range" to refer to current range, and that interpretation is entitled to *Chevron* deference ............................................... 68

        2.    FWS reasonably found that the Western Great Lakes DPS is not endangered or threatened in all or a significant portion of its range ............................................................. 73

   B.   FWS's finding that the wolf is not endangered by disease or human-caused mortality is supported by the record ................................................................... 74

C. FWS correctly determined that the Western
Great Lakes DPS is not endangered or
threatened due to inadequate regulatory
mechanisms in any of the states within its
boundaries .................................................................... 78

Conclusion ................................................................................ 84

Certificate of Compliance with Federal Rule of Appellate
Procedure 32(a) .................................................................. 85

# TABLE OF AUTHORITIES

**CASES:**

*American Wildlands v. Kempthorne,*
530 F.3d 991 (D.C. Cir. 2008)..............................35, 36, 40, 52

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,*
462 U.S. 87 (1983) ..................................................................36

*Carr v. United States,*
560 U.S. 438 (2010) ..............................................................71

*Chevron U.S.A. v. Natural Res. Defense Council,*
467 U.S. 837 (1984) ..................20, 28, 33, 36, 38, 39, 42, 68, 70, 71, 72

*Cobell v. Norton,*
428 F.3d 1070 (D.C. Cir. 2005) ...........................................48

*Defenders of Wildlife v. Norton,*
258 F.3d 1136 (9th Cir. 2001) .......................................71, 72

*Defenders of Wildlife v. U.S. Dep't of the Interior,*
354 F. Supp. 2d 1156 (D. Or. 2005) .....................................17

*Envt'l Def. Fund v. Costle,*
657 F.2d 275 (D.C. Cir. 1981)...............................................35

*Friends of Blackwater v. Salazar,*
691 F.3d 428 (D.C. Cir. 2012)............................35, 37, 70, 82

*Humane Soc'y v. Kempthorne,*
579 F. Supp. 2d 7 (D.D.C. 2008) ..... 19, 20, 21, 23, 28, 37, 40, 41, 42, 43

*In re Polar Bear Endangered Species Act Listing,*
709 F.3d 1 (D.C. Cir. 2013) ......................................35, 53, 78

*In re Polar Bear Endangered Species Act Listing,*
794 F. Supp. 2d 65 (D.D.C. 2011) .......................................38

*\* Authorities chiefly relied upon*

*Int'l Fabricare Inst. v. EPA,*
972 F.2d 384 (D.C.Cir.1992) ............................................................... 36

*Marsh v. Oregon Natural Res. Council,*
490 U.S. 360 (1989) ............................................................................. 36

*McCreary v. Offner,*
172 F.3d 76 (D.C. Cir. 1999) ............................................................... 41

*\*Menkes v. U.S. Dep't of Homeland Sec.,*
637 F.3d 319 (D.C. Cir. 2011)............................................................. 38

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................................... 35

*\*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005) ............................................................................. 72

*Nat'l Wildlife Fed'n v. Norton,*
386 F. Supp. 2d 553 (D. Vt. 2005)................................................... 17, 18

*\*Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.,*
475 F.3d 1136 (9th Cir. 2007) ......................................................... 7, 52

*Sherley v. Sebelius,*
644 F.3d 388 (D.C. Cir. 2011).............................................................. 71

*Trout Unlimited v. Lohn,*
559 F.3d 946 (9th Cir. 2009) ............................................................... 52

**STATUTES:**

*\*Pub. L. 93-205, 87 Stat. 884 (1973)........................................6, 13, 44, 60

Dictionary Act,
1 U.S.C. § 1 ......................................................................................... 71

Administrative Procedure Act ("APA")
5 U.S.C. § 551 ....................................................................................... 3
5 U.S.C. § 706(2) ................................................................................. 35

*\* Authorities chiefly relied upon*

Endangered Species Act ("ESA")

    16 U.S.C. § 1531(b) ................................................................... 5, 67

    16 U.S.C. § 1532(3) ........................................................................ 5

    16 U.S.C. § 1532(6) ........................................................................ 8

    16 U.S.C. § 1532(15) ...................................................................... 5

    *16 U.S.C. § 1532(16) ................................................ 7, 40, 60, 66, 70

    16 U.S.C. § 1532(20) ................................................................ 8, 66

    *16 U.S.C. § 1533(a)(1) .. 6, 9, 10, 19, 20, 27, 39, 40, 41, 43, 53, 57, 65, 70

    16 U.S.C. § 1533(a)(2) .................................................................... 5

    16 U.S.C. § 1533(b)(3) ........................................................ 6, 39, 40

    *16 U.S.C. § 1533(c) ....................................................... 6, 51, 55, 57

    *16 U.S.C. § 1533(c)(1) ............................................... 40, 41, 43, 44

    *16 U.S.C. § 1533(c)(2) ................................................................ 44

    16 U.S.C. § 1533(c)(2)(B) ............................................................. 42

    16 U.S.C. § 1533(f) ........................................................................ 5

    16 U.S.C. § 1533(g) ....................................................................... 6

    16 U.S.C. § 1540(g) ....................................................................... 3


28 U.S.C. § 1291 ................................................................................ 3

28 U.S.C. § 1331 ................................................................................ 3


**RULES:**

    Fed. R. App. P. 4(a)(1)(B) ................................................................ 3

    Fed. R. App. P. 4(a)(3) .................................................................... 3


**REGULATIONS:**

    50 C.F.R. § 17.11(g) ................................................................. 44, 56

    50 C.F.R. § 402.01(b) ..................................................................... 5

    50 C.F.R. § 402.02 ......................................................................... 6


32 Fed. Reg. 4,001 (Mar. 11, 1967) .................................................... 12

39 Fed. Reg. 1,171 (Jan. 4, 1974) ...................................................... 12

40 Fed. Reg. 44,415 (Sept. 26, 1975) .................................................. 43

*43 Fed. Reg. 9,607 (Mar. 9, 1978) ....................................... 13, 17, 60, 62

59 Fed. Reg. 34,270 (Jul. 1, 1994) ..................................................... 23

*61 Fed. Reg. 4,722 (Feb. 7, 1996) ........................................... 7, 26, 53

68 Fed. Reg. 15,803 (April 1, 2003) .................................................... 55

*Authorities chiefly relied upon*

72 Fed. Reg. 6,052 (Feb. 8, 2007) ............................................. 18

74 Fed. Reg. 15,070 (Apr. 2, 2009) ........................................... 22

75 Fed. Reg. 55,730 (Sept. 14, 2010) ....................................... 22

76 Fed. Reg. 26,095 (May 5, 2011) .......................................... 11

76 Fed. Reg. 81,666 (Dec. 28, 2011) ....................................... 25

*79 Fed. Reg. 37,578 (July 1, 2014) ............................... 8, 69, 70

## LEGISLATIVE HISTORY:

*Endangered Species: Hearings on H.R. 37 Before the Subcomm. on Fisheries and Wildlife Conservation,* 93rd Cong. 327 (1973) ........ 45, 50

119 Cong. Rec. 25,669 (July 24, 1973) ..................................... 46

S. Rep. No. 96-151 (May 15, 1979) ..................................... 47, 48

*\* Authorities chiefly relied upon*

# GLOSSARY

Add. .........................................U.S. Statutory and Regulatory Addendum

APA ...........................................................Administrative Procedure Act

DPS...............................................................Distinct Population Segment

ESA....................................................................Endangered Species Act

FWS...........................................................U.S. Fish and Wildlife Service

JA .....................................................................................Joint Appendix

NMFS...................................................National Marine Fisheries Service

## INTRODUCTION

The Western Great Lakes region of the United States is the only place in the lower 48 states where wolves were never fully extirpated. Even when wolf populations were at their lowest nationwide, a tenacious population, estimated at between 500 and 1000 wolves, held on in northern Minnesota. That population was listed as threatened under the Endangered Species Act (ESA) in 1978. Over the ensuing years, thanks to the conservation efforts of the U.S. Fish and Wildlife Service (FWS) and the cooperation of the states of Minnesota, Wisconsin, and Michigan, and private conservation groups, that wolf population has multiplied, expanded, and recovered.

By 1998, the Minnesota wolves had expanded into Wisconsin and the Upper Peninsula of Michigan, and had fully achieved their recovery goals for five consecutive years. By 2011, the wolf population of the Western Great Lakes states numbered over 4,000, vastly exceeding its recovery goals, and the wolves had spread to occupy virtually all of the suitable habitat in Minnesota, Wisconsin, and the Upper Peninsula of Michigan.

The ESA requires FWS to periodically revise the list of endangered and threatened species ("the List") to reflect changes in species' conservation status. In 2011, after several unsuccessful attempts to carry out that duty, FWS published a final rule revising the 1978 listing of Minnesota wolves by renaming it the Western Great Lakes Distinct Population Segment, expanding its boundaries to reflect the territorial expansion of the wolf population, and finding that this population was no longer threatened under the ESA. FWS experts, peer reviewers, state biologists, and even major environmental groups with a long history of litigating for greater wolf protections supported the rule, agreeing that the Western Great Lakes wolves are fully recovered and that FWS properly removed this population from the list of endangered and threatened species.

This appeal is about the validity of that rule, but at bottom it is about whether the purpose of the ESA is to conserve and recover endangered and threatened species to the point where they are no longer in danger of extinction, or whether it goes beyond that to require that species be restored to their full historical range and population levels. The ESA is clear: its goal is to prevent extinction, not to restore

species to their pre-Columbian numbers and range. Only species that are in danger of extinction, or that are likely to become so endangered, may be listed, and species that have recovered must be removed from the List. Recovered and delisted species may certainly continue to expand in their numbers and range under state management, but FWS is not authorized to retain the extraordinary protections of the ESA for species that are no longer in danger of extinction or likely to become endangered in the foreseeable future.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction, 28 U.S.C. § 1331, over the plaintiffs' suit, which was predicated on the citizen-suit provision of the Endangered Species Act ("Act"), 16 U.S.C. § 1540(g), and the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq.

The district court entered summary judgment for the plaintiffs on December 19, 2014. The federal defendants filed a timely notice of appeal on February 13, 2015. Fed. R. App. P. 4(a)(1)(B). Three other notices of appeal were filed by various intervenor-defendants within the 14-day window allowed by Fed. R. App. P. 4(a)(3). This Court's jurisdiction rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that the ESA does not permit FWS to designate a Distinct Population Segment (DPS) unless it finds that the DPS is endangered or threatened.

2. Whether the district court erred in holding that the ESA does not permit FWS to designate a DPS within a species that is already listed as endangered or threatened at a broader taxonomic level.

3. Whether the district court erred in holding that the Minnesota wolf population, which was listed as a separate species from wolves in other states in 1978, was not a de facto DPS whose borders FWS revised in the final rule.

4. Whether the district court erred in rejecting FWS's interpretation of the ambiguous phrase "significant portion of its range" and FWS's conclusion that the Western Great Lakes DPS is not in danger of extinction throughout all or a significant portion of its range.

5. Whether the district court erred in holding arbitrary and capricious FWS's findings that the Western Great Lakes DPS is not endangered or threatened due to disease, human-caused mortality, or a lack of adequate state regulatory mechanisms.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

# STATEMENT OF THE CASE

## A.     Statutory Background: The Endangered Species Act

Congress enacted the ESA in 1973 to "provide a program for the conservation of . . . endangered species and threatened species" and to conserve "the ecosystems upon which [such species] depend . . . ," 16 U.S.C. § 1531(b), with the goal of "bring[ing] any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary," *id.* § 1532(3).

The ESA directs the Secretary of the U.S. Department of the Interior[1] to maintain a list of threatened and endangered species ("the List").  Once a species is listed as endangered or threatened, Section 4(f) requires FWS to develop and implement a recovery plan for a listed species "unless [it] finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f).  Recovery plans formulate a strategy designed to achieve species "recovery," meaning

---

[1] Responsibility for administering the ESA is divided between the Secretaries of Interior and Commerce.  16 U.S.C. §§ 1532(15), 1533(a)(2).  The Secretaries' responsibilities under the ESA have been delegated to FWS and the National Marine Fisheries Service (NMFS).  *See* 50 C.F.R. § 402.01(b).  FWS has responsibility for wolves.  50 C.F.R. § 402.01(b).

"improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02.

The ESA requires FWS to periodically re-evaluate listed species to see if they should be removed from the List (delisted), reclassified from threatened to endangered (uplisted), or reclassified from endangered to threatened (downlisted). 16 U.S.C. § 1533(c). Interested persons may also petition for the listing, delisting, uplisting, or downlisting of a species. 16 U.S.C. § 1533(b)(3).

If FWS determines that a species is recovered and delists it, FWS must monitor the species for at least five years. 16 U.S.C. § 1533(g). If the monitoring reveals a significant risk to the recovered species, the ESA requires FWS to "make prompt use" of the ESA's emergency procedures to protect the species. *Id.*

### 1. The definition of "species" and distinct population segments

As originally enacted, the ESA defined "species" to include species, subspecies, and "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Pub. L. 93-205, 87 Stat. 884, 886 (1973) (U.S. Statutory and

Regulatory Addendum (Add.) at 12).  That definition was in effect in 1978, when the currently operative rule listing *Canis lupus* was issued.  Later that year, Congress amended the definition of "species," replacing the words "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature" (referred to as the "proto-DPS language") with the words "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature" (the "DPS language").  16 U.S.C. § 1532(16).

The ESA does not define the term "distinct population segment," but, following notice-and-comment procedures, FWS and NMFS jointly adopted a formal policy governing the determination of whether a wildlife population constitutes a DPS.  *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy") (Add.27).  The DPS Policy provides that a population "qualifies as a DPS if it is both discrete and significant.  If a population is deemed to be a DPS, the inquiry then proceeds to whether it is endangered or threatened." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1138 (9th Cir. 2007) (internal citation omitted).

### 2. The definitions of "endangered species" and "threatened species" and the meaning of "significant portion of its range"

The ESA defines an endangered species as one that "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Neither the term "range" nor the phrase "significant portion of its range" is defined by the statute. FWS and NMFS therefore jointly adopted a formal policy interpreting the terms "range" and "significant portion of its range." *Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species,"* 79 Fed. Reg. 37,578, 37,583 (July 1, 2014) (Add.31, 37).[2]

The policy explains that "range" refers to a species' current range, rather than its range at some point in history, because it would be "inconsistent with common usage" to say a species "is in danger" in an

_____

[2] The publication of the policy postdates the publication of the rule under review, although it predates the district court's decision. FWS's interpretation of "range" in the final rule is consistent with the policy.

area where it no longer exists. Add.37. The policy further states that a portion of the range is "significant" if "the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." Add.34.

### 3. The five factors for determining a species' status

Section 4(a)(1) charges FWS with determining whether any species (including a subspecies or DPS) is endangered or threatened because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). Those five factors govern all determinations of a species' conservation status, regardless of whether or how the species is

already listed, and regardless of whether the resulting determination leads to listing, delisting, uplisting, or downlisting the species.

## II. THE RECOVERY AND DELISTING OF THE WESTERN GREAT LAKES GRAY WOLF POPULATION

### A. Gray wolf biology

The gray wolf (*Canis lupus*), the largest wild member of the dog family, is so resilient and adaptable that it is "equally at home in the deserts of Israel, the deciduous forests of Wisconsin, and the frozen arctic of Siberia." JA873. Gray wolves have a circumpolar range including North America, Europe, and Asia and are recognized globally as a species of "least concern."[3] They can live "almost anywhere if they have abundant wild prey and excessive numbers are not taken by humans." JA873. In the Midwest, the wolf's prey consists primarily of deer, moose, beaver, and snowshoe hare. JA874. When living in proximity to humans and agricultural uses, however, wolves also prey on domestic animals such as cattle, horses, and dogs. JA822.

As highly territorial, social animals and group hunters, wolves normally live in packs of 2 to 12 wolves. *Id.* Packs are family groups

---

[3] http://www.iucnredlist.org/details/3746/0

consisting of a breeding pair, their pups from the current year, offspring from the previous one or two years, and occasionally an unrelated wolf. *Id.* Litters, which are typically born every April or May, generally produce 4 to 6 pups. *Id.*

Most wolves, male and female, disperse from the pack they were born into by age three, often as yearlings, to search for a mate and unoccupied habitat in which to begin a new pack. *Id.*; JA874. Dispersing wolves have traveled as far as 600 miles. JA874. These dispersals allow a wolf population to quickly expand and colonize areas of suitable habitat, even if those areas are separated by broad stretches of unsuitable habitat. JA822.

Because of their high reproductive potential, wolf populations can withstand a high rate of mortality without experiencing population declines. JA1154. From 1999 to 2005, for example, the wolf population in the Upper Peninsula of Michigan rose from 174 to 405, despite annual mortality rates of 15 to 46%. JA684, 688.

## B. The listing, recovery, and expansion of the Western Great Lakes wolves

Gray wolves once ranged throughout most of North America, except for arid deserts and the southeast, but by the mid-20th century

they had become extirpated from most of their historical range south of the Canadian border. Wolf populations in Canada and Alaska remained sizeable and healthy, but south of Canada, only one substantial population of wolves remained, in the wooded wilderness of northeastern Minnesota and nearby Isle Royale, Michigan. Population estimates varied widely, but all were under 1,000. JA1129.

In 1967, the Eastern Timber Wolf, *Canis lupus lycaon*, was listed as an endangered species under a predecessor statute to the ESA. 32 Fed. Reg. 4001 (Mar. 11, 1967). After the ESA became law in 1973, the Eastern Timber Wolf was relisted under that statute, along with the Northern Rocky Mountain wolf, *Canis lupus irremotus*. 39 Fed. Reg. 1171, 1175 (Jan. 4, 1974). Two other subspecies of *Canis lupus* were also listed.

In 1978, FWS issued a new rule superseding the previous wolf listings. The 1978 rule explained that the previous subspecies-based listings were based on out-of-date taxonomic information and may have left some wolves unprotected. Since FWS considered all subspecies and populations of *Canis lupus* south of Canada to be endangered or threatened, it explained that "this matter can be handled most

conveniently by listing only the species name." *Reclassification of the Gray Wolf,* 43 Fed. Reg. 9607 (Mar. 9, 1978) (Add.18).

Although the 1978 rule protected all members of *Canis lupus* in the lower 48 states, the rule explained that "the gray wolf (*Canis lupus*) group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one 'species', and the gray wolf group in Minnesota is being considered as another 'species'." Add.21. The DPS language was not added to the ESA's definition of "species" until later that year, but the original definition contained similar language that authorized FWS to treat as a species "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Add.12, 21. It was under that definition that FWS listed the Minnesota population as a separate species from the few remaining wolves in the other lower 47 states and Mexico. *Id.*

Although the 1978 rule superseded the separate listings for the various subspecies of *Canis lupus*, FWS committed to continuing to manage and recover biological subspecies separately. Add.20. Accordingly, FWS developed and implemented regional recovery plans

appropriate to the subspecies and distinct local circumstances found in the Western Great Lakes, the Northern Rocky Mountains, and the Southwest.

FWS prepared the first recovery plan for the Eastern Timber Wolf in 1978, and a revised plan was adopted in 1992. The recovery plan set forth two basic criteria for finding the Eastern Timber Wolf recovered: that the Minnesota population be stable or growing, and its survival assured; and that a second viable wolf population be established, outside of Minnesota and Isle Royale.

The recovery plan identified a numeric management goal of 1251-1400 animals for the Minnesota wolves, finding that such a population would be large enough to maintain long-term genetic diversity and to provide resiliency against unpredictable events. For the second wolf population, the recovery plan set a goal of at least 100 wolves in late winter if located within 100 miles of the Minnesota wolf population, or at least 200 wolves if located farther away. JA1129. A more distant population would be less likely to exchange wolves with the Minnesota population, and therefore a larger population was considered necessary to ensure its viability. *Id.*

The recovery goals have long since been achieved and surpassed. At the time of the 2011 rule, Minnesota's wolf population was estimated at 2,900 wolves – roughly double the management goal for Minnesota contained in the recovery plan. JA1130. Minnesota wolves had also dramatically expanded their geographical distribution, from under 15,000 square miles to approximately 34,000 square miles, which is about 40% of Minnesota. JA1130-31. With most of the suitable habitat in Minnesota occupied by wolves, both population numbers and geographic distribution had remained stable at those levels for over a decade, and FWS considered the wolf's survival to be assured. JA1131.

In Wisconsin and Michigan (excluding Isle Royale),[4] wolves had been completely extirpated at the time of listing; neither state had any resident breeding population, and only a few dispersing Minnesota wolves were occasionally found in either state. JA1131-32. As the

_____

[4] Isle Royale National Park, Michigan, is located off the coast of Ontario, to the east of Minnesota's northeastern corner. A small population of wolves inhabits the island, but it is completely cut off from the remainder of Michigan's wolf population, and it is therefore generally not counted as part of that population. References in this brief to Michigan wolves exclude Isle Royale unless otherwise specified.

Minnesota wolf population grew and expanded, dispersing wolves colonized and established packs in Wisconsin and Michigan, and those populations multiplied and thrived. At the time of the 2011 rule, there were 782 resident wolves in Wisconsin, and 687 in the Upper Peninsula of Michigan. *Id.* It is beyond dispute that the wolves of the Western Great Lakes area have greatly exceeded the goals set forth in FWS's recovery plan.

## C. FWS's efforts to delist the recovered wolf population and ensuing litigation

Before the 1978 *Canis lupus* listing, Minnesota contained the only significant wolf population in the lower 48 states. The remaining 47 states and Mexico were lumped together because they contained hardly any wolves, and a blanket listing was a way to "conveniently" extend the ESA's protection to all of them. Add.18. Thanks to reintroduction and recovery efforts under the ESA, however, there are now three distinct, established wolf populations in the United States: recovered and thriving populations in the Western Great Lakes and the Northern Rocky Mountains, and a much smaller population in the Southwest.

In 2003, FWS attempted to update the 1978 listing to reflect the new reality. The 2003 rule divided the lower 48 states into three large

DPSs: Eastern, Western, and Southwestern. The Southwestern DPS was classified as endangered, and the Eastern and Western DPSs were classified as threatened. The 2003 rule was challenged and vacated by two district courts. *Defenders of Wildlife v. U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005). One of the problems identified was that the DPSs extended far beyond the areas in which wolves had become reestablished, encompassing vast areas, such as the northeastern United States, in which wolves did not occur. The Oregon district court explained that the purpose of the DPS Policy was to "draw a line around a population whose conservation status differs from other populations within that species." FWS erred, that court held, because "[i]nstead of drawing a line around the distinct populations in the Western Great Lakes and the Northern Rockies, FWS extended the boundaries from these core areas to encompass the wolf's entire historical range." *Defenders*, 354 F. Supp. 2d at 1170-71.

In the Vermont case, the arguments centered on whether FWS had to include all of the areas in which the wolf was listed in one of the DPSs because, as FWS argued, it lacked authority to leave a "non-DPS

remnant" on the List. The plaintiff environmental groups disagreed, arguing that "the ESA and DPS policy do not force a choice, so defendants are not prevented from maintaining its nationwide species listing and establishing DPSs in areas where FWS needs the kind of flexibility the DPS designation provides." *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 564. The Vermont district court agreed with the plaintiffs, holding that "[n]owhere in the ESA is the Secretary prevented from creating a 'non-DPS remnant' designation, especially when the remnant area was already listed as endangered." *Id.* at 565.

FWS accordingly developed a new rule, published in 2007, recognizing a much smaller Western Great Lakes DPS centered on the recovered population in Minnesota, Wisconsin, and Michigan. Because that population had exceeded all recovery goals and no longer met the ESA's definition of threatened or endangered, FWS delisted the Western Great Lakes DPS. 72 Fed. Reg. 6052 (Feb. 8, 2007).

The Humane Society challenged the 2007 rule, making the exact opposite argument from the successful environmental plaintiffs in the Vermont case. Humane Society claimed that the ESA prohibits FWS from identifying and delisting a recovered DPS of listed animals, unless

the entire species, both inside the DPS and out, is recovered and delisted. *Humane Soc'y v. Kempthorne*, 579 F. Supp. 2d 7, 9 (D.D.C. 2008).

In the 2007 rule, FWS explained that the ESA defines "species" to include DPSs, and that section 4(a) of the ESA provides that the Secretary "shall . . . determine whether any species is an endangered species or a threatened species." Thus, FWS argued, the plain text of the ESA gives FWS the authority to determine whether any species, including a DPS, is threatened or endangered, and to revise the List accordingly. *Id.* at 15-16. The *Kempthorne* court acknowledged that "the ESA could be construed in the way urged by FWS," *id.* at 19, but held that section 4(a) "could be read to mean, more generally, that *when* it is appropriate to evaluate and/or revise the status of 'any species,' *then* the agency must apply the factors prescribed therein." *Id.* at 16 (emphasis in original). Since FWS had relied on what it perceived as the statute's plain language, the court concluded that there was no agency interpretation to which the court could defer under *Chevron* step two. *Id.* at 19. The court vacated the 2007 rule and remanded to FWS

"so that the agency can provide a reasonable explanation for the interpretation of the Act which underlies the Final Rule." *Id.* at 20.

On remand, the Solicitor of the Interior issued a memorandum opinion setting forth the Department of the Interior's interpretation of the ESA provisions at issue. JA607. The opinion declined to adopt the *Kempthorne* court's alternative interpretation of section 4(a) "because we can find no textual support for it. . . . There is no qualifying or limiting language attached to that grant of authority to FWS. It does not say that FWS shall undertake such a five-factor evaluation only in appropriate (and undefined) circumstances. In allocating its resources, FWS must necessarily choose what determinations to make and in what order, but the Act does not in any way limit FWS's discretion in that regard." JA610.

The Solicitor's opinion acknowledged that FWS's use of the term "delist" may have contributed to the confusion, leading the *Kempthorne* court to reasonably question whether a DPS could be "delisted" if it had not first been listed. JA610. The opinion explained that the term "delist," which is not found in the ESA but is used extensively in its implementing regulations, does not refer solely to "an action which

deletes an entry" on the List, but applies broadly to "*any* action that revises the lists either to remove an already-listed entity from the appropriate list in its entirety, *or* to reduce the geographic or taxonomic scope of a listing to exclude a group of organisms previously included as part of an already-listed entity."  JA611 n.8 (emphasis in original).  The opinion explained that the terms "uplist" and "downlist" are used similarly, so that "FWS may uplist to endangered status the entirety of a species already listed as threatened, or it may identify a part of that species (a subspecies or DPS) that now meets the definition of 'endangered species' and uplist just that part of the species."  *Id.*

The opinion went on to affirmatively justify FWS's interpretation that it may identify a DPS within a broader listing, and, if the DPS is not endangered or threatened, may remove the DPS from the List.  The opinion explained that this interpretation is consistent with the text, structure, and legislative history of the ESA, JA610-622, and that it is consistent with the ESA's policy goals.  JA622-625.  In particular, it is critical to fostering state cooperation with recovery and reintroduction programs, and benefits still-endangered populations by allowing FWS

to focus its limited resources on them instead of being forced to divert resources to species that are already recovered. JA620-622, 624.

With its authority clarified, FWS then published a final rule identifying the Western Great Lakes DPS, finding it recovered, and revising the List accordingly. 74 Fed. Reg. 15,070 (Apr. 2, 2009). Humane Society and several other groups challenged the rule for failure to comply with the Administrative Procedure Act's notice-and-comment requirements. That challenge was resolved by a stipulated settlement that vacated and remanded the rule and committed to a 60-day public-comment period for any new rulemaking concerning the status of the Western Great Lakes wolves.

In 2010, FWS received four citizen petitions to remove the Western Great Lakes wolves from the List, which FWS found to present substantial information that the petitioned action may be warranted. 75 Fed. Reg. 55,730 (Sept. 14, 2010). FWS then published a notice of proposed rulemaking that, like the 2007 rule, would revise the 1978 listing of Minnesota wolves by recognizing it as a Western Great Lakes

DPS and classifying that DPS as not threatened or endangered.[5]

JA813.  In response to the *Kempthorne* opinion, FWS noted that it

interpreted its authority under the ESA to permit it to designate a DPS

within a listed species and find that DPS not endangered or threatened.

JA819.  FWS also noted FWS's full agreement with the reasoning and

conclusions of the Solicitor's opinion.  *Id.*  In accordance with FWS

policy, the proposed rule was subjected to peer review as well as public

comment.  59 Fed. Reg. 34,270 (July 1, 1994).

All of the peer reviewers concurred in FWS's conclusion that the

wolves of the Western Great Lakes constitute a valid DPS, and are not

endangered or threatened.  JA1135; JA881; JA887; JA1116.

Significantly, even major environmental groups with a long history of

litigating for greater wolf protections agreed.  The National Wildlife

Federation, which brought one of the challenges to the 2003 rule,

---

[5] The proposed rule also ventured into a long-running scientific debate
about whether the Eastern Timber Wolf is more accurately classified as
a subspecies of the gray wolf (*Canis lupus lycaon)* or as a separate
species (*Canis lycaon*).  The proposed rule proposed recognizing the
Eastern Timber Wolf as *Canis lycaon*, JA819-821, but the peer review
and public comment processes, as well as an additional study published
after the proposed rule, convinced FWS that the best scientific and
commercial data available at that time did not warrant the proposed
change in taxonomic classification.  JA1122-1123, 1135.

strongly supported the designation and delisting of the Western Great Lakes DPS, declaring that "[t]he recovery of wolves in the Great Lakes is one of America's great wildlife success stories." JA897. Defenders of Wildlife, which brought the other challenge to the 2003 rule, stated that "Defenders supports the Service's proposal to revise the current listing of the Minnesota population of gray wolves and to establish it as a Western Great Lakes DPS," JA884, agreeing that "the wolf population in Minnesota, Wisconsin, and Michigan has recovered to the levels necessary to delist" and that "the state management plans and regulations are adequate to maintain recovered wolf population levels." JA885. The Natural Resources Defense Council likewise "agree[d] with the Proposed Rule that wolves in the Upper Midwest constitute a distinct, significant, and recovered population," JA900, and that the state management plans, while not in their view ideal, are adequate to "maintain[] a viable wolf population." JA905.

## D. FWS's 2011 Western Great Lakes rule

Following a thorough evaluation of the public comments, peer reviews, and the best available scientific and commercial data, on December 28, 2011, FWS promulgated a final rule revising the listing of

*Canis lupus* in the Western Great Lakes. Endangered and Threatened Wildlife and Plants; Revising the Listing of the Gray Wolf (*Canis lupus*) in the Western Great Lakes, 76 Fed. Reg. 81,666 (Dec. 28, 2011) ("the rule"). The rule addressed FWS's legal authority, noting that the plain language of the statute allows FWS to identify a DPS and find it not endangered or threatened, and that if the ESA is considered ambiguous on that question, FWS interprets it to confer that authority. FWS also explicitly adopted the "analysis and conclusions set out in the Solicitor's opinion." JA1123-24; JA1136-37.

The rule recognized that the Minnesota wolf population, which was recognized as a separate species in the 1978 rule, was identified as a species under language substantially similar to the later-enacted DPS language, and has functioned as a DPS ever since. The rule reevaluated that de facto DPS under subsequently developed standards for identifying DPSs, and revised it by adjusting its boundaries to reflect its current expanded range and renaming it the Western Great Lakes DPS. JA1124. The rule then evaluated the conservation status of the Western Great Lakes DPS and found that it no longer meets the definition of an endangered or threatened species. JA1128-1177.

A population qualifies as a DPS if it is discrete in relation to the remainder of its taxon, and if it is significant to the taxon. JA1123; *see also* DPS Policy, 61 Fed. Reg. 4722 (Add.27). The rule explained that the Western Great Lakes population of wolves is discrete from other populations – it is separated by 400 miles from the nearest known gray wolf packs in Wyoming and Montana. It is also significant to the larger taxon of gray wolves because it "provides an important extension of the range of gray wolves in North America," and, without it, a significant gap in the species' range would be created. JA1126. The population therefore meets the regulatory definition of a DPS.

The rule then established the boundaries of the DPS. FWS explained that studies of wolves' movement show that wolves very commonly move outside their core range and then return to it, thus contributing to the continued survival of the population; but that those wolves that disperse distances of more than 250 or 300 miles from the core area are unlikely to return, and thus lose their "connection with, and potential value to" the Western Great Lakes DPS. JA1126-27.

Thus, in delineating the boundaries of the Western Great Lakes DPS,

FWS included a "wolf movement zone around the core metapopulation"

that is large enough to encompass the movements of those wolves likely

to return to the core population, but not the long-distance dispersals of

those wolves that never return. JA1127. The resulting boundaries

include the entirety of Minnesota, Michigan, and Wisconsin, which are

the states that contain the core; parts of North Dakota, South Dakota,

Iowa, and Illinois; and extremely small parts of Indiana and Ohio.

JA1125 (map).

Having revised and delineated the DPS, the rule then turned to

determining its conservation status. FWS extensively analyzed the

impact of the five factors set forth in Section 4(a) of the ESA, 16 U.S.C.

§ 1533(a)(1), and concluded that the Western Great Lakes DPS is not

endangered or threatened as a result of any of them, in all or a

significant portion of its range. JA1142-1177. Accordingly, FWS

revised the 1978 listing of Minnesota wolves, which it renamed the

Western Great Lakes DPS, and removed it from the List. JA1177.

## E.  Legal challenge in the district court

The Humane Society brought suit challenging the 2011 rule, arguing that FWS lacked legal authority to simultaneously designate and delist a DPS, and that FWS's finding that the DPS was recovered was arbitrary and capricious because the wolf is not recovered in a significant portion of its range; because other causes of mortality affect wolves; and because some of the states in the DPS lack sufficiently protective management plans for wolves.

The district court, without oral argument, issued a 111-page decision granting summary judgment for the Humane Society on six separate grounds.  Despite the *Kempthorne* court's ruling that "the ESA could be construed in the way urged by FWS," 579 F. Supp. 2d at 19, the district court held that it could not be: the agency's interpretation, the district court held, "directly conflicts with the structure of the ESA and, consequently, this interpretation is entitled to no deference under *Chevron* step two."  JA69.  The court held that FWS's authority to designate DPSs "operates as a one-way ratchet" – FWS can identify a DPS for the purpose of listing or uplisting it, but not for downlisting or delisting it.  JA67.  Additionally, the court held that FWS cannot find

that a population qualifies as a DPS unless it also finds that DPS to be endangered or threatened. *Id.*

FWS explained, in the rule and in briefing, that the Minnesota wolf population was already identified as a separate "species" in the 1978 rule, and had functioned effectively as a DPS ever since. JA1136. Rather than recognizing a new DPS as a new "species" under the ESA, what the 2011 rule actually did was update the boundaries of the already-recognized Minnesota "species" to reflect its expansion, and reevaluate its conservation status. *Id.* The district court rejected FWS's explanation, holding that the Minnesota wolf population was not a DPS because the 1996 DPS Policy rejects the use of "infra-national political boundaries" to delineate distinct populations. JA72. The district court also opined that a DPS "is, for the most part, a static designation" and therefore "the fact that the DPS's boundaries expanded from one to nine States militates heavily against finding that the Minnesota wolf population was, in fact, a DPS." JA74-75.

The district court then went on to hold that, even if FWS could designate a Western Great Lakes DPS, its conclusion that the DPS should be delisted was invalid for other reasons. The district court held

that the agency relied on an incorrect interpretation of "significant portion of its range" in concluding that the Western Great Lakes DPS is not "threatened with extinction throughout all or a significant portion of its range." The district court held that the rule was "arbitrary and capricious for neglecting to explain why the portion of the historical range no longer occupied by the gray wolf in the western Great Lakes DPS is no longer a significant portion of the species' range." JA100.

The district court next held that FWS's conclusion that disease and human-caused mortality do not pose a threat to the survival of wolves was contrary to the evidence before the agency because the rule acknowledged that both will continue to affect wolves. The court also reasoned that since the ESA's protections caused the wolf population to "recover to some extent," it is arbitrary and capricious to discontinue those protections. JA102.

Next, the court held that FWS acted arbitrarily and capriciously in finding that the wolf's survival is not threatened due to inadequate regulatory mechanisms in the states. The court held that the agency erred by focusing its analysis principally on the regulations in Minnesota, Wisconsin, and Michigan – the states that the Western

Great Lakes wolves actually inhabit.  Although the court acknowledged that "few, if any wolves are currently present in the six states outside the Tri-State Area," JA104, it held that the absence in five of those states of regulations to protect wolves that might someday cross into those states rendered the agency's conclusion that the existing population is unlikely to become endangered contrary to the record. JA103-04.

The court also held that FWS erred in finding Minnesota's regulatory mechanisms adequate to ensure protection of the wolf. Minnesota's management plan divides the state into two zones: the northeastern third of the state, where the wolves live, in which strict controls on the killing of wolves is maintained; and the more populous and agricultural remainder of the state, in which landowners and land managers are permitted to shoot wolves to protect their livestock, pets, or other domestic animals.  Although the rule explained that the recovery plan did not call for wolves to be restored in the southern and western parts of Minnesota, which do not contain suitable habitat, the court declared that irrelevant and held that FWS's conclusion that

Minnesota's regulations are adequate to ameliorate threats to the survival of the gray wolf population was contrary to the record. JA106.

The court then vacated the rule and ordered "the immediate restoration of the gray wolf's protected status in the purported western Great Lakes DPS." JA110.

## SUMMARY OF ARGUMENT

The recovery of the Western Great Lakes wolves has been a tremendous success. That once-threatened population has grown to number more than 4,000 and has more than doubled its range, expanding to occupy virtually all of the suitable habitat across Minnesota, Wisconsin, and the Upper Peninsula of Michigan. After exhaustive analysis of the wolves and the factors affecting them, FWS found that the Western Great Lakes DPS is not endangered or threatened, and removed it from the List.

The district court's holding that FWS cannot delist recovered populations of the gray wolf *anywhere* until it can delist gray wolves *everywhere* is based on an erroneous reading of the ESA. The ESA clearly provides FWS with the authority to determine whether a species, which by statutory definition includes a DPS, is endangered or

threatened, and to list, uplist, downlist, or delist it accordingly. The ESA is not ambiguous because the alternative reading lacks a textual basis and thus does not render the statute susceptible of more than one reasonable interpretation. Even if the ESA were considered ambiguous on that point, however, FWS has set forth, in a notice-and-comment rulemaking, a reasonable interpretation that is consistent with all statutory text and supported by the legislative history and policies of the ESA. That interpretation is entitled to *Chevron* deference.

The district court's reasons for withholding *Chevron* deference from FWS's construction do not withstand scrutiny. Its holding that a DPS is not a species (notwithstanding the ESA's definition that says it is) unless it is endangered or threatened finds no support in the statutory language and is contrary to the DPS Policy and FWS's interpretations of that policy. The court's holding that FWS cannot identify a DPS if the species is already listed at a broader taxonomic level is similarly untethered to the statutory language, and contrary to agency determinations that are entitled to deference.

The district court also erred in rejecting FWS's explanation that the rule in this case did not create a new DPS, but rather revised a

preexisting one.  The Minnesota wolf population was recognized as a separate species in the 1978 listing rule, and has functioned as a DPS ever since.

FWS's finding that the Western Great Lakes DPS is not endangered or threatened was supported by the record and should have been upheld.  The district court's contrary conclusion rested on its rejection of FWS's interpretation of the phrase "significant portion of its range," part of the statutory definitions of "endangered species" and "threatened species."  FWS's eminently reasonable interpretation of that inherently ambiguous phrase has been articulated in multiple notice-and-comment rulemakings and is controlling.  The district court erred by substituting its own interpretation.  The district court also erred by overturning, without identifying any contrary record evidence, FWS's expert findings and conclusions that the Western Great Lakes DPS is not endangered or threatened due to disease, human-caused mortality, or inadequate regulatory mechanisms.

## STANDARD OF REVIEW

"In a case like the instant one, in which the District Court reviewed an agency action under the APA, we review the administrative

action directly, according no particular deference to the judgment of the District Court." *In re Polar Bear Endangered Species Act Listing*, 709 F.3d 1, 8 (D.C. Cir. 2013) (citation omitted); *accord Friends of Blackwater v. Salazar*, 691 F.3d 428, 432 (D.C. Cir. 2012). This Court's direct review of FWS's rule is governed by the highly deferential standards of the Administrative Procedure Act (APA). *American Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008). Under those standards, FWS's decision may be set aside only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency decision is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court]

might otherwise disagree." *Envt'l Def. Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted).

APA review is especially deferential where, as here, the agency is "making predictions, within its area of special expertise, at the frontiers of science," *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 93, 96, 103, 105-106 (1983); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375-77 (1989) (where analysis "requires a high level of technical expertise" court must defer to informed discretion of agency). "The rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise.'" *Am. Wildlands*, 530 F.3d at 1000 (D.C. Cir. 2008) (quoting *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C.Cir.1992)).

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN HOLDING THAT THE ESA'S DEFINITION OF "SPECIES" OPERATES AS A "ONE-WAY RATCHET" ALLOWING FWS TO LIST, BUT NOT DELIST, A DPS**

This Court reviews an agency's interpretation of a statute it administers under the familiar two-step framework of *Chevron U.S.A. v. Natural Res. Defense Council*, 467 U.S. 837, 842-43 (1984). At Step One, the court examines whether the statute's text unambiguously

answers the question; if it does, the plain language controls.  If it does

not, "then at Step Two we defer to the administering agency's

interpretation as long as it reflects a permissible construction of the

statute." *Friends of Blackwater v. Salazar*, 691 F.3d at 432 (citations

omitted).

After the court in *Humane Society v. Kempthorne* held that the

ESA is ambiguous on whether FWS may simultaneously designate and

delist a DPS, it remanded for the agency to "bring its expertise and

experience to bear on the question of whether the ESA permits it to use

the DPS tool in the fashion it has proposed." 579 F. Supp. 2d at 20.  The

agency complied with that directive in two ways.

First, the Solicitor for the Department of the Interior issued a 19-

page memorandum opinion setting forth the agency's interpretation,

and explaining how it is consistent with the ESA's text, structure,

legislative history, and policy objectives.  JA607-625.  The Solicitor's

opinion concluded that the plain language of the ESA gives FWS "clear

authority" to designate and delist a recovered DPS, but that "even if

FWS's authority was not clear," its interpretation "is reasonable and

fully consistent with the ESA's text, structure, legislative history, relevant judicial interpretations, and policy objectives." JA608-609.

Second, FWS reiterated those conclusions in the rule, and adopted "the analysis and conclusions set out in the Solicitor's opinion," which it acknowledged represents "the views of the Department of the Interior." JA1124, JA1136-1137. FWS also noted that it has consistently adhered to that interpretation, citing a series of actions going back to 1985 that delisted or downlisted a DPS within a larger listed population. JA1123-1124..

The Solicitor's opinion and FWS's interpretation expressed in the rule are entitled to *Chevron* deference. When a court finds a statute ambiguous and remands to the agency for interpretation, this Court "has subsequently reviewed the agency's supplemental analysis under the *Chevron* framework." *In re Polar Bear Endangered Species Act Listing*, 794 F. Supp. 2d 65, 88-89 (D.D.C. 2011) (collecting cases and, in highly analogous situation, giving *Chevron* deference to FWS memorandum opinion); *see also Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 332-33 (D.C. Cir. 2011) (holding Coast Guard decision issued on remand entitled to *Chevron* deference, "especially given the

instruction from this court to the agency to 'come to grips with the meaning of the statute.'") Moreover, the reasoning and conclusions of the Solicitor's opinion were expressly adopted and reaffirmed in the rule, a notice-and-comment rulemaking. JA1124, JA1136-1137.

The district court, however, held that FWS's interpretation "is entitled to no deference under *Chevron* step two." JA69. The court held that the agency's interpretation "conflicts with the structure of the ESA" because, in the district court's view, FWS cannot recognize a DPS unless it finds that the DPS is endangered or threatened, and FWS cannot recognize a DPS if the broader species of which the DPS is a part is already listed. None of the district court's reasons for rejecting the agency's interpretation finds any support in the text, legislative history, or purpose of the ESA.

### A. The ESA unambiguously authorizes FWS to determine whether any species, including a DPS, is endangered or threatened, and to list, delist, or reclassify it accordingly

Section 4(a)(1) of the ESA directs FWS to "determine whether any species is an endangered species or a threatened species . . . ." 16 U.S.C. § 1533(a)(1). FWS may make that determination on its own initiative or in response to a petition. *Id.* § 1533(b)(3). If it determines

that a species is endangered or threatened, it must add it to the List.

The ESA requires FWS to update and revise its lists "from time to time"

to "reflect recent determinations, designations, and revisions" made

under the ESA. *Id.* § 1533(c)(1).

By statutory definition, "[t]he term 'species' includes any

subspecies of fish or wildlife or plants, and any distinct population

segment of any species of vertebrate fish or wildlife which interbreeds

when mature." *Id.* § 1532(16). That statutory definition clearly limits

FWS's authority to designate DPSs to vertebrate fish and wildlife

populations, but it equally clearly imposes no other limitations on

FWS's authority to recognize a DPS as a "species" under the ESA.

Nothing in the ESA suggests that FWS's authority to determine

whether a species is endangered or threatened is restricted to certain

unspecified "appropriate" circumstances, as the *Kempthorne* court

speculated.[6] Nothing in the ESA's definition of "species" suggests that

---

[6] Even if FWS's authority to make determinations under Section 4(a)(1)
were restricted to "appropriate" situations, responding to a petition for
listing, delisting, or reclassification is clearly an "appropriate" occasion
for making that determination. *See* 16 U.S.C. § 1533(b)(3); *Am.
Wildlands v. Kempthorne*, 530 F.3d 991, 994 (D.C. Cir. 2008).

FWS may recognize a DPS only if it concludes that the population is endangered or threatened. Nothing in the ESA says that FWS may not designate a DPS that is a subset of a species that is already listed. A statute is ambiguous only if it is "*reasonably* susceptible to more than one meaning." *McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999) (emphasis added). In the absence of any textual support for the claim that Congress intended to limit FWS's authority to make determinations about species to unspecified "appropriate circumstances," or that Congress intended the word "species" to include DPSs for some purposes but not for others, those interpretations are not reasonable. There must be *some* reasonable basis for an alternative reading before it can be considered to render a statute ambiguous.

In short, then, *Kempthorne* was wrongly decided because the ESA is not ambiguous. The plain language of Section 4(a)(1) authorizes FWS at any time to determine whether a species, which by definition includes a DPS, is endangered or threatened. Section 4(c)(1) equally clearly authorizes FWS at any time to revise the List to reflect recent

---

Numerous petitions have been filed for the delisting of the Western Great Lakes DPS. JA1121.

determinations made under Section 4(a).  FWS therefore acted within its clear authority in determining that the Western Great Lakes DPS is neither endangered nor threatened, and in removing it from the List.

## B.  In the alternative, Interior's reasonable interpretation is entitled to deference under *Chevron* step two

The rule and the Solicitor's opinion both explained that, even if the ESA were ambiguous, the interpretation that FWS may designate a DPS within a broader-listed species and delist it is reasonable and consistent with the ESA's text, legislative history, and policy objectives. JA1124; JA609.

### 1.  When a species is listed, that listing includes all subspecies and distinct population segments of the listed species

One of the issues raised by the *Kempthorne* court in finding the ESA ambiguous was the facially plausible argument that FWS cannot "delist" a species if it never "listed" it in the first place.  579 F. Supp. 2d at 17.  That court cited Section 4(c)(2)(B), which directs FWS to review, at least every five years, the species "included in a list" which is "in effect at the time of such review."  At the same time, the *Kempthorne* court acknowledged that FWS could interpret a species-level listing as implicitly including all subspecies and DPSs contained within that

species, and that such a view would be "a permissible reading of the statute." *Id*. n.10.

The Solicitor's opinion explained that FWS's authority to revise a broader listing to remove a recovered DPS derives, not from the five-year review provision cited by the *Kempthorne* court, but rather from Section 4(c)(1), which directs FWS to "from time to time revise each list . . . to reflect recent determinations, designations, and revisions" made under Section 4(a)(1) and other authority. 16 U.S.C. § 1533(c)(1); JA609. That provision clearly gives FWS the authority to make determinations about a species and then revise the List accordingly, regardless of whether the species is currently listed at the same or a broader level. Nothing in Section 4(c)(1), or any other part of the ESA, suggests that FWS is precluded from making such determinations and revisions with respect to a subspecies or DPS that is part of a larger listed species.

Moreover, both the rule and the Solicitor's opinion confirmed that FWS does, as the *Kempthorne* court suggested it reasonably might, consider a listed species to include all subspecies and populations within that species. JA1137; JA610-611 & n.8; JA613 & n.10. That

interpretation has been embedded in the ESA's implementing regulations since at least 1975. *See* 40 Fed. Reg. 44,415, 44,417 (Sept. 26, 1975). The current regulation states that "[t]he listing of a particular taxon includes all lower taxonomic units. For example, the genus *Hylobates* (gibbons) is listed as Endangered throughout its entire range (China, India, and SE Asia); consequently, all species, subspecies, *and populations* of that genus are considered listed as Endangered for the purposes of the Act." 50 C.F.R. § 17.11(g) (Add. 14) (emphasis added). Thus, when FWS recognizes a population within a listed vertebrate species as distinct and significant, *i.e.*, a DPS, that DPS is already "included in [the] list" and can be uplisted, downlisted, or delisted to reflect its current conservation status under the authority granted in Section 4(c)(2) as well as Section 4(c)(1).

> **2.** **The legislative history of the ESA supports FWS's interpretation**

>> **a.** **The 1973 legislative history of the substantially similar language in the original ESA strongly supports FWS's interpretation**

The ESA as originally enacted did not contain the DPS language, but it did contain substantially similar language defining species to include "any other group of fish or wildlife of the same species or

smaller taxa in common spatial arrangement that interbreed when mature." Add.12. The legislative history of the original definition, therefore, sheds light on Congress's intent in allowing such populations to be treated as species.

The legislative history shows that Congress was concerned that then-existing laws requiring species to be listed at the whole-species level did not allow sufficient flexibility to exclude healthy populations, and that this inflexibility meant that "States with good management practices are having to pay the penalty for the States that are not up to par." *Endangered Species: Hearings on H.R. 37 Before the Subcomm. on Fisheries and Wildlife Conservation,* 93rd Cong. 327 (1973) (Statement of Rep. John Breaux).[7] Senator John Tunney, the Senate floor manager of the ESA, noted that under then-existing law, "a species must be declared 'endangered' even if in a certain portion of its range, the species has experienced a population boom, or is otherwise threatening

_____

[7] Rep. Breaux was the principal sponsor of the Endangered Species Act in the House of Representatives. The witness to whom Rep. Breaux was speaking was the Director of the Minnesota Department of Natural Resources, and they were discussing Minnesota's stewardship of what was, at the time, the only significant gray wolf population in the lower 48 states.

to destroy the life support capacity of its habitat.  Such a broad listing

prevents local authorities from taking steps to insure healthy

population levels."  119 Cong. Rec. 25,669 (July 24, 1973) (statement of

Sen. Tunney).

To correct that weakness in earlier statutes, Congress included

the proto-DPS language in the ESA's definition of "species," allowing

FWS to list, or delist, populations below the subspecies level to provide

the appropriate level of protection at a more localized level.  Senator

Tunney explained that "[a]n animal might be 'endangered' in most

States but overpopulated in some.  In a State in which a species is

overpopulated, the Secretary would have the discretion to list that

animal as merely threatened *or to remove it from the endangered species

listing entirely while still providing protection in areas where it was

threatened with extinction.*  In that portion of its range where it was not

threatened with extinction, the States would have full authority to use

their management skills to insure the proper conservation of the

species."  *Id.* (emphasis added).

Senator Tunney's statement makes clear that, at least with

respect to the proto-DPS language in the ESA's original definition of

"species," Congress intended for FWS to have the authority to remove a recovered population from the List, while leaving the remainder of the species listed in places where it had not recovered – exactly what FWS has done here. The legislative history of the 1973 ESA, therefore, strongly supports FWS's interpretation.

> ### b. The legislative history of the 1978 amendments is sparse and inconclusive

In 1978, Congress amended the ESA's definition of "species." In place of the original language which defined "species" to include fish and wildlife "in common spatial arrangement," the amended definition defined "species" to include any "distinct population segment" of *vertebrate* fish and wildlife. There is no legislative history explaining why Congress enacted that amendment, the substantive effect of which was to exclude invertebrate populations below the level of subspecies from the statutory definition of "species."

In 1979, the General Accounting Office urged Congress to repeal the DPS language, fearing that it would allow FWS to list "squirrels in a specific city park, even though there is an abundance of squirrels in other parks in the same city, or elsewhere in the country." S. Rep. No. 96-151, p. 6-7 (May 15, 1979). Congress did not make the requested

amendment. A Senate Committee on Environment and Public Works report explained that it is important for FWS to be able "to adopt different management practices for healthy, threatened or endangered populations." *Id.* at 7. Nevertheless, the report cautioned FWS to "use the ability to list populations sparingly and only when the biological evidence indicates that such action is warranted." *Id.*

Regarding the DPS language, the 1979 Senate committee report is post-enactment legislative history, which this Court has described as "entitled to little weight." *Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005). Even if it were to be considered, however, it is irrelevant to the question before the Court. It shows that a later Senate committee felt that the DPS language should not be used to list insignificant populations of species that are otherwise abundant. That concern was addressed in the DPS Policy, which requires populations to be "significant" as well as "discrete." Add.27. The Senate committee report provides no support whatsoever for the district court's very different interpretation – that the DPS language was intended to operate as a "one-way ratchet" allowing the listing, but not the delisting, of populations below the subspecies level.

The 1973 legislative history strongly suggests that Congress intended for FWS to be able to remove a recovered population from the List, while leaving unrecovered populations of the same species listed, as FWS has done here. Nothing in the text or the scant legislative history of the 1978 amendment suggests that Congressional intent changed on that point. The overall legislative history of the ESA, therefore, supports FWS's interpretation.

### 3. FWS's interpretation is consistent with the ESA's policy objectives

FWS's interpretation of its authority to delist a recovered DPS is consistent with two important policy objectives of the ESA: fostering state cooperation, and focusing agency resources on species in the greatest need.

"The primary objective [of the ESA] is to protect and conserve (i.e. recover) endangered and threatened species. . . . Perhaps the most important secondary objective is federal-State cooperation in conserving listed species." JA622. Close cooperation with state wildlife agencies is essential to the successful recovery of endangered and threatened species. FWS does not have the resources do to it all on its own.

If FWS cannot recognize and delist distinct, significant populations that have recovered, then states' incentive to cooperate with FWS is greatly reduced. The problem of "States with good management practices . . . having to pay the penalty for the States that are not up to par" is one of the problems the ESA was enacted to solve. *Endangered Species: Hearings on H.R. 37 Before the Subcomm. on Fisheries and Wildlife Conservation,* 93rd Cong. 327 (1973) (Statement of Rep. John Breaux). FWS's interpretation preserves the flexibility to return management authority to states that have cooperated to successfully recover formerly endangered or threatened species, thus incentivizing and rewarding state cooperation.

The conservation and optimum deployment of FWS's limited resources is another significant policy weighing in favor of FWS's interpretation. Within a species, discrete populations recover at differing rates. FWS's interpretation, allowing FWS to remove recovered DPSs from the list, better promotes the ESA's goal of protecting and recovering endangered and threatened species by enabling FWS to focus its limited manpower and funding on those populations that have not yet recovered. JA1123, JA624.

## C. The district court erred in holding that FWS cannot recognize a DPS unless it finds that the DPS is endangered or threatened

The district court rejected FWS's reasonable interpretation of the ESA because, in the court's opinion, "[t]o identify a DPS, the FWS is required to determine that the covered vertebrates, as a distinct group, are threatened with extinction and, absent that determination, the ESA does not authorize the FWS to recognize and create the DPS at all. *See* 16 U.S.C. § 1533(c)." JA66. Neither the cited provision nor any other provision of the ESA supports the district court's assertion that the ESA does not authorize FWS to recognize a DPS unless it first determines that the population is endangered or threatened.

The district court's restrictive interpretation of FWS's authority to recognize a DPS is based on a misreading of the DPS Policy. "Under the DPS Policy," FWS explained in the rule, "two factors are considered in a decision regarding the potential identification of a DPS: (1) Discreteness of the population segment in relation to the remainder of the taxon, and (2) the significance of the population segment to the taxon to which it belongs. *If a population meets both tests, it can be identified as a DPS.*" JA1123 (emphasis added). Once a DPS is

51

identified by those two factors, FWS must then "undertake an analysis

to determine whether the DPS is endangered or threatened or does not

meet the criteria for listing. All three steps are necessary components

of a complete DPS analysis." *Id*. Thus, as FWS plainly explained in a

notice-and-comment rulemaking, the DPS Policy requires consideration

of three factors, but the first two determine whether the population

under consideration is a DPS, and the third factor determines whether

that DPS should be listed, delisted, or reclassified. That understanding

of the DPS Policy is also clearly stated in the Solicitor's opinion.

JA608.

Other courts have recognized that a population "qualifies as a

DPS if it is both discrete and significant. If a population is deemed to

be a DPS, the inquiry then proceeds to whether it is endangered or

threatened." *Nw. Ecosystem Alliance,* 475 F.3d at 1138 (internal

citation omitted); *see also Trout Unlimited v. Lohn*, 559 F.3d 946, 949

(9th Cir. 2009)("after deciding whether a population of fish or wildlife

constitutes a 'species' or a 'distinct population segment,' NMFS must

decide whether to 'list' the species or distinct population segment"); *cf.*

*Am. Wildlands v. Kempthorne*, 530 F.3d 991, 994 (D.C. Cir. 2008) ("In

determining whether to list a species as threatened or endangered, the Service must first define the species so the agency can estimate its population.")

This Court has held that the agency's interpretation of the DPS Policy "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *In re Polar Bear*, 709 F.3d at 11. The language of the DPS Policy confirms the reasonableness of Interior's interpretation of its own regulation. For instance, the DPS Policy states that "[i]f a population segment is discrete and significant (i.e. it is a distinct population segment), its evaluation for endangered or threatened status will be based on the Act's definition of those terms and a review of the factors enumerated in section 4(a)." Add.30. By using "*i.e.*" to equate "a distinct population segment" with "a population segment [that] is discrete and significant," the DPS Policy makes clear that determining the population's conservation status is not an element of *identifying* a DPS, but is simply the next step to be carried out once a DPS has been identified by the first two elements.

The district court claimed that the "Solicitor's Opinion touted by the FWS" supports the court's view that "no DPS may be recognized"

unless it is endangered or threatened. JA67-68. That characterization

of the Solicitor's opinion is as inaccurate as it is dismissive. The

Solicitor's entire 19-page analysis is dedicated to explaining that FWS

*can* designate a DPS within a listed species and find that the DPS is no

longer endangered or threatened. The opinion also specifically states

that "'[d]esignation' of a DPS does not mean that FWS necessarily adds

the DPS to the lists of endangered and threatened species; rather, it

refers to the identification of a DPS that may or may not be endangered

or threatened."[8] JA608 n.4. How the district court can construe that as

*supporting* its diametrically opposite view defies comprehension.

The district court also stated that FWS, in the 2003 rule,

"recognized" that it could not designate and delist a DPS, JA68, but the

court's conclusion is based on a misreading of that rule. In the 2003

rule, FWS stated that

> neither the [ESA] nor its implementing regulations allow the
> delisting of a portion of a listed species' historical range
> because restoration is not necessary and not feasible in that
> area. Delisting can only occur if the listed species is
> recovered, if the listed species is extinct, or if the original

---

[8] The opinion adds that FWS "interchangeably uses the terms 'identification,' 'recognize,' and 'establish' to describe the same process as 'designation.'" JA608 n.4.

listing was based on data, or data interpretation, that were
in error.

68 Fed. Reg. 15,803, 15,859 (April 1, 2003); JA68. That statement in no

way conflicts with FWS's actions in the 2011 rule, which delists the

gray wolf in the Western Great Lakes DPS because that population is

recovered, not because recovery is unnecessary or infeasible. In areas

where the wolf is not recovered, the rule does not delist it. The 2003

rule simply states that FWS cannot delist a species in an area where it

has *not* recovered, unless it is extinct or the original listing was in error.

Nothing in that statement conflicts with what FWS has done here, nor

does it support a conclusion that FWS cannot designate and delist a

recovered DPS.

## D. The district court erred in holding that FWS cannot designate a DPS if the species at issue is already listed at a broader level

As an additional reason for refusing to defer to FWS's

interpretation, the district court found it "inherent in the purpose and

structure of the ESA" that FWS may not designate a DPS if the

population at issue is already listed at a broader taxonomic level, even

if the DPS is threatened or endangered. JA76. The district court

reasoned that "once an entity is identified and listed, that *entity* is

afforded protection under the ESA, *see* 16 U.S.C. § 1533(c), and the agency's actions must address that entire listed entity." JA86 (emphasis in original). To allow FWS to recognize DPSs within that entity, the court held, "subverts the review and delisting process." JA85.

As explained above, pp. 42-44, when a species is listed, that listing includes all subspecies and populations of that species. 50 C.F.R. § 17.11(g) (Add. 14); *see also* JA613 & n.10. The district court, however, refused to credit the agency's interpretation set forth in both the Solicitor's opinion and the Code of Federal Regulations, stating that "the agency's proffered interpretation that 'implied' DPSs may be found within broader listed species would permit the FWS to avoid its statutory duties (1) to review the listed species' status as a whole and (2) to change the listing status only for the reasons enumerated in the ESA." JA85. Neither of the district court's reasons for rejecting the agency's interpretation is sound.

The court's first reason relies on circular logic. It holds that a listed species must be dealt with as a whole because otherwise FWS would be able to avoid its statutory duty to deal with the listed species

as a whole.  The court never identifies any basis for that alleged

statutory duty, however.  The only authority cited by the court is

section 4(c), 16 U.S.C. § 1533(c), which, as explained above, pp. 42-44,

allows FWS to "revise each list" to "reflect recent determinations,

designations and revisions," including those made under Section 4(a)(1).

Nothing in Section 4(c) supports the district court's holding that once

FWS lists a species at the species-wide level, it forfeits its authority to

make future determinations about subspecies or DPSs within that

species.

The court's second point is a red herring.  It is indisputable that

the conservation status of any species – whether it be a full species,

subspecies, or a DPS – may be changed only based on the criteria listed

in Section 4(a).  That undisputed fact sheds no light on the question of

whether FWS may apply those criteria to a DPS that is a subset of a

species listed at a broader level.

The district court also expressed a policy concern that, if FWS can

delist a recovered DPS while the rest of the species remains listed, then

FWS could "delist[] *any* endangered species whose remaining

populations are clustered in isolated pockets."  JA63, quoting Plaintiffs'

Memorandum in Support of Summary Judgment (Dkt. 24-1) at 22. As a practical matter, delisting "isolated pockets" of species is highly unlikely to occur, because a large and stable population, or else a metapopulation of smaller connected populations, is usually a condition for finding a species recovered. Isolated pockets are also unlikely to be "significant" as defined by the DPS Policy, and so such populations would not likely qualify as DPSs. And of course, any delisting decision is subject to judicial review, so if FWS were to delist a population that was too small and isolated to be viable, that decision could be overturned. The Western Great Lakes DPS, however, contains over 4,000 wolves whose core habitat spreads across three large states, and it is connected to a population of over 60,000 wolves in Canada. It is hardly an isolated pocket.

Whatever the validity of the district court's policy concern that FWS might abuse its authority to delist DPSs, it is merely one policy consideration among many, and it is the agency's role, not the district court's, to balance that consideration against others. The agency has made clear that it places greater weight on the importance of incentivizing state cooperation and the need to direct scarce agency

resources to species that are truly endangered or threatened. JA1136; JA622-624. The district court should not have substituted its own policy judgment as a reason for rejecting FWS's reasonable interpretation of the ESA.

## II. THE RULE DID NOT DESIGNATE A NEW SPECIES; IT REVISED THE 1978 LISTING OF MINNESOTA WOLVES

As explained above, the district court erred as a matter of law in holding that FWS lacks the authority to designate and delist a DPS within a listed species. The district court also erred as a matter of fact in vacating the rule on that basis, because, as FWS explained both in the rule and in its briefing, the rule did not in fact designate and delist a new DPS. What the rule actually did was to revise the 1978 rule's listing of Minnesota wolves as a distinct species to reflect the population's territorial expansion and its recovered status, and to bring that 1978 listing into compliance with the requirements of the subsequently-promulgated DPS Policy. JA1124.

At the time that FWS issued the 1978 rule, the ESA's definition of "species" had not yet been amended to add the "distinct population segment" language, but the original definition contained substantially similar authority. The only practical difference between the original

59

language[9] and the amendment[10] is that the latter eliminated FWS's authority to treat populations of *invertebrate* fish or wildlife below the subspecies level as "species" under the ESA. With respect to vertebrate species such as wolves, however, the amendment made little if any difference.

The original definition was in effect when FWS issued the rule listing *Canis lupus* in the lower 48 states. Noting its authority to define a "group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature" as a species, Add.21, FWS stated that "the gray wolf (*Canis lupus)* group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one 'species', and the gray wolf group in Minnesota is being considered as another 'species'." *Id.* Thus, from the beginning, the Minnesota wolf population has been listed as a separate species under predecessor language that, with respect to

_____

[9] The original language defined "species" to include "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Add.12.

[10] The amended language defined species to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16) (Add.3).

vertebrates, is functionally identical to the DPS language. It is, and always has been, a DPS in all but name.

FWS acknowledged that fact in the rule, explaining that "the Minnesota gray wolf population listed as a species in 1978 has functioned effectively as a DPS ever since the DPS provision was added to the Act later in 1978." JA1136. "Under the Act," FWS explained, it "is authorized to reevaluate that functional DPS listing and revise it to meet the criteria in the DPS policy and to reflect the 'best available biological data.'" *Id.* Accordingly, FWS "delineat[ed] the boundaries of the expanded Minnesota population segment to meet the criteria in the DPS policy and to reflect the current geographic location of the population." JA1137.

FWS argued below that the district court need not reach the statutory-interpretation issues concerning the scope of FWS's authority to recognize a DPS, because FWS was not in fact recognizing a new DPS in this action; it was, rather, revising a preexisting DPS-in-all-but-name to bring it into line with current policy and current facts.

The district court rejected that explanation for several reasons. First, it noted that the Minnesota wolf species listed in 1978 was not

"formally designated as a DPS in 1978," and notes that FWS did not describe it as such in its prior rulemakings. JA70-71. While it is of course true that the 1978 rule did not formally designate the Minnesota species as a DPS, for the obvious reason that Congress did not add the DPS language to the statute until later that year, the district court failed to understand that FWS *did* designate the Minnesota wolf as a separate species under statutory authority that is functionally identical to the DPS language. The district court stated that "[t]he 1978 Rule does not identify any statutory authority for designating wolves in Minnesota as a separate 'species' from those in the 48 conterminous States," JA70, notwithstanding the fact that in the 1978 rule FWS specifically cited its statutory authority to manage any "group of fish or wildlife of the same species . . . in common spatial arrangement" as a species *in the same two-sentence paragraph* in which it stated that the Minnesota population would be a separate species. Add.21. The court's failure to understand that FWS did have statutory authority to list the Minnesota wolves as a separate species, and that its statutory authority was (with respect to vertebrate species) substantially identical to its

authority under the DPS language, undermines the court's holding that the rule did not revise and delist a preexisting de facto DPS.

It is also true that previous rulemakings involving the Western Great Lakes wolves stated that they were establishing a DPS, rather than revising a preexisting one, but it does not follow that the earlier, vacated rules were correct and the present one is wrong. One effect of the repeated rounds of judicial review has been to force FWS to be more clear and precise in describing its actions and its authority to take them. Change, particularly from a rule that was invalidated, is not evidence of error.

The district court's second reason for rejecting FWS's view that the Minnesota species was functionally a DPS is that the DPS Policy rejects the use of state borders to define a DPS. JA71-72. That is true, but beside the point. The DPS Policy was not promulgated until 1996, 18 years after Congress enacted the DPS language and 23 years after the ESA defined "species" to include populations "in common spatial arrangement" at lower than the subspecies level. Many DPSs and de facto DPSs were recognized before 1996, and many were not entirely consistent with the standards adopted in the Policy. JA1123. That

does not mean that they ceased to be DPSs; rather, it means that they needed to be reevaluated and revised to become consistent with the DPS Policy. That is exactly what FWS said it was doing in the rule – "revising that de facto DPS listing to meet the criteria in the DPS policy and to reflect the best available biological data." JA1124.

Finally, the court concluded that the present Western Great Lakes DPS could not be an updated version of the 1978 Minnesota species because, in the court's unsupported view, "a DPS is, for the most part, a static designation that is unlikely to change in the short-term." JA74-75. The court ridiculed the idea that "the wolves in Minnesota suddenly acquired 'physical, physiological, ecological, or behavioral factors' that are shared with other wolves in the new nine-State area that differentiate them from all other gray wolves, such that the DPS's boundaries must be significantly expanded." JA75.

That argument betrays confusion about the facts. The Minnesota wolf population did not "suddenly acquire[]" traits in common with wolf populations in neighboring states; there *were* no wolf populations in neighboring states until the Minnesota wolf population, over the course of 33 years, expanded into them. JA1129-1133. The wolves' territorial

expansion simply reflects the population's recovery, and in no way undermines FWS's position that the Minnesota wolf population listed as a separate species in 1978 was effectively a DPS that has grown larger but remains a DPS.

## III. THE RECORD SUPPORTS FWS'S FINDING THAT THE WESTERN GREAT LAKES DPS IS NEITHER ENDANGERED NOR THREATENED

All decisions to list, delist, uplist, or downlist species must be based on the five criteria set forth in Section 4(a) of the ESA, 16 U.S.C. § 1533(a). That section directs FWS to

> determine whether any species is an endangered species or a threatened species because of any of the following factors:
>
> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). Determining whether a species "is an endangered species or a threatened species" requires FWS to determine whether the species "is in danger of extinction throughout all or a

significant portion of its range," 16 U.S.C. § 1532(16), or whether it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). FWS, in the rule, explained in detail why the Western Great Lakes wolves were not endangered or threatened, in all or a significant portion of their range, by any of those factors. JA1142-1176.

The district court, after holding that FWS lacked the legal authority to recognize the Western Great Lakes DPS, went on to hold that, even if FWS did have that authority, its finding that the Western Great Lakes DPS is not endangered or threatened was contrary to the record. In the court's view, the record does not support FWS's conclusions that the Western Great Lakes DPS is not endangered or threatened by disease and human-caused mortality, inadequate state regulatory mechanisms, and the fact that its current range is smaller than its maximum historical range.

A common thread of error runs through each of the district court's holdings on the Section 4 factors: the court focused on whether the factor could affect individual wolves, rather than on whether the factor endangered or threatened the survival of the Western Great Lakes DPS

as a whole.  The court's approach sets an impossible standard.  All species are affected to some degree by things like disease, predation, and human-caused mortality, but that does not make them all endangered or threatened.  The ESA allows FWS to list a species, or keep it listed, only if the *very existence of the species* is endangered or threatened by the listed factors.  16 U.S.C. § 1533; *see also* 16 U.S.C. § 1531(b) (overall purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species").

A.    **The district court erred in rejecting FWS's conclusion that the Western Great Lakes DPS is not "in danger of extinction throughout all or a significant portion of its range"**

The district court held that FWS's conclusion that the Western Great Lakes DPS is not endangered or threatened was arbitrary and capricious because FWS "neglect[ed] to explain why the portion of the historical range no longer occupied by the gray wolf in the western Great Lakes DPS is no longer a significant portion of the species' range."  The district court's holding is both factually and legally incorrect.  FWS did analyze *all* of the territory in the entire DPS,

occupied and unoccupied, and explained why the population is not endangered or threatened in any significant portion of its range. JA1176-1177; *see also* JA1143-1147. Moreover, the phrase "significant portion of its range" refers to the current, not maximum historical, range of the species. JA1176.

> ### 1. FWS reasonably interprets "significant portion of its range" to refer to current range, and that interpretation is entitled to *Chevron* deference

The ambiguity inherent in the phrase "significant portion of its range" has been recognized by numerous courts, including the district court. JA94. The rule acknowledged the ambiguity and explained that "[w]e interpret a portion of a species' range as being significant if it is part of the current range of the species (species used here as it is defined in the ESA, to include species, subspecies, or DPS) and if it is important to the conservation of the species because it contributes meaningfully to the representation, resiliency, or redundancy of the species. The contribution must be at a level such that its loss would result in a decrease in the ability to conserve the species." JA1176. That interpretation was set forth in a notice-and-comment rulemaking, and is thus entitled to *Chevron* deference. FWS, acting jointly with

NMFS, has since confirmed and further explained that interpretation in a legally-binding published policy that was also subject to notice and comment.[11] Add.31.

The policy explains that its interpretation of the term "range" as referring to the species' current, rather than historical, range, is "based on the text of the Act. As defined in the Act, a species is endangered only if it 'is in danger of extinction'" throughout all or a significant portion of its range. The phrase 'is in danger' denotes a present-tense condition of being at risk of a current or future undesired event. Hence, to say a species 'is in danger' in an area where it no longer exists – *i.e.* in its historical range where it has been extirpated – is inconsistent with common usage. Thus, 'range' must mean 'current range,' not 'historical range.'" Add.37.

Certainly, the loss of historical range could affect a species, the policy explained, by reducing population numbers or available habitat.

---

[11] The policy's definition of "significant" differs from the final rule's usage in minor ways not relevant to this appeal. On the material issue of the meaning of the word "range" and whether it refers to current or historical range, however, the policy is entirely consistent with the final rule.

Those effects, however, are taken into account in assessing the current and future viability of a species across its current range.  Add.38.

> The effect of loss of historical range on the viability of the species could prompt us to list a species because the loss of historical range has contributed to its present status as endangered or threatened throughout all or a significant portion of its range.  In such a case, we do not list a species because it is endangered or threatened in its lost historical range, but rather because it is endangered or threatened throughout all or a significant portion of its current range because that loss of historical range is so substantial that it undermines the viability of the species as it exists today.  Conversely, a species suffering a similar loss of historical range would not be listed if viability of the remaining individuals was not compromised to the point of endangering or threatening the species.

*Id.*  As the policy makes clear, the question under the ESA is not whether a species has lost a portion of its historical range; it is whether the species "is in danger of extinction" in its current condition.  16 U.S.C. § 1532(16); 16 U.S.C. § 1533(a)(1).

The policy, as well as the rule, interpreted ambiguous language in a decisionmaking process that included notice and comment.  Under *Chevron* step two, it is entitled to deference "as long as it reflects a permissible construction of the statute."  *Friends of Blackwater v. Salazar*, 691 F.3d at 432 (citations omitted).

FWS's interpretation, based on the ESA's definition of an endangered species as one that "is in danger in all or a significant portion of its range" is eminently reasonable and consistent with the ESA. A species cannot be in *present* danger in habitat it does not occupy, regardless of whether it once did. The relevant question under the ESA is whether the species *is* endangered or threatened, and that requires analysis of its current conditions. This Court has noted that "[t]he use of the present tense in a statute strongly suggests it does not extend to past actions." *Sherley v. Sebelius*, 644 F.3d 388, 394 (D.C. Cir. 2011); *see also Carr v. United States*, 560 U.S. 438 (2010) (holding that, under Dictionary Act, 1 U.S.C. § 1, "the present tense generally does not include the past.") FWS's interpretation is therefore entitled to deference.

The district court, however, rejected FWS's interpretation and held that FWS must analyze "why the lost historical range of the gray wolf population in the Midwest is not a significant portion of its range." JA100. The court relied on *Defenders of Wildlife v. Norton*, JA94-95, in which the Ninth Circuit declined to give *Chevron* deference to the agency's interpretation because, on the record in that case, the agency

"did not . . . expressly consider the 'extinction throughout . . . a significant portion of its range' issue at all."  258 F.3d 1136, 1145 (9th Cir. 2001).  Applying its own interpretation, the Ninth Circuit held that where a species' current range is much smaller than its historical range, the agency "must at least explain [its] conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'"  *Id.*

"A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005).  The Ninth Circuit in *Defenders of Wildlife* described the phrase "significant portion of its range" as "inherently ambiguous."  258 F.3d at 1144.  The district court therefore erred in rejecting FWS's interpretation in the 2011 rule and FWS's and NMFS's joint interpretation in the 2014 policy interpreting "significant portion of its range" in favor of the Ninth Circuit's 2001 interpretation in *Defenders of Wildlife.*

The district court also stated that FWS "concede[d] in its briefing" that FWS must consider whether lost portions of the wolf's historical range are significant portions of its range. JA96. That is a misreading of the government's brief. What the brief actually said was that FWS evaluated *all* of the land within the DPS to determine whether the Western Great Lakes DPS is endangered or threatened in any significant portion of its range, and that "by evaluating habitat and threats to wolves throughout the upper Midwest, FWS also necessarily evaluated the lost portions of historical range of gray wolves within the DPS and evaluated whether any of those portions constituted 'significant portions' of that range." U.S. Memorandum in Support of Summary Judgment (Dkt. 28) at 27. The word "necessarily" is not an admission that it is "necessary" to determine whether currently unoccupied historical range is a significant portion of the species' range; it simply means that the whole necessarily included the parts.

      **2.    FWS reasonably found that the Western Great Lakes DPS is not endangered or threatened in all or a significant portion of its range**

FWS found that the core population area of the Western Great Lakes DPS – northern Minnesota, northern Wisconsin, and the Upper

Peninsula of Michigan – contains sufficient suitable habitat, an adequate wild prey base, sufficient protection from human-caused mortality, and sufficient numbers and distribution of wolves to assure the continued vitality of the Western Great Lakes wolf population. JA1176-1177. Areas outside that core population area "generally are not conducive to [the] long-term persistence" of wolves, due to high road densities and heavy agricultural use. JA1176. Those areas therefore do not contribute meaningfully to the representation, resiliency, or redundancy of the species. The loss of those areas would not result in a decrease in the ability to conserve the species. They are therefore not "significant" portions of the Western Great Lakes wolves' range, as FWS defines that term. *Id.*

## B.   FWS's finding that the wolf is not endangered by disease or human-caused mortality is supported by the record.

The rule contains a lengthy and detailed discussion of disease and predation threats to wolves, surveying an extensive body of literature. JA1148-1152. The discussion explained that although both canine parvovirus and mange affect the Western Great Lakes wolves, neither has prevented the wolf population from growing. Lyme disease, dog

lice, and canine distemper virus were also discussed and found not to threaten the survival of the wolf population. Those findings were subjected to peer review and were confirmed by independent wolf experts, including one whose specific expertise is in wolf diseases. JA881.

The rule likewise thoroughly discussed human-caused wolf mortality, which primarily comes from illegal shooting, depredation control, and vehicle collisions. JA1152-1155. Again, FWS discussed data from scores of studies across time and place, and acknowledged that human-caused mortality is likely to increase after delisting. Still, FWS concluded, the "high reproductive potential of wolves allows wolf populations to withstand relatively high mortality rates, including human-caused mortality." JA1154. Those conclusions, too, were corroborated by peer review.

The district court held FWS's conclusion arbitrary and capricious because it did not "address how the two factors [disease and human-caused mortality] could interact with each other, given that the Final Rule acknowledges that both could, individually, represent a clear threat to the species." JA102. That holding is erroneous.

First of all, the rule does not "acknowledge" that either disease or human-caused mortality is a "clear threat to the species"; it finds exactly the opposite. FWS does acknowledge that both disease and human-caused mortality will continue to *affect* wolves, but neither factor – individually or in combination – threatens or endangers the wolf population, which is the statutory standard.

Second, FWS did discuss how the two factors interact. FWS explained that human-caused mortality was formerly believed to be "compensatory" of natural mortality, meaning that "human-caused mortality is not simply added to 'natural' mortality, but rather replaces a portion of it." JA1154. More recent studies, FWS noted, call that conclusion into question, and suggest that the two causes of death are "additive." *Id.* FWS explained, however, that the "high reproductive capacity of wolves allows wolf populations to withstand relatively high mortality rates," and that the states of Minnesota, Wisconsin, and Michigan "have committed to continue to regulate human-caused mortality so that it does not reduce the [Western Great Lakes] wolf population below recovery levels." *Id.*

Finally, the district court cited no record evidence contradicting FWS's conclusion or supporting the court's notion that disease and human-caused mortality might interact in ways other than those discussed by FWS. The court's mere speculation that those factors might somehow cause each other to multiply, in the absence of any record evidence in support of that claim and in contradiction to FWS's conclusions about how disease and human-caused mortality interact, *id.,* does not warrant preempting FWS's scientific judgment.

The court then essentially found that, because the ESA's protections were successful in causing the wolf population to recover, it is arbitrary and capricious to remove those protections:

> The FWS's reasoning appears to proceed as follows: despite acknowledgement that humans are the biggest threat to the continued viability of the wolf, followed closely by habitat destruction and disease, and that the management of habitat destruction and the prohibition on the killing of wolves has allowed the wolf to recover to some extent, somehow the ending of federal management and elimination of the taking prohibition is no longer necessary [sic]. This conclusion is disconnected from and belied by the record. As such, it was arbitrary and capricious for the FWS to determine that the threat of disease combined with human taking of wolves has been reduced to such a degree in the western Great Lakes region so as to render the removal of all ESA protections from wolves in the region appropriate.

JA102. Under this standard, no recovered species could ever be delisted. The very success of the measures used to recover it is, in the court's view, proof that those measures cannot be removed. The court alleges inconsistency with the record, but cites absolutely nothing in the record that contradicts FWS's well-documented conclusion that although individual wolves will continue to die of disease, shooting, vehicle collisions, and other causes, the Western Great Lakes DPS as a whole is not in danger of extinction from those or any other causes. Where, as here, the district court did not identify any data that FWS overlooked, or any genuine errors in its reasoning, its holding "amount[s] to nothing more than competing views about policy and science," which this Court has held do not warrant overturning an agency's decision, particularly where that decision required a high level of scientific expertise. *In re Polar Bear*, 709 F.3d at 3 (internal citation omitted).

C.   **FWS correctly determined that the Western Great Lakes DPS is not endangered or threatened due to inadequate regulatory mechanisms in any of the states within its boundaries**

FWS thoroughly analyzed the wolf management plans of Minnesota, JA1155-1159, Wisconsin, JA1159-1164, and Michigan,

JA1164-1167, the three states that contain all of the wolf packs in the DPS. In each of those states, FWS found that the state's regulatory mechanisms were adequate to maintain a wolf population above recovery levels, and so the DPS was not endangered or threatened due to a lack of adequate regulatory mechanisms.

The rule also discussed the regulatory mechanisms of the peripheral states, in which wolves sometimes roam but do not live or breed. FWS found that while the relative absence of regulatory protections in the Dakotas may prevent wolves from establishing packs there, that would have "no adverse effects on the long-term viability of wolf populations in the [Western Great Lakes] DPS as a whole, because the existence of a wolf or a wolf population in the Dakotas will not make a meaningful contribution to the maintenance of the current viable, self-sustaining, and representative metapopulation of wolves in the [Western Great Lakes] DPS." JA1167. Any wolves that enter Illinois or Iowa would be protected by state law, the rule noted, while those entering Ohio and Indiana would not be. However, since the portions of Iowa, Illinois, Indiana, and Ohio contained within the DPS contain neither wolf packs nor any suitable habitat, they are unlikely to become

inhabited by wolves, and therefore neither state-law protection nor the lack thereof is likely to "have any significant impact on the continued viability of wolf populations" in the DPS. *Id.*

The court held that FWS's finding that the Western Great Lakes DPS is not endangered or threatened due to inadequate regulatory mechanisms in the six states outside the wolf's range was contrary to the record. The court reasoned that "[t]he fact that few, if any, wolves are currently present in the six states outside the Tri-State Area does not foreclose the possibility of an increased presence there" in the future. JA104. The court's reasoning fails to apprehend that the ESA is directed at preventing the extinction of species, not at the protection of individual members of populations that are not threatened with extinction. The court focused on potential threats to individual dispersing wolves, but as long as the population as a whole is not in danger of extinction or likely to become so in the foreseeable future, threats to individual dispersing wolves do not warrant continued listing of the DPS.

The court also rejected FWS's finding that the Western Great Lakes DPS is not threatened with extinction under Minnesota's wolf-

management plan.  Minnesota divides the state into two wolf-management zones.  In Zone A, which covers 30,000 square miles in northeastern Minnesota and contains all of the core wolf range in the state, wolves would remain subject to strict protections.  JA1155.  In Zone B, wolves would be subject to more permissive standards of lethal depredation control, meaning that landowners could shoot wolves to protect their livestock or pets.  *Id.*  FWS concluded that the changes in Zone A would be "minor" and would not likely have any significant effect on wolf populations.  JA1158.  In Zone B, FWS acknowledged that the number of wolves could be significantly reduced or even eliminated.  FWS noted, however, that Zone B does not contain suitable wolf habitat and that the Recovery Plan does not call for reestablishing a wolf population in Zone B.  Accordingly, FWS concluded that Minnesota's wolf-management plan was adequate to "maintain a Minnesota wolf population that continues to satisfy the Federal recovery criteria after Federal delisting."  *Id.*

The district court held that finding to be arbitrary and capricious, holding that "the Final Rule fails to explain adequately how the presence of an unregulated killing zone for wolves allowed under the

Minnesota Wolf Management Plan presents no threat to the gray wolf over a significant portion of its range."  JA105.

FWS did, in fact, explain why the absence of strong protections for wolves in the areas outside their core population area does not place the overall Western Great Lakes wolf population in danger of extinction. JA1167; JA1171; JA1176-1177.  The court's refusal to accept FWS's explanation flows from its erroneous interpretation of "significant portion of its range" discussed above, pp. 68-73.  Because the court erroneously construed "significant portion of its range" to include unoccupied historical range, it found insufficient FWS's sound explanation of why the lack of protective regulations outside the wolf's currently occupied habitat do not endanger the survival of the DPS.

The district court's reasoning is in tension with *Friends of Blackwater v. Salazar*, 691 F.3d 428 (D.C. Cir. 2012), in which this Court affirmed a decision by FWS delisting the West Virginia Northern Flying Squirrel.  Having concluded that the squirrel was not in danger of extinction from any of the threats listed in Section 4(a)(1)(A), (B), (C),

or (E),[12] FWS stated that there was no need to separately assess the inadequacy of existing regulatory mechanisms because there were no threats for the regulatory mechanisms to protect against. The plaintiffs insisted that the ESA required "the inadequacy of existing regulatory mechanisms," 16 U.S.C. § 1533(a)(1)(D), to be independently evaluated regardless of the existence of other threats.

This Court agreed with FWS, reasoning that "[i]f the adequacy or 'inadequacy of existing regulat[ion]' is to be judged without considering the level, or even the existence, of any threat the regulation is designed to meet, then it would follow that the Service could never delist a species unless some regulatory mechanism was in place to protect it – whether needed or not." 691 F.3d at 436. While the context in this case is not identical, the principle that the adequacy of the regulation must be judged against the level of the threat is instructive here. The Western Great Lakes wolf population needs protective regulations in the areas they actually inhabit, and FWS reasonably found that the laws, regulations, and management plans applicable to the wolf's core

_____

[12] *See* p. 9, above.

habitat are adequate to ensure the future viability of the wolf population.  Because the possible killing of dispersing wolves in North Dakota or the suburbs of Minneapolis poses no threat of extinction, now or in the foreseeable future, to the core DPS population, the lack of highly protective regulations in North Dakota or southern Minnesota does not endanger or threaten the Western Great Lakes wolf population.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

JOHN C. CRUDEN
  *Assistant Attorney General*

*Of Counsel:*
BENJAMIN C. JESUP
SHARON PUDWILL
  *Office of the Solicitor*
  *U.S. Department of the Interior*
  *Washington, DC 20240*


JUNE 2016
90-8-6-07449

DAVID C. SHILTON
ANDREA GELATT
MICHAEL R. EITEL
JOAN M. PEPIN
  *Environment & Nat'l Res. Div.*
  *U.S. Department of Justice*
  *P.O. Box 7415*
  *Washington, D.C.  20044*
  *(202) 305-4626*
  *joan.pepin@usdoj.gov*

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitations of this Court's order of July 29, 2015, which authorized the Federal Appellants to file a brief not to exceed 17,000 words. The foregoing brief contains 16,663 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

s/ Joan M. Pepin

_____

JOAN M. PEPIN

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2016, I electronically filed the foregoing final brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ Joan M. Pepin

_____

JOAN M. PEPIN