# United States Court of Appeals for the District of Columbia Circuit

## No. 15-5041
### (Consolidated with 15-5043, 15-5060, and 15-5061)

THE HUMANE SOCIETY OF THE UNITED STATES, *et al.*,

*Plaintiffs-Appellees,*

v.

SALLY JEWELL, Secretary of the Interior, *et al.*,
STATE OF WISCONSIN, *et al.*, and
U.S. SPORTSMEN'S ALLIANCE FOUNDATION, *et al.*,

*Defendants-Appellants*

*Appeals from the United States District Court for the District of Columbia in Case Number 1:13-CV-00186-BAH, Hon. Beryl A. Howell, Judge*

## BRIEF FOR PLAINTIFFS-APPELLEES THE HUMANE SOCIETY OF THE UNITED STATES, *ET AL.*

SCHIFF HARDIN LLP
Elizabeth Runyan Geise (D.C. Bar 965559)
EGeise@schiffhardin.com
901 K Street, NW, Ste. 700
Washington, DC 20001
(202) 778-6400
(202) 778-6460 (facsimile)
*Counsel for Plaintiffs-Appellees The Humane Society of the United States, Born Free USA, Help Our Wolves Live, and Friends of Animals and Their Environment*

Ralph E. Henry (D.C. Bar 982586)
rhenry@humanesociety.org
2100 L Street NW
Washington, DC 20037
(202) 676-2324
(202) 778-2357 (facsimile)
*Counsel for Plaintiffs-Appellees The Humane Society of the United States, Born Free USA, Help Our Wolves Live, and Friends of Animals and Their Environment*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

**(A) Parties and Amici**.  All parties, intervenors, and *amici* are listed in the opening brief of the federal Defendants-Appellants (Doc. No. 1582499) and the brief of *Amici Curiae* States of Wyoming, Colorado, Idaho, Kansas, Montana, New Hampshire, North Dakota, and Utah (Doc. No. 1588735).

**(B) Rulings under Review.**  The decisions under review are the Memorandum Opinion and Order granting summary judgment for Plaintiffs-Appellees, Docket Nos. 52, 53, issued on December 19, 2014 by the United States District Court for the District of Columbia (Hon. Beryl A. Howell) in *Humane Society of the United States v. Jewell*, No. 13-186, 76 F. Supp. 3d 69 (D.D.C. 2014).

**(C) Related Cases.** This case has not previously been before this or any other court as defined by D.C. Circuit Rule 28(a)(1)(C).  The pending case of *Defenders of Wildlife v. Jewell*, D.C. Cir. No. 5300, involves some of the same parties and some similar issues.

/s/ Elizabeth R. Geise
Elizabeth R. Geise

**CORPORATE DISCLOSURE STATEMENT**

Plaintiffs-Appellees The Humane Society of the United States, Born Free USA, Help Our Wolves Live, and Friends of Animals and Their Environment are non-profit conservation organizations.  None of the Plaintiff-Appellee organizations has a parent corporation, and no publicly held corporation owns a 10 percent or greater ownership interest in any of the Plaintiff-Appellee organizations.

# TABLE OF CONTENTS

*Page*

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ....................................................................................... i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ................................................................ vii

GLOSSARY OF ABBREVIATIONS ................................................... xiii

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION......................................................3

STATEMENT OF ISSUES PRESENTED..............................................4

STATUTES AND REGULATIONS .......................................................5

COUNTERSTATEMENT OF THE CASE..............................................5

I.      Statutory and Regulatory Background. ........................................5

      A. The Endangered Species Act...................................................5

      B. The DPS Policy. ......................................................................7

      C. The Administrative Procedure Act............................................9

II.     History of WGL Wolves................................................................10

      A. The First Listing of the Gray Wolves.....................................10

      B. The 1992 Recovery Plan. .......................................................11

      C. Subsequent Delisting Efforts..................................................14

III.    The 2011 Final Rule In This Appeal. ..........................................17

      A. The DPS Policy Findings Applicable to the Final Rule...........19

B.  Setting WGL DPS Boundaries. ...............................................................20

C.  The Final Rule's Impact on Multiple Listings. .......................................22

STANDARD OF REVIEW .......................................................................................23

SUMMARY OF ARGUMENT ...............................................................................27

ARGUMENT ..............................................................................................................31

I.     The Trial Court Properly Held that the ESA Does Not Permit
       the Creation of a DPS Solely for the Purpose of Delisting that
       Same DPS. ..................................................................................................31

       A.  The Final Rule Violates the Underlying Purpose of the ESA .................32

       B.  Creating a DPS for Purposes of Delisting Is Contrary to the
           "DPS Policy." .......................................................................................36

       C.  The Solicitor's Opinion Does Not Justify FWS's Illegal
           Conduct ..................................................................................................39

II.    FWS May Not "Revise" the Minnesota Wolves Classification. ...................42

       A.  There Was Never Any Minnesota DPS to "Revise." ...............................43

       B.  FWS's "Revision" Would Alter the 1978 Listing for All
           Gray Wolves in the 48 Conterminous United States ................................45

III.   FWS's Interpretation of the Term "Significant Portion of the
       Range" Is Contrary to the ESA ...................................................................47

       A.  FWS Improperly Ignores the Gray Wolf's Historical Range .................48

           1.  The Historical Range of the Gray Wolf Is the Entire
               United States ....................................................................................48

           2.  FWS Ignores Evidence Regarding the Wolf's Historical
               Range. ..............................................................................................50

       B.  FWS's Analysis of the Significant Portion of the Western
           Great Lake Range Is Also Insufficient. ..................................................52

C. FWS's Interpretation of "Significant Portion Of Its Range" Is In Conflict With the ESA. ...................56

IV. The Rule Was Properly Overturned As It Did Not Rely On the Best Scientific Information Available. ...........................58

    A. FWS Failed to Rely on the Best Available Science in Focusing Its Rulemaking on the Western Great Lakes Region Alone. .....................................................58

    B. FWS's Delisting Decision Was Unlawfully Based on Political Pressures. .....................................................63

V. The Final Rule Was Correctly Overturned Because FWS Ignored Evidence of Continuing Threats to Wolves. ...................67

    A. FWS Ignored Known Threats to the Wolf Population. ...........68

    B. FWS Ignored Inadequacies in State Management Plans. ..........68

VI. The Arguments Posited By The Non-Federal Appellants Do Not Change The Outcome. ..............................................72

    A. Michigan. ....................................................................73

    B. Wisconsin. ..................................................................76

    C. Minnesota. ..................................................................77

        1. Minnesota's Wolf Management Plan is Flawed. ................77

            a. Minnesota's Wolf Management Plan Offers Little, If Any, Protection to Wolves. .............................77

            b. Minnesota's Wolf Management Plan is Inconsistent with the ESA. .............................................79

        2. The Court Should Not Sever the Final Rule. .....................80

    D. States Not Within the WGL DPS. .........................................82

    E. Intervenors Hunter Conservation Coalition. ...........................83

        1. A DPS Does Not Exist Absent Creation by FWS. ...............83

2. Hunters Argue That FWS Should Not Be Burdened With Following the Law ................................................................ 85

3. FWS Is Not "Handcuffed" by Its Listing, Provided It Does Its Job. .......................................................................... 86

4. Other Species ................................................................... 87

VII. Vacatur Was the Proper Remedy ................................................ 89

CONCLUSION .............................................................................. 92

CERTIFICATE OF COMPLIANCE ..................................................... 94

CERTIFICATE OF SERVICE .............................................................. 95

# TABLE OF AUTHORITIES

## Cases

*Asiana Airlines v. FAA*,
134 F.3d 393 (D.C. Cir. 1998)............................................................57

*Bennett v. Spear*,
520 U.S. 154 (1997)......................................................................89

*Biodiversity Legal Foundation v. Babbitt*,
943 F. Supp. 23 (D.D.C. 1997) ..........................................................66

*Burley v. National Passenger Rail Corp.*,
801 F.3d 290 (D.C. Cir. 2015)...........................................................23

*Cablevision Systems Corp. v. F.C.C.*,
649 F.3d 695 (D.C. Cir. 2011) ..........................................................23

*Camp v. Pitts*,
411 U.S. 138 (1973)......................................................................89

*Chamber of Commerce of the U.S. v. FEC*,
76 F.3d 1234 (D.C. Cir. 1996)...........................................................25

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*,
467 U.S. 837 (1984) ........................................... 23, 24, 25, 26, 41, 53

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)......................................................................24

*Commonwealth of Mass. v. Dep't of Transp.*,
93 F.3d 890 (D.C. Cir. 1996)............................................................24

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012).................................................... 26, 39

*Defenders of Wildlife v. Jewell*,
68 F. Supp. 3d 193 (D.D.C. 2014)............................................... 71, 76

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Defenders of Wildlife v. Norton*,
239 F. Supp. 2d 9 (D.D.C. 2002) .................................................................. 48, 49

*\*Defenders of Wildlife v. Norton*,
258 F.3d 1136 (9th Cir. 2001) .............................................................. 47, 48, 49

*Defenders of Wildlife v. Salazar*,
729 F. Supp. 2d 1207 (D. Mont. 2010) ...............................................................81

*\*Defenders of Wildlife v. Secretary, United States Dep't. of Interior*,
354 F. Supp. 2d 1156 (D. Or. 2005) ............................................. 7, 15, 34, 51, 89

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
537 U.S. 293 (2003) ...........................................................................................89

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C.1995) ...........................................................................25

*Gen. Instrument Corp. v. FCC*,
213 F.3d 724 (D.C. Cir. 2000).............................................................................25

*Heartland Regional Medical Center v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) ...........................................................................90

*Hemp Industries Ass'n. v. Drug Enforcement Admin.*,
357 F.3d 1012 (9th Cir. 2004) .............................................................................24

*Humane Society of the United States v. Jewell*,
76 F. Supp. 3d 69 (D.D.C. 2014) .......................................... 43, 46, 54, 68, 78, 92

*\*Humane Society of the United States v. Kempthorne*,
579 F.Supp.2d 7 (D. D.C. 2008) ........................... 5, 16, 33, 34, 35, 52, 53, 91, 92

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
920 F.2d 960 (D.C. Cir. 1990).............................................................................90

*Man Hing Ivory and Imports, Inc. v Deukmejian*,
702 F.2d 760 (9th Cir. 1983) ...............................................................................74

*\*Marsh v. Oregon Natural Res. Council*,
490 U.S. 360 (1989) ....................................................................................... 24, 38

*Modesto Irr. Dist. v. Gutierrez*,
  619 F.3d 1024 (9th Cir. 2010) ...........................................................84

*Motor Vehicle Manufacturer's Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*,
  463 U.S. 29 (1983) ................................................................... 25, 38

*National Ass'n of Broadcasters v. F.C.C.*,
  789 F.3d 165 (D.C. Cir. 2015)..........................................................24

*National Ass'n of Regulatory Utility Comm'rs v. ICC,*
  41 F.3d 721 (D.C. Cir. 1994)...........................................................25

*National Mining Ass'n v. Kempthorne*,
  512 F.3d 702 (D.C. Cir. 2008)..........................................................24

*National Wildlife Fed'n v. Norton*,
  386 F. Supp. 2d 553 (D. Vt. 2005) ................................... 15, 41, 47, 84

*New Hampshire Motor Transport Ass'n. v. Town of Plaistow*,
  67 F.3d 326 (1st Cir. 1995) ............................................................26

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) ..................................................... 44, 84

*Safari Club Int'l v. Jewell*,
  960 F. Supp. 2d 17 (D.D.C. 2013) ................................................ 40, 42

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ..........................................................26

*\*Save Our Springs v. Babbitt*,
  27 F. Supp. 2d 739 (W.D. Tex.1997) ........................................... 63, 65

*Shays v. Fed. Election Comm'n*,
  414 F.3d 76 (D.C. Cir. 2005)...........................................................25

*State of N.C. v. F.E.R.C.*,
  730 F.2d 790 (D.C. Cir. 1984)..........................................................81

*Strahan v. Coxe*,
  127 F.3d 155 (1st Cir. 1997) ...........................................................74

*Tennessee Valley Authority v. Hill,
437 U.S. 153 (1978) .................................................. 5, 33, 79, 88, 92

Trout Unlimited v. Lohn,
559 F.3d 946 (9th Cir. 2009) ............................................................34

United States v. $133,420.00 in U.S. Currency,
672 F.3d 629 (9th Cir. 2012) ...........................................................57

Western Watershed Project v. U.S. Fish and Wildlife Service,
535 F. Supp. 2d 1173 (D. Id. 2007) ...................................................66

Winder v. Erste,
566 F.3d 209 (D.C. Cir. 2009) ..........................................................57

**Statutes, Rules, and Regulations**

15 U.S.C. § 1535(f) ........................................................................73

*16 U.S.C. § 1531(b) .......................................................................6

16 U.S.C. § 1532 ........................................................................ 1, 74

*16 U.S.C. § 1532(16) ................................................................. 6, 81

16 U.S.C. § 1532(19) .......................................................................6

16 U.S.C. § 1532(20) .......................................................................6

16 U.S.C. § 1532(5)(A) ...................................................................56

16 U.S.C. § 1532(5)(C) ...................................................................56

*16 U.S.C. § 1532(6) ........................................................ 4, 6, 28, 47

16 U.S.C. § 1533 ............................................................................6

*16 U.S.C. § 1533(a)(1) ..................................... 7, 9, 37, 47, 67, 81

16 U.S.C. § 1533(a)(1)(D) ......................................................... 69, 79

16 U.S.C. § 1533(a)(1)(E) ...............................................................80

16 U.S.C. § 1533(b) ........................................................................88

*16 U.S.C. § 1533(b)(1)(A) .................................................................. 6, 58

16 U.S.C. § 1533(c)(2)(B) ........................................................................33

16 U.S.C. § 1533(e) ...................................................................................61

16 U.S.C. § 1536(a)(2) ................................................................................6

16 U.S.C. § 1538(a)(1)(B) .........................................................................74

43FR9607 ..................................................................................................49

43FR9611 ..................................................................................................50

5 U.S.C. § 702 .............................................................................................9

5 U.S.C. § 704 .............................................................................................9

5 U.S.C. § 706(1) ......................................................................................89

5 U.S.C. § 706(2) ......................................................................................23

5 U.S.C. § 706(2)(A) ................................................................ 10, 24, 38, 89

5 U.S.C. § 706(2)(C) .................................................................................10

5 U.S.C. § 706(2)(D) .................................................................................10

51FR6688 (Feb. 25, 1986) ........................................................................48

58FR34928 (June 30, 1993) ......................................................................48

*61 Fed. Reg. 4722 (Feb. 7, 1996) 7, 8, 9, 19, 20, 27, 34, 36, 37, 38, 43, 44, 45, 84, 85, 91

65FR43,462 ...............................................................................................51

65FR43,474 ...............................................................................................51

68 Fed. Reg. 15804 .................................................................... 14, 15, 35

71FR15,279 ...............................................................................................51

72 Fed. Reg. 6052 (Feb. 8, 2007) ......................................................... 15, 16

73 Fed. Reg. 10514 (Feb. 27, 2008) ........................................................15

74 Fed. Reg. 15,070 ................................................................................17

76 Fed. Reg. 26086 ......................................................................... 17, 44

76 Fed. Reg. 81666 (Dec. 28, 2011) .... 15, 17, 18, 19, 20, 21, 22, 44, 49, 52, 55, 58, 60, 71, 78

77 Fed. Reg. 55530 (Sept. 10, 2012) .....................................................15

Fed. R. Civ. P. 56(a) ..............................................................................23

## Other Authorities

Black's Law Dictionary .............................................................................81

Gray Wolf Western Great Lakes DPS Post-Delisting Monitoring Report (September 2014) (http://www.fws.gov/midwest/wolf/monitoring/pdf/Year1PDMReportSept2014. pdf)........................................................................................................ 69, 78

H.R. Rep. No. 95-1625 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9463 ..........65

Nat'l Ctr. for Ecological Analysis and Synthesis, *Review of Proposed Rule Regarding Status of the Wolf Under the Endangered Species Act* (Jan. 2014) (http://www.fws.gov/science/pdf/Peer-Review-Report-of-Proposed-rule-regarding-wolves.pdf)...........................................................................................60

S. Rep. No. 96-151 (1979), *reprinted in* ESA Legislative History at 1397.......................................... 9, 34, 40

# GLOSSARY OF ABBREVIATIONS

DPS………………………………………………………Distinct Population Segment
ESA……………………………………………………...Endangered Species Act
FWS……………………………………………….....U.S. Fish and Wildlife Service
SPR………………………………………………..Significant Portion of the Range
WGL……………………………………………….........Western Great Lakes

# INTRODUCTION

This case arises from the district court's opinion striking down a federal agency's 2012 decision to remove protection for gray wolves in nine states under the Endangered Species Act, 16 U.S.C. §§ 1532, *et seq*. ("ESA"). For years, the Department of the Interior, through the United States Fish and Wildlife Service ("FWS"), has waged a war on the gray wolf. Time and time again FWS sought to deny the gray wolf protections to which endangered species are entitled, despite the incontrovertible evidence that the gray wolf remains at risk in a large percentage of its historical range and despite the fact that the gray wolf remains endangered as a matter of law. Over and over, federal courts have rebuked FWS, overturning the various administrative efforts and condemning failed policies.

When the district court cast its light on the agency's action here, the manipulation of law, and fact, and science, was clearly arbitrary and capricious. One glaring ESA violation is found in FWS's effort to strip protection from the gray wolf, using a strategy which has already failed four times: unlawfully manipulating the "Distinct Population Segment" (DPS) provision of the ESA to reach a pre-determined and politically expedient result. FWS attempted to simultaneously designate and delist a DPS of wolves in one part of an area in which the species remains protected. In so doing, FWS has effectively stopped wolf recovery in its tracks, allowing states antagonistic to wolves to implement

policies that will prevent wolves from expanding into viable areas of their historic range.

The FWS also tried to excuse its delisting efforts by announcing it was "revising" a *single state's* gray wolf listing, by turning it into a *nine-state* listing – and then decided those wolves should be considered separate from the wolves in the rest of the lower 48 states. The glaring problem with that decision is that, by bringing more states into the designated range, FWS actually altered the entire country's wolf listing, which was the effect of redrawing the boundary of the wolves in only Minnesota.

FWS also was unhappy with its own decades-long practice of examining the entire historical range of a species when determining its conservation status. In a radical rewrite of its own - and the courts' - rules, it redefined the "range" where animals would be considered, in order to stack the deck against the wolves.

The FWS even flip-flopped on what species it was regulating. In trying to present a scientific basis for removing protections, FWS first claimed the Western Great Lakes wolves were one species, then another, after the first was rejected by wolf experts. In the end, admitting uncertainty over what wolves were actually in the covered area, it ignored the science and engaged in taxonomic revisionism that the district court found "fatally flawed."

Finally, FWS ignored extensive evidence that gray wolves turned over to state management authorities would be immediately hunted and would have little to no opportunity to recover.

The Final Rule (as defined herein) at issue in this case suffers from a laundry list of improper and illegal conduct. FWS ignored not only the express terms and intent of the ESA – to ensure that endangered species are given every opportunity to recover - it also violated its own policies. It short circuited administrative law and key definitions of important terms. It manipulated science which its own employees admitted was unreliable. It ignored problems with and risks arising from human-related causes of death and individual state laws designed to allow humans to hunt and kill gray wolves. In short, it abused the discretion provided to any administrative agency and passed a rule which could not withstand judicial review. The district court found FWS's actions arbitrary and capricious in multiple ways, granted summary judgment and vacated the Final Rule at issue, and reinstated the protection which has been in existence for almost 40 years. The trial court's ruling was correct and should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs-Appellees The Humane Society of the United States, Born Free USA, Help Our Wolves Live, and Friends of Animals and Their Environment (collectively "Appellees") adopt the Statement of Jurisdiction of the Federal

Defendants-Appellants (collectively "Federal Defendants"). *See* Fed. Defs.' Br. at 3.

## STATEMENT OF ISSUES PRESENTED

1. Whether the district court correctly ruled that FWS acted in an arbitrary and capricious manner and violated the ESA, when it created a "distinct population segment" ("DPS") for the sole purpose of delisting that population, and from within a larger listing without simultaneously addressing the larger listing.

2. Whether the district court correctly ruled that FWS violated the ESA in attempting to "revise" a "species" listing of Minnesota gray wolves that existed before any DPS listing was authorized and was never subject to a DPS designation, and which was never subject to the level of analysis required under the current ESA at the time of classification.

3. Whether the district court correctly ruled that FWS's interpretation of the term "significant portion of [the] range," as that term is used in the ESA, 16 U.S.C. § 1532(6), is contrary to the intent of the ESA.

4. Whether the district court correctly found that FWS's delisting of the WGL gray wolves was arbitrary and capricious because the best available science showed unresolved conflict regarding the taxonomy of those wolves, and because FWS designated a DPS while the taxonomic confusion about the species in the DPS continued.

5.     Whether, even if a WGL DPS could have been lawfully recognized, the district court correctly ruled that FWS violated the ESA when it delisted a DPS despite the evidence available to the agency that showed the DPS faced serious threats to its ongoing viability absent the protections offered by the ESA.

## STATUTES AND REGULATIONS

Except for the Administrative Record ("AR") materials to be reproduced in the parties' Joint Deferred Appendix ("JA"), pertinent statutes and regulations appear in the addenda to the brief filed by Plaintiffs-Appellees (Doc. No. 1598446), federal Defendants-Appellants (Doc. No. 1582500), and Defendant-Appellant State of Michigan (Doc. No. 1584893).

## COUNTERSTATEMENT OF THE CASE

## I.     Statutory and Regulatory Background.

### A.     The Endangered Species Act.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Humane Society of the United States v. Kempthorne*, 579 F.Supp.2d 7, 10 (D.D.C. 2008) ("*2008 Wolves*") (quoting *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978)).  "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."  *Hill*, 437 U.S. at 184.  Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for

the conservation of such endangered species and threatened species." 16 U.S.C. §
1531(b).  Federal protections for endangered species under the ESA involve being
shielded from a variety of harms, including any "taking" or other federal action
that would likely jeopardize the species' survival or recovery.  16 U.S.C. §
1536(a)(2).[1]

The ESA is designed to protect "species", defined as "any subspecies of fish
or wildlife or plants, and any distinct population segment of any species of
vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).
A species is "endangered" when it is "in danger of extinction throughout all or a
significant portion of its range."  16 U.S.C. § 1532(6).  A species is "threatened"
when it is "likely to become an endangered species within the foreseeable future
throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

The ESA requires FWS, through delegation from the Secretary of the
Interior, to identify and list species that are "endangered" or "threatened."  16
U.S.C. § 1533.  Listing decisions must be made "solely on the basis of the best
scientific and commercial data available...."  16 U.S.C. § 1533(b)(1)(A).  Any one
or a combination of the following factors requires ESA listing:

---

[1] "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap,
capture or collect, or to attempt to engage in any such conduct."  16 U.S.C. §
1532(19).

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); *Defenders of Wildlife v. Secretary, United States Dep't. of Interior*, 354 F. Supp. 2d 1156, 1159 (D. Or. 2005) ("*Oregon Wolves*").

The phrase "all or a significant portion of its range," incorporated into the definitions for both endangered and threatened species, is not a defined term under the ESA. The "significant portion of [the] range" ("SPR") statutory phrase must be interpreted to advance, rather than undercut, the ESA's fundamental purpose of saving and restoring threatened and endangered species.

B.    The DPS Policy.

The ESA does not expressly define the term "distinct population segment." To address that gap, FWS and the National Marine Fisheries Service ("NMFS") jointly adopted a policy statement to guide their evaluation of whether a population group should be treated as a DPS. Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722 (Feb. 7, 1996) (the "DPS Policy") (JA 204). The DPS Policy "allows the Services to protect and conserve species ... *before large-scale decline occurs that*

*would necessitate listing a species or subspecies throughout its entire range*." JA 208.

To find a valid DPS, FWS must evaluate: the "[d]iscreteness of the population segment in relation to the remainder of the species to which it belongs," and the "significance of the population segment to the species to which it belongs." JA 208. In addition, FWS must satisfy a third prong and determine the "population segment's conservation status in relation to the Act's standard for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?)." *Id.*

"Discreteness" is satisfied if a population segment is "separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors," or if a population's boundaries are marked by international borders. JA 208.

"Significance" is analyzed under four non-exclusive factors: (1) whether the population persists in a unique or unusual ecological setting; (2) whether the loss of the population would cause a "significant gap" in the taxon's range; (3) whether the population is the only surviving natural occurrence of a taxon; and (4) whether the population's genetic characteristics are "markedly" different from the rest of the taxon. *Id.*

Conservation status is determined by the five factors set forth under 16 U.S.C. § 1533(a)(1).

The DPS Policy must be considered in context -- a Senate committee report in 1978 cautioned that it was "aware of the great potential for abuse" of FWS's DPS authority. S.Rep. No. 96-151, at 7 (1979) . The report further stated an expectation that FWS would "use the ability to *list* populations *sparingly* and only when the biological evidence indicates that such action is warranted." *Id.* (emphasis added). FWS recognized, in the DPS Policy, "the congressional instruction that the authority to address DPS's be exercised sparingly." DPS Policy, JA 206. That "sparing" use must be directed at protection – not for delisting.

C.    The Administrative Procedure Act.

The ESA expressly reserves to the Secretary of the Interior the right to determine whether any species is entitled to federal protection under the statute. 16 U.S.C. § 1533(a)(1). That authority, however, is not unlimited. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *See* 5 U.S.C. §§ 702, 704. A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." *Id.* §§ 706(2)(A), (C), and (D). [2]

## II.    History of WGL Wolves.

### A.    The First Listing of the Gray Wolves.

Government-sponsored bounty programs resulted in mass extermination of once abundant wolf populations in the early 1900s, and the species was nearly eliminated from the lower 48 states. JA 658, 680. Despite substantial human-caused mortality and loss and interruption of habitat, a small pocket of wolves in the Western Great Lake ("WGL") region hung on long enough to garner federal endangered species protection before its extermination.

The protection for the WGL wolves predates the ESA. In 1967, the eastern timber wolf (*Canis lupus lycaon*) was listed by Department of the Interior as "endangered" in the United States. FWS, *Recovery Plan for the Eastern Timber Wolf* (1992), JA 140. In 1978, after the 1973 passage of the ESA, FWS reclassified the eastern timber wolf in Minnesota as a species and determined its conservation status as "threatened," at the same time that it reclassified the gray wolf as an endangered species across all of the lower 48 states and Mexico.[3] JA

---

[2] The standard of review under the APA is discussed in more detail *infra*.

[3] The language adopted by most entities addressing this issue is that the gray wolf was deemed threatened in Minnesota and endangered in the lower 48 states.

140, 815. "At that time, [FWS] considered the Minnesota group of gray wolves to be a listable entity under the Act, and [it] considered the gray wolf group in Mexico and the 48 conterminous states other than Minnesota to be another listable entity." JA 815.

B.   The 1992 Recovery Plan.

In 1992, FWS adopted a recovery plan for the wolves previously listed as threatened in Minnesota which, by this time, had expanded their range beyond the state's borders. JA 130.[4] At the time, there was a population estimated at 1,550 to 1,750 wolves in Minnesota and a second population of "Minnesota wolves" (wolves whose families migrated from Minnesota) of approximately 45 to 60 wolves in northern Wisconsin and the Upper Peninsula of Michigan. JA 134. In the eastern timber wolf recovery plan,[5] FWS stated that the "eastern timber wolf [*Canis lupus lycaon*] is a subspecies of the gray wolf and is listed as threatened in Minnesota and endangered throughout the remainder of its historical range in the

Technically, the endangered status would apply in 47 states (the 48 conterminous United States minus Minnesota).

[4] As noted below, FWS's reliance on the recovery plan to show the gray wolf is recovered is misplaced. FWS no longer recognizes the Eastern Timber wolf as part of the gray wolf species, and as recently as May 2011 the agency suggested that it may be a separate species. The state of the taxonomy is uncertain.

[5] Aspects of the recovery plan are confusing based on the language loosely used by FWS in the plan. Technically, the "eastern timber wolf" is only the "Minnesota" wolf population. However, FWS used the terminology "eastern timberwolf" in the Recovery Plan to describe the entire gray wolf species.

eastern United States." *Id.* The recovery plan noted that one of the major actions needed was an evaluation of the "need and feasibility of *restoring* wolves to Maine, New Hampshire, and/or New York." JA 136 (emphasis added). The recovery goal for the gray wolf was never to isolate and abandon a finite number of wolf packs in Minnesota.

FWS's 1992 recovery plan assessed specific threats to the species, which included

> (l) intensive human settlement of the land, (2) direct conflict with domestic livestock, (3) a lack of understanding about the animal's ecology and habits, (4) fears and superstitions about the animal . . . (5) overzealous control programs designed to exterminate the wolves, and (6) perceived competition for deer and moose.

JA 142. FWS believed parasites and diseases could become "more significant mortality factors" given identifiable factors threatening the species. JA 142.

In reviewing the status of this gray wolf subspecies, FWS stated that the eastern timber wolf originally "occurred throughout most of the eastern United States and southeastern Canada," but that the only U.S. populations were "in Minnesota, Michigan, and Wisconsin, comprising about three percent of its original range." JA 140. Almost 25 years ago, FWS knew this small area was only three percent of the wolves' historical range.

The plan's recovery goal for absolute wolf numbers was minimal, determining that "recovery" would occur when "(1) the survival of the wolf in Minnesota is assured, and (2) at least one viable population . . . of eastern timber wolves outside Minnesota and Isle Royale in the contiguous 48 states of the USA is re-established." JA 154. "The Recovery team would like to have several wolf populations prior to recommending delisting, but settled on two as *the minimal acceptable number*." JA 154 (emphasis added). Thus, the recovery team recognized that it was setting the bare bones floor for considering delisting, and that clustering wolf groups close together was not ideal.

> From a conservation biology standpoint, ideal multiple recovery populations should: (1) be completely separated from each other so as to eliminate the possibility of transmission of disease, parasites, etc., from one population to the other, thereby potentially transferring a catastrophe, and (2) be close enough to allow a low level of exchange of genes between them so as to maintain maximum genetic diversity in all populations if they are very small.

JA 154-55.

Finally, "[i]n that part of the United States from which the eastern timber wolf has been extirpated, *several areas deserve serious investigation as potential reintroduction sites*." JA 186 (emphasis added). Even the recovery plan's limited goals show that FWS did not believe that recovery would be accomplished simply when the numbers of wolves in Minnesota increased. The species recovery plan,

for the last twenty years, contemplated expanded range and reintroduction sites in additional areas that would further support the goal of recovery.

C.    Subsequent Delisting Efforts.

The species-level classifications of lower 48 gray wolves and "Minnesota" gray wolves stayed unchanged until 2003, when FWS began its war on wolves. Since then the agency has aggressively pursued delisting of the gray wolf in specific areas of occupied territory and failed to design or implement a national recovery plan.

On April 1, 2003, FWS published a final rule revising the listing status of the gray wolf across most of the conterminous United States.  68 Fed. Reg. 15804 (the "2003 Rule") (Appellees' Add., A1).  Within that rule, for the first time, FWS created three DPSs for the gray wolf: Eastern (including the Midwest and northeast regions), Southwestern (extending into Mexico) and Western (Rocky Mountains and Pacific Northwest).[6]  *Id.*, 68FR15819.  The Eastern DPS, which included the Minnesota wolves, "was reclassified from endangered to threatened, except where already classified as threatened."[7]  JA 1120.

---

[6] The 2003 Rule excluded the southeastern United States, finding the gray wolf was completely extirpated from that area at that time.  68FR15826.

[7] FWS used the term "Eastern Gray Wolf" in the Recovery Plan and the term "Eastern DPS" in the 2003 Rule.  The geographic areas of the two documents were significantly different.  The Eastern DPS constituted most of the eastern portion of the United States.

The 2003 Rule was challenged and ultimately vacated by two federal

District Courts. In Oregon, the court rejected the DPS designations because the

FWS sought to downlist entire ranges of wolves based on the success of certain

core areas within the DPS. *Oregon Wolves*, 354 F. Supp.2d at 1167-78. In

Vermont, the court found, among other things, that FWS acted arbitrarily and

capriciously by ignoring the historical range in which the gray wolf species

thrived. *National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 566 (D. Vt. 2005)

("*Vermont Wolves*"). Thus, in both cases, the courts rejected FWS's fractured

approach of delisting specific occupied portions of wolf range, rather than dealing

with the entire listed entity.

Instead of taking a broader view of wolf recovery, the Service's response

was to try a different attack with an even more piecemeal approach. Beginning in

2006 and continuing to the present, FWS has attempted to delist gray wolves by

drawing narrower and equally insupportable DPS boundaries around wolf-

occupied areas. FWS continues to dodge any efforts at its obligation to create a

national recovery plan to match the national species listing.[8] These efforts have

resulted in no less than twelve orders from federal courts finding that FWS was

---

[8] *See* 72 Fed. Reg. 6052 (Feb. 8, 2007) (2007 WGL delisting rule); 73 Fed. Reg.
10514 (Feb. 27, 2008) (2008 Northern Rockies delisting rule); Revising the Listing
of the Gray Wolf (Canis Lupus) in the Western Great Lakes, 76 Fed. Reg. 81666
(Dec. 28, 2011) ) (the "Final Rule") (JA 1119); 77 Fed. Reg. 55530 (Sept. 10,
2012) (2012 Wyoming delisting rule).

acting in violation of the APA and the ESA, in its continued efforts to rob gray

wolves of federal protections to which they are entitled.

In regards to the WGL gray wolves, in February 2007, FWS issued a rule

that simultaneously created and delisted a WGL DPS of the gray wolf (*Canis*

*lupus*), essentially the same DPS at issue here. 72 Fed. Reg. 6052 (Feb. 8, 2007)

(the "2007 Rule"). The 2007 Rule was challenged by several parties, including

plaintiff-appellee The Humane Society of the United States, as violative of the

ESA and APA. *2008 Wolves*. That court vacated the 2007 Rule, holding FWS

violated the ESA when it did exactly what it did again with the Final Rule here --

simultaneously designate and delist a DPS. *Id.* at 15.[9]

Instead of heeding the court's concerns, FWS obtained a memorandum

opinion from its lawyer, which tries to justify FWS's actions despite the *2008*

*Wolves* opinion criticizing its approach with respect to DPSs.[10] FWS immediately

used that opinion to justify the exact same conduct that had been rejected. On

April 2, 2009, the agency published another final rule identifying the WGL

---

[9] The court further noted that FWS failed to explain how simultaneously creating
and delisting the same DPS could be harmonious with the purposes of the ESA and
that "the ESA's *preference for protecting endangered species counsels strongly in
favor of vacating the [2007] Rule*." *Id.* at 21 (emphasis added).

[10] *U.S. Fish and Wildlife Service Authority Under Section 4(c)(1) of the
Endangered Species Act to Revise Lists of Endangered and Threatened Species to
"Reflect Recent Determinations."* (U.S. DOI 2008) ("Solicitor's Opinion") (JA
607).

populations of gray wolves as a DPS and delisting the DPS.  74 Fed. Reg. 15070

(Apr. 2, 2009) (the "2009 Rule") (JA 626).  The 2009 Rule was ultimately vacated

by consent -- after plaintiff-appellee HSUS challenged it -- when FWS conceded it

had not complied with the APA in issuing the Rule.

These three prior delisting attempts plainly demonstrate that FWS, as a

matter of policy and/or politics, seems bound and determined to delist the WGL

wolves, regardless of the legal contortions – or propriety -- required to accomplish

that end.[11]  FWS would continue its folly with the Final Rule at issue here.

## III.    The 2011 Final Rule In This Appeal.

On May 5, 2011, FWS published a proposal to remove the gray wolf in the

eastern United States from ESA protection.  76 Fed. Reg. 26086 ("2011 Proposed

Rule") (JA 812).  The 2011 Proposed Rule contained three parts of significance.

First, FWS sought to remove ESA protections by revising the historical range of

the gray wolf (*Canis lupus*) in all or parts of 29 eastern states, somehow

discovering in 2011 that those states had been erroneously included in the wolves'

range in 1978.  JA 813, 815, 868-69; Feds.' Add. A18.

Second, FWS announced a major scientific shift in taxonomy, stating that

Minnesota gray wolves (labelled as threatened in 1978) should be elevated to a full

_____

[11] E-mail from Matthew C. Huggler, FWS, to Dan Ashe, Director of FWS (Dec. 9, 2010, 9:10am), JA 778 ("[The FWS] will always seek to remove wolves from ESA everywhere.").

taxonomic species.[12]  JA 813.  The intended result would be that the "Minnesota wolves" (which now included wolves in other states) would be treated as a separate species, from which FWS would remove protection.

Third, the FWS for the third time proposed the creation of a WGL gray wolf DPS with the simultaneous delisting of those wolves – *exactly* the move that had been rejected before.  JA 813.

On December 28, 2011, FWS published the Final Rule, with two substantive changes to the proposed rule.  First, it withdrew efforts to recognize a new species of wolf, admitting that that conclusion was not supported by the science.  JA 1135. Second, it made a weak attempt at recharacterizing its planned action, in order to justify why it was doing again what had already been found illegal (the simultaneous creation and delisting of a DPS).  So FWS announced it was "*revising* the 1978 listing of the Minnesota population of gray wolves (*Canis lupus*) . . . [and] renam[ing them] as the Western Great Lakes (WGL) Distinct Population Segment (DPS)".  JA 1120.  In other words, FWS claimed that this new "WGL DPS" would replace the species listed as threatened in Minnesota in 1978. This was an unprecedented and previously untried manipulation of the ESA.

Among the findings made in the Final Rule were that the

---

[12] The species would be called *C. lycaon*, also known as the "eastern wolf."  JA 815.

> Minnesota wolf population has expanded well beyond state boundaries and is connected to the wolf population in Wisconsin and Michigan, as evidenced by frequent movements of wolves among the States . . . and genetic analyses that demonstrate the Wisconsin and Michigan wolves are mostly from the same genetic mix as Minnesota wolves. . . Therefore, we are delineating the boundaries of the expanded Minnesota population segment to meet the criteria in the DPS policy and to reflect the current geographic location of the population.

JA 1124.

The geographical area of the newly created WGL DPS is "all of Minnesota, Wisconsin, and Michigan" and portions of North Dakota, South Dakota, Iowa, Illinois, Indiana and Ohio. JA 1124. Thus, in the Final Rule, FWS converted the population living solely in Minnesota, and declared it a DPS (which it never was before) covering nine states. This was a daring effort.

A.    The DPS Policy Findings Applicable to the Final Rule.

The Final Rule found that the WGL wolves satisfied the DPS Policy requirement of discreteness. Specifically, FWS found the DPS was discrete because of the "high degree of physical separation between the WGL DPS and the [wolves of the] northern Rocky Mountains . . ." JA 1126.

As to the significance criterion, the WGL population was considered a DPS because it "provides an important extension of the range of gray wolves in North

America," and, without it, a significant gap in the species' range would be created. JA 1126.[13]

FWS ignored the third criterion of the DPS Policy, which requires a DPS population to be either threatened or endangered. Of course FWS could not do so because its ultimate conclusion was to delist the DPS and strip it of ESA protections.

B.    Setting WGL DPS Boundaries.

Under the Final Rule, the boundaries of the WGL DPS were

> delineated to include the core recovered wolf metapopulation plus a wolf movement zone around the core wolf metapopulation. This geographic delineation is not intended to include all areas to which wolves have moved from the Great Lakes population. Rather, it includes the area currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan; the nearby areas in these States in which wolf packs may become established in the foreseeable future; and a surrounding area into which Minnesota, Wisconsin, and Michigan wolves occasionally move. . . . Therefore, the DPS encompasses the current range of the population.

JA 1127.

In the same breath, FWS states that it

---

[13] FWS had decided at this time that it would be delisting a DPS comprised of gray wolves, *C. lupus*, which species was listed as endangered throughout the lower 48 states. Utilizing the new DPS as a species, FWS determined that it could assess the very limited area of that *species*' range using the DPS as the species, and that therefore what "significant portion of the range" meant, only by looking at the DPS boundaries, not the range of the lower 48 species listing.

had to consider the high degree of mobility shown by wolves.
The dispersal of wolves from their natal packs and territories is a
normal and important behavioral attribute of the species that
facilitates the formation of new packs, the occupancy of vacant
territories, and the expansion of occupied range by the
"colonization" of vacant habitat. Data on wolf dispersal rates
from numerous North American studies . . . show dispersal rates
of 13 to 48 percent of the individuals in a pack.

JA 1127 (citations omitted). *See also* JA 140-41 ("Wolves live in packs, and each

pack 'inhabits an area of 20 to 214 square miles (51 to 555 km$^2$) or more and tends

to be territorial.'" When wolf pups leave their pack, they "either live nomadically

over areas of 1,000 square miles (2,500 km$^2$) or more," or disperse out of the area,

sometimes moving more than 500 miles (800 km) away). In FWS's own words,

these animals need significant space to roam in order to recolonize viable habitat

and reestablish new packs, if they are expected to recover.

The Final Rule recited the documented long-distance dispersals of wolves

from these WGL packs, JA 1126-28, and acknowledged the important biological

and social function that dispersal serves, yet FWS designated the DPS boundary

around all existing wolves to delist them, without considering their possible

expansion outside of "the current range." JA 1127.

C.    The Final Rule's Impact on Multiple Listings.

The Final Rule alters two species-level listings, an issue which has not been addressed by the FWS.  First, the Final Rule significantly revises the current, longstanding listing of gray wolves as endangered throughout the 48 conterminous United States by placing some of the wolves in that listing in its new DPS. Second, FWS creates and delists the WGL DPS of gray wolves, purportedly by "revising" the Minnesota threatened gray wolf listing.  In the Final Rule, FWS did not explain how it could "revise" the Minnesota listing and, by drawing the boundaries of that DPS, take wolves who are and have been protected as endangered under the ESA and the 1978 Rule governing the lower 48 listing (which is still in place), carve those wolves out from protections of the lower 48 listing by placing them with the "Minnesota wolves," and yet not review and revise that lower 48 listing as well.  It is an administrative sleight of hand that, when examined, has no support in the ESA or precedent.

In an effort to address at least some of these issues, FWS stated in the Final Rule that "[r]evising and delisting the WGL DPS of wolves is consistent with the Service's past practice and does not represent a change in agency position."  JA 1124.  However, as discussed above, the "Service's past practice" has been repeatedly rejected, and there is simply no support for FWS efforts to rewrite

listing decisions and "revise" populations without express rulemaking procedures being followed.

## STANDARD OF REVIEW

This appeal challenges an award of summary judgment in favor of Appellees. The Court reviews the district court's summary judgment award on a *de novo* basis. *Burley v. National Passenger Rail Corp.*, 801 F.3d 290, 295 (D.C. Cir. 2015). Summary judgment is appropriate where, as here, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Whether summary judgment was appropriately granted in this case requires the Court to undertake a review under both *Chevron U.S.A. Inc. v. Natural Res. Def. Council,* 467 U.S. 837 (1984) and the Administrative Procedure Act, 5 U.S.C. § 706(2) (the "APA").

For issues of statutory interpretation, the Court begins, under *Chevron*,

> by asking whether Congress has directly spoken to the precise question at issue. If it has, we give effect to the unambiguously expressed intent of Congress. But if Congress has not unambiguously foreclosed the agency's construction of the statute, we defer to the agency provided its construction is reasonable.

*Cablevision Systems Corp. v. F.C.C.*, 649 F.3d 695, 704 (D.C. Cir. 2011) (citations and quotations omitted). Stated another way, "[w]here the statute is ambiguous, we defer to the agency's reasonable interpretation of its meaning. By contrast, a clear

expression of congressional intent will bind agency and court alike." *National Mining Ass'n v. Kempthorne*, 512 F.3d 702, 707 (D.C. Cir. 2008).

If the statute is unambiguous, the Court need not undertake further analysis under *Chevron*. *Hemp Industries Ass'n. v. Drug Enforcement Admin.*, 357 F.3d 1012, 1016 (9th Cir. 2004) (no deference required if issue is resolved at "*Chevron* step one").

If the statute is ambiguous, the Court must determine if the agency's interpretation of the statute is "reasonable." *Commonwealth of Mass. v. Dep't of Transp.*, 93 F.3d 890, 893 (D.C. Cir. 1996). What a "court may consider a reasonable interpretation largely depends on the nature and extent of the ambiguity" contained in the statute. *Id.* "A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made, but an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute' ... is not." *National Ass'n of Broadcasters v. F.C.C.*, 789 F.3d 165, 171 (D.C. Cir. 2015) (citation and quotation omitted).

Separately, agency action must be overturned under the APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 376 n.21 (1989). The court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415 (1971), to determine

whether an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action. . . ." *Motor Vehicle Manufacturer's Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43 (1983). The Court considers whether the agency acted within the scope of its legal authority, explained its decision, relied on facts in the record, and considered the relevant factors. *Fund for Animals v. Babbitt,* 903 F. Supp. 96, 105 (D.D.C.1995).

The Court's "inquiry at the second step of *Chevron, i.e.*, whether an ambiguous statute has been interpreted reasonably, overlaps with the arbitrary and capricious standard" of the APA.[14] "Whether a statute is unreasonably interpreted is close analytically to the issue whether an agency's actions under a statute are unreasonable," *Gen. Instrument Corp. v. FCC,* 213 F.3d 724, 732 (D.C. Cir. 2000). The Court need not undertake the *Chevron* step two inquiry where the agency fails to provide a rational justification for the interpretation, "as required by the arbitrary and capricious standard." *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 96-97 (D.C. Cir. 2005).

Under either *Chevron* or the APA, the Court must not abdicate its review in the name of deference. *New Hampshire Motor Transport Ass'n. v. Town of*

---

[14] *Chamber of Commerce of the U.S. v. FEC,* 76 F.3d 1234, 1235 (D.C. Cir. 1996) (citing *National Ass'n of Regulatory Utility Comm'rs v. ICC,* 41 F.3d 721, 726–27 (D.C. Cir. 1994)).

*Plaistow*, 67 F.3d 326, 334 (1st Cir. 1995) ("Even under *Chevron*, deference to an administrative interpretation is not unlimited.").  Indeed,

> *Chevron* recognized the judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 904 (9th Cir. 2012) (citation omitted).

The same is true with respect to the deference available under the APA.  The

> deference we owe an agency is not unlimited.  We may not automatically defer to an agency's conclusions, even when those conclusions are scientific.  Rather, our review must be sufficiently probing to ensure that the agency has not relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  A different approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.

*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994-95 (9th Cir. 2014) (quotations and citations omitted).

Here, the Court must ensure that the Final Rule was not arbitrary or capricious in any way, and was consistent with the language and intent of the ESA.

Because it was not, this Court should uphold the lower court's award of summary judgment to plaintiffs-appellees.

## SUMMARY OF ARGUMENT

The trial court found that the decision in the Final Rule to remove ESA protection from the WGL wolves was illegal for several reasons. This Court can affirm and vacate on any one of those bases. And underlying all of the reasons for affirmance is one basic idea: FWS is obligated to follow both the law and its own policies, but it has not done so.

The expressly stated purpose of the ESA is the protection of species in danger of extinction. Congress created the DPS tool to further that goal and to be employed in limited circumstances for the purpose of providing *protections* for individual populations of species before protections are needed for the whole species. In attempting to use the DPS tool to simultaneously create and delist a species, FWS seeks to use the ESA, and the DPS tool, not to protect but to eliminate protections for the WGL wolves. FWS's conduct is in direct conflict with the language and purpose of the ESA, and therefore illegal.

Attempting to use a DPS for the sole purpose of restricting protections under the ESA is also a violation of FWS's own "DPS Policy" defining when and how a DPS may be created. A DPS does not exist in nature; it only exists when FWS determines that the proposed DPS (considered a "species" under the ESA) meets

all the criteria of its DPS Policy.  The third prong of that policy *requires a finding that the proposed species is threatened or endangered*.  Delisting a species, on the other hand, requires a finding by FWS that the species is *not* threatened or endangered.  FWS's simultaneous designation and delisting of the WGL DPS is therefore internally inconsistent, legally and factually impossible and fatally flawed.

FWS's argument that it is just "revising" a pre-existing "implied DPS" of Minnesota wolves further demonstrates FWS's desperate and tortured efforts to justify its conduct.  There is no basis, in law, fact or precedent, for the concept of an "implied DPS."  Moreover, even if it could survive its reliance on a non-existent entity, FWS's purported "revision" of the *Minnesota* "implied DPS" actually has a substantive impact on the actual and pre-existing classification of the gray wolf throughout *the entire 48 conterminous United States*.  Yet FWS never took the necessary steps to amend the actual, pre-existing listing of the gray wolf.  Thus, even if FWS could rely on this "revision" fiction to justify its conduct, that conduct remains illegal.

Yet another reason that the Final Rule fails is FWS's insupportable interpretation of the statutory term "significant portion of the range."  Any listing or delisting effort by FWS requires an analysis of the species' viability throughout a "significant portion of [its] range."  16 U.S.C. § 1532(6).  And there is no dispute

that the historical range in which the gray wolf was viable is the entire 48 conterminous United States. It is also unequivocal that the gray wolf has not been restored throughout its historical range, a fact which imposes legal obligations on FWS. But FWS simply ignores both the species' historical range and the legal obligations associated with having to restore the gray wolves to a significant portion of its range. That refusal to honor the law is, standing alone, arbitrary and capricious.

Compounding its error, FWS has come up with a new definition of the WGL gray wolf's "range" in order to manipulate its analysis of the gray wolf's recovery. This newly defined, and legally insupportable, definition includes all or a portion of nine Midwestern states. However, even using this twisted definition, the Final Rule fails as it ignores the scientific evidence that gray wolves were not fully recovered within a significant portion even of the (improperly and) newly-defined range. Again, this is fatal to the Final Rule.

Each of these reasons, standing alone, justify the lower court's award of summary judgment. And there is more. In making a listing or delisting decision, the ESA requires FWS to rely on the best available scientific evidence. This is another bedrock principle that FWS has ignored. In order to justify the Final Rule, FWS relied on scientific evidence which FWS itself now admits was not the best available, which renders the Final Rule *per se* invalid.

Even worse, FWS ignored the best available science while capitulating to political pressures and rushing to a delisting decision, in order to adopt the Final Rule before it had to deal with the wrath of members of Congress. This consideration alone also merits a vacatur of the rule.

Furthermore, FWS adopted the Final Rule despite obvious threats to the viability of the gray wolf population within the proposed DPS. These threats include increased new diseases, human-caused mortality, and the heightened risks created because of the inadequacy of individual states' management plans. In short, and again, FWS illustrates its willingness to ignore the underlying purpose and mandate of the ESA; i.e. the protection of a species.

The briefs by intervenors and *amici* raise no compelling, let alone countervailing, arguments. Instead, they simply complain that the ESA is bad law because it does not suit their interests. They make up out of whole cloth arguments insupportable under established law in an effort to show the law does not suit their needs. Those questions, however, are not before this Court. For example, intervenors argue that FWS should ignore the best scientific evidence in making its decisions -- a concept overtly rejected by the ESA. And those same intervenors make the surprising claim that a DPS – a statutory creation -- exists in nature, simply waiting to be labelled by FWS as a species. But the law is clear: no DPS exists unless and until FWS recognizes it as such. Contrary to the allegations of

the intervenors and *amici*, neither Appellees' positions nor the ruling of the district court in this case would demand that gray wolves in the WGL be forever protected under the federal ESA. But these wolves must remain federally managed until delisting would be consistent with the law and FWS's own policies. And FWS's incessant attempts to delist wolves in a piecemeal manner, without addressing the entire existing listing, has been rightly rejected by multiple federal courts, including the district court below, as contrary to law.

Finally, the trial court appropriately vacated the Final Rule, which was invalid on multiple grounds. There is no benefit to be obtained by remanding the rule for further consideration, given the multiple grounds upon which it was rejected. The trial court appropriately reinstated a regulatory regime which has been in place for 36 of the last 37 years. This Court should affirm that decision.

## ARGUMENT

**I.** **The Trial Court Properly Held that the ESA Does Not Permit the Creation of a DPS Solely for the Purpose of Delisting that Same DPS.**

The Final Rule simultaneously created the WGL DPS and stripped it of all protections under the ESA. Indeed, the DPS was created for the sole purpose of being delisted. Neither the ESA nor the DPS tool permits the creation of a DPS/species for the sole purpose of stripping that species of protection.

Equally problematic, FWS's approach nullifies the importance of the listing of wolves outside of the DPS. The extant endangered listing for wolves outside the newly created DPS was promulgated for the purpose of, and is still intended to, provide protections that will foster recovery of the species. But the purpose and intended effect of that listing is neutralized by the delisting of the DPS carved out within it, robbing those wolves of protections previously granted. The FWS cannot avoid its obligation to address the existing listing for wolves—it cannot delist a small portion of an existing listing in way that will undeniably stifle recovery in the remaining listed area without addressing the larger listed entity in the same rulemaking. FWS's attempt here is to avoid its statutory obligations and impact wolves in way that affects the national population. This it cannot do.

A. The Final Rule Violates the Underlying Purpose of the ESA.

The Supreme Court has noted the extremely broad protections intended by the ESA:

> The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute. . . . Agencies in particular are directed . . . to "use . . . *all methods* and procedures which are necessary" to preserve endangered species. [Citation omitted.] In addition, the legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species.

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184-85 (1978). Thus, the underlying intent of *all* agency action under the ESA must be, first and foremost, to provide protections to endangered or threatened species. FWS properly relies on the DPS tool where it is being used to expand the broad protections created by the ESA, and the history of the tool demonstrates that single-minded purpose.

An inarguable caveat is that it contradicts the purposes of the ESA for FWS to create a DPS solely for purposes of delisting the DPS and removing protections. Keeping in mind that creating a DPS is actually creating a "species" under the ESA, creating a DPS in order to simultaneously delist it is actually creating a species in order to strip it of the protections offered under the ESA – which it never had in the first place. There is no provision under the ESA which permits that conduct, and permitting that result is contrary to the broad protections for which the ESA was created:

> Section 1533(c)(2)(B) does not suggest that the FWS may simultaneously designate and delist a previously unlisted sub-population of vertebrates within a broader listing. Rather, it quite strongly suggests – consistent with common usage – that the *listing* of any species (such as the western Great Lakes DPS) is a precondition to the *delisting* of that species.

*2008 Wolves*, 579 F. Supp. 2d at 17, citing 16 U.S.C. § 1533(c)(2)(B)).[15]

---

[15] The *2008 Wolves* court vacated the delisting rule and ordered the FWS to explain, *inter alia*, how its interpretation of the DPS rule could be consistent with the ESA's language and policies, and how it might undermine the ESA's policy objectives.

For this reason, courts have consistently held that FWS may only use the DPS tool to broaden, and not restrict, the scope of the EPA safeguards. Creating a DPS allows the FWS "to provide different levels of *protection* to different populations of the same species." *Trout Unlimited v. Lohn,* 559 F.3d 946, 949 (9th Cir. 2009) (emphasis added). FWS may list a DPS when listing at the species biological, taxonomic level is not warranted, but where a local population of the species is facing threats *unique to the DPS. 2008 Wolves*, 579 F. Supp. 2d at 11; *Oregon Wolves,* 354 F. Supp. 2d at 1169.[16] Legislative history also supports this one-way use of the DPS, with Congress indicating its intent that the DPS be a tool for the protection of species *in addition to* that protection already provided under the ESA and directing the FWS to "*list* [DPS] populations sparingly and only when the biological evidence indicates that such action is warranted." S. Rep. No. 96-151, at 7 (1979), *reprinted in* ESA Legislative History at 1397; *see also* JA 208.[17]

Indeed, relying on that very same legislative history instructing FWS "to use the

---

579 F. Supp. 2d at 7 n.8, 20. FWS's efforts at using the Solicitor's Opinion to respond to the court, and why it is inadequate, is addressed *infra.*

[16] Contrary to assertions in the Solicitor's Opinion, the holding in *Oregon Wolves,* 354 F. Supp. 2d 1156, is consistent with the trial court's ruling in *2008 Wolves.* Both courts recognized that the DPS Policy is intended to protect DPSs, not to give FWS the power to strip species of protections.

[17] While this legislative history was actually recorded after the DPS was passed, FWS recognized its validity when FWS relied on the history in passing the DPS Policy. *See supra*, p 9.

ability to *list* [DPSs] sparingly," one court noted that the legislative history "suggests that Congress thought of the DPS tool primarily – if not exclusively – as a tool for listing locally vulnerable populations." *2008 Wolves*, 579 F. Supp. 2d at 18 n.12 (citations omitted, emphasis in original). And FWS itself agreed in 2003, before it changed its mind to come up with this year's justification for the misuse of the DPS tool. In its 2003 Rule, FWS stated that "[d]elisting can *only* occur if the *listed species* is recovered, if the *listed species* is extinct, or if the original *listing* was based on data, or data interpretation, that were in error." (Emphasis added.) *See* 68FR15859. *None* of these findings were made regarding the WGL DPS before FWS simultaneously identified and delisted the DPS.

FWS's effort to use a DPS to delist a portion of the gray wolf population is simply the most recent example of the agency seeking to avoid its statutory obligation with respect to wolves. Eschewing its mandate to address the national gray wolf population, FWS continued its war on wolves by fighting to turn the protective shield of a DPS into a species-endangering sword in direct conflict with the intent of the ESA (setting a precedent that could hurt other "undesirable" species). FWS's action glaringly avoids its undeniable obligation to undertake a holistic, national approach to the issues surrounding the species. Instead it continues to ignore the policies of the ESA and insists on taking partial measures which have resulted in no less than twelve court decisions holding FWS's policy to delist

individual gray wolf populations to be illegal, a remarkably detailed and long losing streak. It is time for FWS to engage in a national recovery program, and stop its efforts to eliminate wolves from the landscape in piecemeal -- and illegal -- fashion.

The Court should not allow FWS to deny gray wolves ESA protections by manipulation of the DPS tool for purposes contrary to the ESA and Congressional intent. Using the DPS tool to simultaneously create and delist an isolated population of an already listed (and thus federally protected) species is contrary to the underlying purpose of the ESA and is therefore arbitrary and capricious. Summary judgment should be affirmed.

B.  Creating a DPS for Purposes of Delisting Is Contrary to the "DPS Policy."

The DPS is a legislatively created concept. While the ESA defines a DPS as a "species," it is not a "species" in the traditional, scientific sense of the word. FWS created the DPS Policy pursuant to the statute, to determine when a DPS may be created. *See* JA 204. The DPS Policy reflects the exact same one-way approach discussed *supra* and intended by Congress—the DPS is solely a means of *increasing* protections for a population before broader protections are needed at the species or subspecies level. FWS declares that designation of a DPS "allows the Services to *protect and conserve* species ... *before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range*." JA 208. Moreover, the DPS Policy expressly states that no DPS can be created absent

an express finding that the proposed DPS is endangered or threatened. Under FWS's own policy, it is not possible to create a DPS for the purposes of delisting the species. Such an action would be inherently contradictory and in direct violation of the Policy – and a violation of the clear intent of the ESA.

Under the DPS Policy, FWS first considers if the proposed DPS is (i) discrete and (ii) significant. JA 208. If so, FWS must also analyze the required third prong of the DPS Policy. Specifically, FWS is *required* to determine if the proposed DPS has a conservation status. *Id*. The available conservation statuses are determined pursuant to a detailed analysis under the ESA. 16 U.S.C. § 1533(a)(1). If, and only if, the proposed DPS meets all three standards (discrete, significant, and conservation status) can the DPS be created.

Accordingly, in order to create the WGL DPS, FWS has to first recognize those wolves as either endangered or threatened. Absent such a finding, there can be no DPS. The FWS has made no such finding, which represents an independent reason why the Final Rule and use of the DPS tool here is unsupportable. In order to support its action, FWS would have to assert that, at the very same instant in time, the very same Western Great Lakes wolves were *both* threatened or endangered, *and* that they were *not* threatened or endangered. It is arbitrary and capricious and outside of the ESA's scope to take two completely contrary positions in the same

Rule and remove ESA protections with that dichotomy. This unexplainable conundrum proves FWS' conduct violated the ESA.

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, . . . or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In determining whether an agency's conduct is arbitrary or capricious, "the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378 (citations and quotations omitted). "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (citations and quotations omitted).

By ignoring its own policy, as well as the ESA, FWS acted in a way which can only be considered arbitrary and capricious, unreasonable, and in violation of the ESA. The Final Rule must therefore be vacated and the trial court's decision affirmed.[18]

_____

[18] Both the federal Appellants and certain of the state Appellants argue that if FWS is not permitted to delist endangered species using the DPS tool, individual states will be disincentivized to engage in adequate management practices of their wildlife, and that "good" states will pay for the poor management of other states. This is not a policy consideration that is relevant to this Court's ruling. And even if it were, the answer lies in proper *federal* adherence to the principles of both the ESA and DPS Policy. If, instead of its continued unsuccessful attack on gray

## C.     The Solicitor's Opinion Does Not Justify FWS's Illegal Conduct.

The FWS attempts to justify its illegal actions by relying on its lawyer's self-serving memorandum intended to discount the valid concerns of the *2008 Wolves* opinion.  That legal opinion falls far short of the mark, focusing on inapposite arguments, failing to show how use of the DPS tool to *destroy* federal protections meets Congress's clear intent to have the DPS tool be used solely to *increase* species protections, or how the FWS's *seriatim* rejected abuses of the DPS tool serves the language or meaning of the ESA.  The Solicitor's Opinion is simply another piece of propaganda in the war FWS wages on wolves.  Moreover, neither FWS nor this Court can abdicate their responsibilities by relying on a legal opinion offered by counsel, especially when that opinion is as flawed as the Solicitor's here.[19]

The Solicitor's Opinion states that an interpretation of the ESA requiring that a DPS be listed before it be delisted would "requir[e the] FWS to reject any petition requesting removal of a recovered DPS from a broader species listing."  JA 613.  This is clearly not the case and demonstrates precisely the problem: by stating that assumption, the Solicitor acknowledged that there cannot be a request to remove

wolves, FWS followed its mandate to engage in nationwide recovery activities for the species, the entire nation – and each individual state in the species' range – would benefit from the effort.

[19] At most, the Solicitor's Opinion is an interpretation of the law by the agency's counsel.  It is not binding on this Court, and indeed is irrelevant to the Court's analysis.  "The judiciary is the final authority on issues of statutory construction . . ."  *Ctr. for Biological Diversity v. Salazar*, 695 F.3d at 904.

ESA protections from a DPS unless the FWS has already, at some prior time, listed the DPS in order to give it heightened protection. The Solicitor's Opinion also states that whenever a species is listed and given protections of the ESA, the "FWS impliedly lists *any* DPSs that are part of a larger species or subspecies listing." *Id.* (emphasis added). This "implied DPS" theory suggests the absurd notion that there are literally hundreds of dormant, implied DPSs around the country, just waiting for FWS to delist them. The notion of DPSs -- which are separate "species" under the ESA -- being formed without formal and considered agency action flies directly in the face of the congressional mandate to use the DPS tool "sparingly." "Indeed, Congress expressed its reluctance to allow the DPS authority to be used widely, and noted that it was 'aware of the great potential for abuse of this authority.'" *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 29 (D.D.C. 2013), quoting S.Rep. No. 96–151, at 1397.[20] The Solicitor's Opinion suggests that for every listed species, there

_____

[20] The Solicitor's Opinion suggests that FWS could game the system if it is not given its way here, implying a casual disregard for the basic tenets of the ESA. The Solicitor's Opinion suggests that if the Court again rejects its twisted application of the DPS tool, that FWS can simply play around with species listings under the ESA to achieve the same end result that it wants. *See* JA 612 ("FWS could achieve the same result by proposing to delist the entire species if it is no longer endangered or threatened over its entire range and simultaneously proposing to list any DPS or significant portion of its range where that species still remains endangered or threatened."). But this scenario suggests a power of the FWS that it has never exercised (delisting the entire gray wolf species without scientific justification), and could not exercise, based on the best available science – as well as a hypothetical problem notably not before this Court.

is an undefined – and, in fact, infinite – number of implied DPSs waiting to be discovered and potentially delisted.  That makes no sense.

The "implied DPS" theory also suffers from a second fatal flaw.  The Solicitor's Opinion assumes, without support in science or law, that a DPS naturally exists absent agency action.  But the DPS tool is a creature of statutory creation intended by Congress to be used by FWS (and NMFS) when appropriate, and sparingly, to provide protection to certain groups within a species.  "The ESA does not define 'distinct population segment' (DPS), *nor is it a term used in scientific literature*."  *Vermont Wolves*, 386 F. Supp. 2d at 562 (emphasis added).  The Solicitor's Opinion is written with that fallacy as a basic premise, one that has no support.  Because the foundation of the Opinion is folly, so are the conclusions and interpretations that follow.

The *Chevron* doctrine and APA judicial review standards require a showing that agency conduct is consistent with the intent of the statute before deference is given to agency action.  The Solicitor's Opinion falls far short of the reasonableness standard required for deference.  The Solicitor's Opinion, written in response to an adverse judicial ruling, fails as an explanation of proper agency conduct, and simply provides an excuse for ignoring the law.  The Court should not defer to this justification under either *Chevron* or the arbitrary and capricious standards for illegality.  "Congress enacted the ESA . . . to ensure the continued existence of

species to perform vital biological services to maintain a balance of nature within their environments and provide for biological diversity for scientific purposes." *Safari Club Int'l*, 960 F. Supp. 2d at 29 (internal quotations omitted). The Final Rule recognizes that the WGL wolves make up seventy per cent of North American gray wolves occurring south of Canada, yet this is the very population – one that could disperse and recolonize areas of extirpation – that has been targeted for delisting. The FWS is ignoring its ESA mandate and jeopardizing the gray wolf's ability to recover in its range, by stripping protection from a group of wolves that provide vital hope to the recovery of this protected species. JA 1119. Wolves have only started their slow progress from the brink of extinction, because of the ESA, in a few small pockets. Delisting through this abuse of the DPS process cuts off the wolves' recovery progress – certainly not what was intended when the DPS was conceived. The Solicitor's Opinion cannot alter that conclusion.

## II.     FWS May Not "Revise" the Minnesota Wolves Classification.

FWS rather brazenly claims that all the Final Rule seeks to do is to revise a previously existing DPS of "Minnesota Wolves." This claim ignores both the facts and the law. The tortured reasoning with which FWS supports this argument further demonstrates the driving nature of its intent – to delist the Western Great Lakes wolves, by any means necessary, regardless of adherence to established

precedent, principles or law.  The trial court's rejection of this new excuse by FWS should be upheld.

A.     <u>There Was Never Any Minnesota DPS to "Revise."</u>

The initial problem with FWS's specious claim that it merely seeks to amend a Minnesota DPS relates to the discussion of the fallaciously denominated "implied DPS," *see supra* pp. 40-41.  As summarized *supra*, there simply is and never has been any prior existing *DPS* of Minnesota wolves.  The parties agree that in 1978 gray wolves in Minnesota were distinguished from wolves in the remaining conterminous United States.  However, this listing action was taken before the concept of a DPS was ever passed into law.  So there never was a DPS there, and none ever existed until FWS made up the "implied DPS" doctrine to excuse its insupportable delisting of the WGL wolves.

The Minnesota wolf population was designated as threatened in March, 1978.  The ESA was subsequently amended to include the concept of a DPS.  *See Humane Society of the United States v. Jewell*, 76 F. Supp. 3d 69, 114 (D.D.C. 2014) .  But when the Minnesota wolves were designated, there was no such thing as a DPS and those wolves were not and could not have been designated as a DPS.  Moreover, listings that took place prior to the 1996 passage of the DPS Policy relied on different standards, and "hence shed no light on the faithfulness of the [FWS's] adherence to the DPS Policy."  *Nw. Ecosystem All. v. U.S. Fish &*

*Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir. 2007). The Ninth Circuit specifically held that the listing of the gray wolf prior to 1996 could not reflect the application of the DPS policy.[21] *Id*.

FWS itself knows this is all true: the May 2011 Proposed Rule "recognized that the 1978 listings of the gray wolf as an endangered species outside of, and a threatened species within, Minnesota were 'not predicated upon a formal DPS analysis and [does] not comport with current policy standards.'" Mem. Op. at 44 (quoting 2011 proposed rule at JA 816). It is shocking that FWS admits that the Minnesota wolves have never been a DPS, yet now is proclaiming they are. Notably, the earlier 1978 Rule, and the FWS in its brief, explains that the 1978 listings were set up for "convenience" in recognizing that the species was listable throughout its range, though the levels of protection needed were different. Fed. Defs.' Br. at 13. That is, the listings were not given any of the attention to detail

---

[21] The DPS Policy expressly provides for re-examining *DPS* listings that were recognized *before* the 1996 DPS Policy: "Any *DPS* of a vertebrate taxon that was listed prior to implementation of this policy will be reevaluated on a case-by-case basis as recommendations are made to change the listing status for that [DPS]. The appropriate application of the policy will also be considered in the 5-year reviews of the status of listed species required by section 4(c)(2) of the Act." JA 208 (emphasis added); Fed. Defs. Br. at 61. Of course this provision has no application to the Final Rule, since the Minnesota listing is not, and has never been, a DPS, so the timing of adoption of the DPS Policy is not relevant to a listing that was never a DPS *and* predates the legal concept of a DPS.

required to set up a DPS, and cannot become one simply because FWS finds it convenient.

FWS wants this Court to approve the retroactive creation of a formal designation – a DPS – by historical revisionism not based in any law. But FWS's idea would ignore decades of listing history for the Minnesota wolves, and would belie the agency's own admission that no DPS analysis was done in Minnesota. The concept that a Minnesota DPS has essentially always existed in the abstract would also ignore the fact that neither before (in the eighteen years between 1978 - 1996) or after (in the past twenty years) the 1996 enactment of the DPS Policy has the fantastic notion of a "Minnesota DPS" ever come up. Despite forty years in which the agency has been silent about a Minnesota DPS, now, being challenged over an action that has been serially rejected by the courts, FWS has come up with a new idea that is just as meritless as before. The counterintuitive and legislatively insupportable constructs that such findings would require should put this effort to rest. FWS does not and cannot show that the Minnesota listing could have been, was, or was intended to be a DPS.

B.  FWS's "Revision" Would Alter the 1978 Listing for All Gray Wolves in the 48 Conterminous United States.

FWS's argument is that it is simply revising the Minnesota DPS. However, as part of that "revision," it seeks to expand the geographical scope of the "Minnesota DPS" from a *single* state to *nine* states, including wolves in eight states

that *already* are subject to the endangered listing for gray wolves across America. Thus, FWS is not, as it says, just revising the Minnesota wolf population -- by "revising" the DPS to include those eight new states, FWS changes the status of wolves in 47 other states, since it affects the listing for wolves in those other states. FWS has not undertaken the appropriate steps to make that amendment.

Tellingly, the federal Appellants do not even address this issue, discussed in detail by the district court. 76 F. Supp. 3d at 123-25. FWS's failure -- and inability -- to explain its revision of the entire national listing without proper process under the ESA further establishes the illegal nature of its action.

In order to amend (or "revise") the status of a pre-existing listed species, FWS must follow the procedure described under the ESA. It cannot avoid that process by recharacterizing its actions – by calling it "revision of a DPS" which just happens to include eight states already contained in a separate listing of the entire gray wolf species -- when the action indisputably affects previously listed species. Here, the "revised Minnesota DPS" encompasses wolves in areas that are currently included within the gray wolf species designated in the 48 conterminous states. Specifically, the practical effect of the "revision" of the fictional Minnesota DPS is to change the listing status of *all* of the wolves in Michigan and Wisconsin and parts of North Dakota, South Dakota, Illinois, Indiana, Iowa and Ohio. This

alters the overall listing of gray wolves in all 48 states, since it irrevocably changes that listing.

If FWS wanted to do this properly, it would have to analyze its action – whether it calls it a revision or acknowledges it is an amendment to a listed species makes no difference – according to the five statutory factors described in 16 U.S.C. § 1533(a)(1). *Supra*, p. 6-7. FWS has never suggested, acknowledged, or shown that it followed that procedure, and instead ignored the issue. But because FWS did not engage in *any* of the required analysis with respect to this population of wolves, its attempts to convert this significant upheaval of a national listing into a regional "revision" of a previously-undiscovered DPS should be rejected. If there is a lawful and prudent reason to engage in a revision of the listing designation for gray wolves in the 48 conterminous states, FWS has the statutory tools and direction to do so. But FWS's claim that all it was doing was expanding a pre-existing Minnesota DPS does not stand up to scrutiny.

## III.   FWS's Interpretation of the Term "Significant Portion of the Range" Is Contrary to the ESA.

A species is endangered when it is in "danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). Courts recognize that the term "significant portion of its range" is ambiguous.[22] However, and specific to

---

[22] *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001) ("*Defenders (Horn-Tailed Lizard)*"); *Vermont Wolves*, 386 F. Supp. 2d at 565.

the term "significant portion of its range," courts have also held that FWS is not entitled to deference where it ignores scientific evidence (*Defenders (Horn-Tailed Lizard)*, 258 F.3d at 1145) or when FWS's conclusions are "antithetical to the ESA's broad purpose to protect endangered and threatened species." *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 21 (D.D.C. 2002) ("*Defenders (Lynx)*").

In this case, FWS's determination of the gray wolf's "significant portion of its range" is arbitrary and capricious for two separate reasons. First, FWS reinterprets the term in order to serve its purposes, ignores the historical range of the gray wolf and is willing to eliminate 95% of the range of the wolf in the Final Rule. Second, even assuming FWS is entitled to set up a WGL DPS, FWS ignores a significant portion of this newly defined range in undertaking its analysis. Accordingly, the Final Rule must be vacated.

A.     FWS Improperly Ignores the Gray Wolf's Historical Range.

1.     The Historical Range of the Gray Wolf Is the Entire United States.

Both the FWS and federal courts have consistently recognized that the term "range" refers to the species' *historical range*.[23] Indeed, the 1978 gray wolf listing

---

[23] *See, e.g.*, 58 Fed. Reg. 34928 (Jun. 30, 1993) (Carolina heelsplitter listed as endangered because it had "been eliminated from a significant portion of its historic range"); 51 Fed. Reg. 6688 (Feb. 25, 1986) (listing northern aplomado falcon after finding it was "endangered throughout its historic range").

implicitly recognized the incorporation of this definition into the analysis.[24]  The

Ninth Circuit has previously held that "range" must mean historical range.[25]  In that

case, the Court "conclude[d], consistent with the Secretary's historical practice, that

a species can be extinct 'throughout . . . a significant portion of its historical range' if

there are major geographical areas in which it is no longer viable but once was."

258 F.3d at 1145.  Moreover,

> where, as here, it is on the record apparent that the area in
> which the [species] is expected to survive is much smaller
> than its historical range, the Secretary must at least explain
> her conclusions that the area in which the species can no
> longer live is not a "significant portion of its range."

*Id.*[26]  *See also Defenders (lynx)*, 239 F. Supp. 2d at 19 (the "focus on only one region

of the Lynx's population  . . . to the exclusion of the remaining three-quarters of the

---

[24] *See* 43FR9607 (listing the gray wolf throughout the conterminous United States
after finding that "the species now occupies only a small part of its original range").
FWS should be estopped from taking a contrary position to rationalize the Final
Rule.  "Where a party assumes a certain position in a legal proceeding, and
succeeds in maintaining that position, he may not thereafter, simply because his
interests have changed, assume a contrary position, especially if it be to the
prejudice of the party who has acquiesced in the position formerly taken by him."
*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citations and quotations
omitted).

[25] *Defenders (Horn-Tailed Lizard),* 258 F.3d at 1145.

[26] The Ninth Circuit, the only other circuit that has addressed this issue, found both
that the historical range is the appropriate range and that this position is consistent
with the position normally espoused by FWS.

Lynx's historical regions, is antithetical to the ESA's broad purpose to protect endangered and threatened species").

Accordingly, the FWS must consider the Section 4(a)(1) threats within the gray wolf's historical range to determine if it remains endangered across "a significant portion of its range." Any gray wolf listing, whether it be the WGL DPS or the current listing of wolves in 47 states, must satisfy this criteria before it can be delisted.

2.      FWS Ignores Evidence Regarding the Wolf's Historical Range.

Despite this seamless history, as it has done repeatedly with respect to the Final Rule, FWS changes its mind on this issue too and now claims that it is not bound to examine the wolf's historical range. For the reasons already stated, it is wrong. Moreover, FWS's failure to address the historical range of the gray wolf is simply a matter of ignoring evidence available to it, in violation of the APA.

*Everyone* agrees that gray wolves once lived throughout most of North America. JA 1126. The federal Appellants cannot contest that the gray wolf is absent from 95 per cent of its historical range within the conterminous United States. Because the wolf was restricted to a small part of its historical range by widespread human persecution, habitat destruction, and inadequate regulatory mechanisms, in 1978, the FWS determined that the species required protection throughout the conterminous United States and Mexico. 43FR9611 (Feds.' Add. A22). Due to the

failures of the FWS to address the issues related to gray wolves on a nationwide basis, the gray wolf is making only slow progress toward recovery. But wolves are unequivocally not present throughout most of their historical range. JA 1126. *See also* 65 Fed. Reg. at 43452-74 (FWS noting there are major geographic areas in which the gray wolf was once viable).

Moreover, there are numerous areas within the conterminous United States that contain suitable habitat and yet remain devoid of wolves. These areas include the Northeast, parts of Michigan and North Dakota, the Pacific Northwest, and other parts of the West.[27] The Final Rule simply ignores this evidence.

Nor is this is a new problem for FWS. Federal Appellants' prior wolf delistings have been struck down for this same reason – because the gray wolf has not recovered across a significant portion of its range. *See*, *e.g.*, *Oregon Wolves,* 354 F. Supp. 2d at 1167-69. And FWS's current decision offers less support than ever before. In fact, the record reflects that the FWS *knows* that the range it designated in

---

[27] *See Oregon Wolves*, 354 F. Supp. 2d at 1167 & n.8 (discussing wolf habitat and dispersing wolves in the Northeast, Northwest, and the Dakotas); 65 Fed. Reg. 43450, 43462 (Jul. 13, 2000) (identifying favorable wolf habitat in the Northeast); 71 Fed. Reg. 15266, 15279 (Mar. 27, 2006) (discussing unoccupied wolf habitat in Michigan and North Dakota); 65 Fed. Reg. 43474 (noting that "there is certainly habitat that could support wolves" in western states such as Oregon, Utah, and Colorado). And this is not an exclusive list of the areas where suitable habitat is available for the gray wolf to survive. But it is a compelling illustration of the fact that FWS has ignored multiple and substantial areas of the wolf's range in its current view.

the Final Rule is neither the historical range nor the entirety of the range where suitable habitat exists.[28]

Because the term "significant portion of its range" is ambiguous, FWS is entitled to some deference. But FWS is not entitled to have the Court turn a blind eye to the fact that the agency is ignoring significant amounts of evidence and failing to explain why that evidence should be ignored. Doing so is a quintessential violation of administrative law. *2008 Wolves*, 579 F. Supp. 2d at 12. The Final Rule is therefore arbitrary and capricious.

B.  FWS's Analysis of the Significant Portion of the Western Great Lake Range Is Also Insufficient.

In addition to ignoring the law, its own policies, and the actual historical range of wolves, FWS also ignored significant portions of the range, even within its own newly-defined DPS boundaries, to facilitate analysis delisting outcome. Specifically, FWS defined the range of the WGL DPS to include all of three states (Minnesota, Michigan and Wisconsin) and parts of six others. Yet when it did its

_____

[28] *See*, *e.g.*, JA 787-88 (FWS staff e-mail stating that if a DPS for Great Lakes wolves were established by the Final Rule, then the FWS "will need to talk about those MO/IA, etc. areas" that are "still C. lupus range"); *see also* E-mail from Patrick Leonard, FWS, to Lynn Lewis, FWS (Dec. 22, 2010 at 11:19 am), JA 790-91 ("I'm not sure it's realistic to expect to settle the question of the historic range of C lupus by the beginning of [F]ebruary (. . . the real question is, what was the historic range of C lupus, and let the "what wasn't" fall off; we can't try to prove the negative instead). I'm not sure exactly what was promised to the Senator, but my thought would be to [just] meet that promise, no more, by this deadline, and at this point not try to include all the things we'd like to do now too.").

analysis of the viability of wolves within the DPS, it ignored the viability of the species in all but a portion of Minnesota, Michigan and Wisconsin. The trial court correctly found the DPS arbitrary as FWS did not address the viability of the wolf in other portions of the DPS.

Even where some deference is owed to FWS's interpretation of the statutory term "significant portion of its range" under *Chevron*, the agency's rule must still be overturned as arbitrary and capricious in violation of the APA where the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise.

*2008 Wolves*, 579 F. Supp. 2d at 12. Where the agency offers "an explanation that is arbitrary, capricious, or manifestly contrary to the statute" the Court need not defer to the agency. *Id.* at 13 (citations and quotations omitted). That is true here.

The Final Rule created a DPS that included all or a portion of nine states.[29] However, even though wolves are not currently prevalent throughout the entire range of the new purported DPS, JA 1143-44, as the trial court noted, the

> Final Rule focuses on the suitability of habitat in the Tri-State Area – the western Great Lakes wolf population's "current range"-- but gives only cursory attention to

---

[29] Those states are Minnesota, Wisconsin, Michigan, North Dakota, South Dakota, Iowa, Illinois, Indiana and Ohio. JA 1124-25.

> "other areas within the DPS," describing those other
> areas as unsuitable habitat, "too small or too fragmented
> to be suitable for maintaining a viable wolf population."

76 F. Supp. 3d at 131.  FWS therefore admits the gray wolf has not yet recovered

in a large portion of the DPS range *as defined by the FWS*.  The gray wolf

therefore remains endangered within a significant portion of the range *even as*

*defined by the FWS*.  The arbitrary and capricious nature of this cannot be denied.

In addition, FWS ignores evidence that wolves could disperse throughout a

greater range that the WGL DPS range if given the chance.  FWS admits that

dispersing wolves have traveled as far as 600 miles from their origin and that these

dispersals "allow a wolf population to quickly expand and colonize areas of

suitable habitat, even if those areas are separated by broad stretches of unsuitable

habitat."  Fed. Defs. Br. at 11.  But in the Final Rule, FWS prevents dispersals to

the full extent possible and has not accounted for the possibility that unsuitable

habitat could link two stretches of suitable habitat, all within the DPS boundaries if

properly drawn, to allow recovery of the population.

Under these circumstances, fundamental principles of administrative law

require, at a minimum, that FWS provide a satisfactory explanation for failing to

meet the legal requirements of the ESA.  And as the trial court correctly noted,

FWS did not adequately address this issue.  76 F. Supp. 3d at 128 ("FWS failed

adequately to explain (1) why parts of six states outside the "core population areas"

of wolves in the western Great Lakes DPS were not "significant portion[s] of [wolf] range" in which the gray wolf remained threatened or endangered").  Nor could they make that claim, because FWS admits that the wolf population within the defined DPS is contained in a small percentage of the DPS range.  JA 1175 ("We have concluded that Minnesota, Wisconsin, and Michigan will maintain their share and distribution of the WGL wolf population.").  Even using FWS's definition of the range, the Rule fails to consider a significant portion of that range.[30]

By improperly shrinking the area in which the threats analysis is conducted, FWS intentionally avoids addressing the serious problems faced by the wolf *rangewide*.  *See* JA 496-97 (describing advantages of this approach including ability to "conduct threats analysis over [a] smaller area" and "delist GL quickly" and acknowledging "remaining areas left unresolved").  This insupportable gerrymandering of the range, which is used as a basis for denying the wolf population sufficient territory to recover, is in direct conflict with the spirit and purpose of the ESA.  On this basis alone, the Final Rule must be vacated.

---

[30] The Rule also ignores other portions of the Midwestern United States as portions of the wolf's range.  The FWS admits, and the Final Rule recognizes, that "wolves can occupy a wide range of habitats . . . [and] wolves historically occupied *the entire Midwest*."  JA 1143 (emphasis added).

C. **FWS's Interpretation of "Significant Portion Of Its Range" Is In Conflict With the ESA.**

As noted, the ESA does not contain a definition of the term "significant portion of its range." The ESA, however, does contain a definition of the term "critical habitat." The definition of the term "critical habitat" is essentially the definition of "significant portion of its range" adopted by the FWS. Since FWS's interpretation would render the term "critical habitat" redundant, the Final Rule is not in accordance with the law and must be vacated.

The ESA states that

> (A) [t]he term "critical habitat" for a threatened or endangered species means--
>
> **(i)** the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
>
> **(ii) specific areas outside the geographical area occupied by the species at the time it is listed** in accordance with the provisions of section 1533 of this title, **upon a determination by the Secretary that such areas are essential for the conservation of the species**.
>
> * * *
>
> (C) Except in those circumstances determined by the Secretary, **critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.**

16 U.S.C. § 1532(5)(A), (C) (emphases added).

In short, the definition of "critical habitat" is that geographic area in which the endangered or threatened species *currently* exists, and areas outside the range currently occupied by the species but which are essential for the survival of the species. Critical habitat is not the entire range which can be occupied by the threatened or endangered species. In other words, the statutory criteria used for determining "critical habitat" are identical to FWS's new definition of "significant portion of the range" for the WGL wolves. That would render the term "significant portion of the range" redundant, in conflict with standard rules of statutory interpretation.

This Court's "reading of the statute is reinforced by the cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Winder v. Erste*, 566 F.3d 209, 214 (D.C. Cir. 2009); *accord United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 643 (9th Cir. 2012) (citations and quotations omitted) (same). A similar "cardinal principle of interpretation requires [the Court] to construe a statute so that no provision is rendered inoperative or superfluous, void or insignificant." *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) (citations and quotations omitted).

Allowing FWS to proceed under a definition of "significant portion of its range" that is the same as the statutory definition of "critical habitat" renders one of those terms superfluous and redundant. As a result, the interpretation provided

by FWS is contrary to the statute and is arbitrary and capricious.  The trial court properly vacated the rule.

## IV.  The Rule Was Properly Overturned As It Did Not Rely On the Best Scientific Information Available.

### A.  FWS Failed to Rely on the Best Available Science in Focusing Its Rulemaking on the Western Great Lakes Region Alone.

The Final Rule sought to create a DPS for the purported WGL wolves. However, the underlying premise of the initially proposed DPS was that the wolves within the DPS were a different taxonomic species.  FWS now admits the science does not support that conclusion.  Once it realized that fatal flaw in its plan, FWS should have dropped the delisting proposal,[31] since the support for a separate DPS disappeared.  Because the underlying premise for the DPS is flawed/absent, the Final Rule must be vacated.

It is indisputable that in order to create a DPS, and list or de-list a species, the FWS is required to rely on the best, most recent science available to it.  16 U.S.C. § 1533(b)(1)(A).  In an effort to meet that requirement, FWS initially put forth a proposed rule that, in light of the "science" it relied upon, contemplated the recognition of a new taxonomic species of wolf in and immediately outside the WGL area.  JA 813, 815.   Indeed, the initial proposed rule did not need to rely on

[31] At the very least, the notice and comment requirements of the APA obligated FWS to revise and re-open, or issue a new, proposed rule with notice and comment on a new rationale.  Instead the agency just asserted its new rationale in its Final Rule.

the creation of a DPS (even though it did) because supposedly, based on the best scientific data available, there was a brand new species recognized.

The proposed rule creating a new taxonomic species was based on a 2012 report by Steven Chambers, a FWS staff biologist, and three of his agency colleagues. Chambers cited "[t]he extreme lack of consensus among researchers on so many important issues related to the taxonomy of North American wolves" as prompting the report. JA 940-41. By construing (or misconstruing) the results of multiple studies, the Chambers report concluded that WGL wolves were hybrids of two separate full species, the eastern wolf, *Canis lycaon*, and the gray wolf, *Canis lupus*. Chambers further concluded, that "the eastern wolf and gray wolf are known to interbreed within the Great Lakes region." JA 1015. But the report concluded that only the newly recognized species, *C. lycaon,* was historically found outside of the WGL region. JA1018, 1026, 1028. On this basis FWS justified its proposed rule delisting gray wolves, *C. lupus*, within the WGL region. JA 868.

Thus, seemingly by design, the new taxonomic conclusions by FWS's own scientists might be used to support delisting of gray wolves in a WGL DPS while avoiding the legal infirmity that caused a federal court to reject the agency's prior WGL delisting rule— because the agency would not be carving out a DPS from within the larger listed range of the species if the gray wolf only historically

existed within the WGL and all wolves that historically existed outside of the WGL were a (only just recently realized) different species.

Unfortunately for FWS, the taxonomic shell game proved to be a loser: after intense criticism of the Chambers report's conclusions, FWS reversed course, abandoned reliance on the report, but nevertheless arrived at the exact same decision to delist the DPS. "Comments on the proposed rule, including comments provided by leading researchers in the field of canid biology and genetics, have led us to reconsider our proposed interpretation [of wolf taxonomy]."[32] JA 1123. This manipulation of taxonomic classification is barely mentioned in FWS's opening brief, Fed. Defs.' Br. at 23 n.5, but FWS cannot hide from the taxonomic turnaround between the documentation supporting its Proposed Rule and the brand new approach in the taxonomic discussion supporting the Final Rule.

In the Final Rule, FWS at least admitted that its "[r]esearchers differ in whether this unique form of wolf should be recognized as a species, a subspecies, or a distinct taxon or ecotype." JA 1123. That concession about uncertainty about

---

[32] In 2014, an independent panel of five leading geneticists and taxonomists harshly criticized the agency's reliance on this Chambers report and proposal to delist gray wolves throughout the lower 48 states, unanimously concluding that the service had not relied on the "best available science" for its listing determinations. Nat'l Ctr. for Ecological Analysis and Synthesis, *Review of Proposed Rule Regarding Status of the Wolf Under the Endangered Species Act* (Jan. 2014) (http://www.fws.gov/science/pdf/Peer-Review-Report-of-Proposed-rule-regarding-wolves.pdf).

the status and classification of wolves in the WGL presents another problem for

FWS: it begs the question of how FWS can identify the WGL DPS *without*

*knowing the species that it is both listing and delisting*. The only thing certain is

that no one is certain about the taxonomy of the WGL wolves, which

> have been considered a subspecies of gray wolf, *Canis lupus lycaon*; a second subspecies of gray wolves, *Canis lupus nubilis*; a *Canis lupus* population that has been influenced by interbreeding with coyotes; members of a full species *Canis lycaon* (or eastern wolf) that is considered separate from *Canis lupus*; possibly the same species as the red wolf, *C. rufus*; the result of hybridization between *C. rufus and C. lupus*; and as a mixed population of *C. lupus*, *C. lycaon*, and their intercrosses (hybrids).

JA 1122 (internal citations omitted). In short, the best available science indicates

that neither FWS nor the scientific community has reached a defensible consensus

regarding the taxonomy of the WGL wolf populations. [33]

Despite this unquestioned uncertainty, FWS apparently saw no problem

proceeding with the DPS delisting, regardless of its lack of knowledge and its

---

[33] Without reaching a determination as to the conservation status (threatened or endangered) of any other species of wolf that may be present in the WGL region (e.g., *C. lycaon*), FWS cannot know whether it may be subjecting another potentially threatened or endangered species to harm even if delisting of gray wolves was in fact appropriate and lawful. The ESA has provisions providing for the listing of any species similar in appearance to a threatened or endangered species that is found in the listed species' range. 16 U.S.C. § 1533(e). Thus, even if the Chambers report had represented the best available science – which even FWS admits it did not -- it would still have been arbitrary and capricious for FWS to delist gray wolves prior to determining the conservation status of any other wolf species or subspecies in the region.

about-face regarding taxonomic classifications of the wolves it was delisting. And in the end, FWS agreed that the WGL wolves are of the same species as the gray wolf in the conterminous 48 states, which wolves are already subject to listing under the ESA. "In light of the ongoing scientific debate, and the lack of clear resolution concerning the taxonomy of wolves in the western Great Lakes, we are at this time continuing to recognize *C. lupus* as the only species that occurs in the WGL." JA 1123.

Having been flummoxed by its changing understanding of the best available science on the taxonomy of the WGL wolves, FWS surely should have abandoned the concept of a new taxonomic level of species and instead turned its focus on a nationwide recovery plan for the species that covered the entire United States. This would have honored the mandate and the purpose of the ESA and provided the protection that gray wolves need everywhere. But instead of following the science and the law, FWS pivoted to the creation of a DPS by revising the decades-old Minnesota wolf listing, a decision that is obviously not based on the best available science but is instead driven by the political desire to create a DPS and strip the WGL gray wolf of the protections of the ESA.

B.     <u>FWS's Delisting Decision Was Unlawfully Based on Political Pressures.</u>

FWS's rush to honor its promises to legislators to get the WGL wolves delisted is clear from the record, and explains its willingness to violate the law and the shifting science. But the ESA "requires [the FWS] to *disregard politics*" in making listing decisions. *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 747 (W.D. Tex.1997) (emphasis added). And the record here shows FWS's ultimate decision was driven by promises made to members of Congress, rather than the enumerated listing factors of the ESA. As early as 2009, several senators wrote to the FWS Director "requesting he take action to delist the western Great Lakes gray wolf." *See Letter from Amy Klobuchar, U.S. Senator-M.N., to Hon. Ken Salazar, Secretary of the Interior* (Dec. 7, 2010), JA 771 (referencing December 2009 letter from Senator Klobuchar and Congressman Oberstar to the FWS Director).

A year later, Senator Klobuchar "request[ed] that FWS put out a public statement by the middle of this week saying that the FWS will move to delist the gray wolf" and indicated that she would "send[] the Secretary a letter . . . that will be an updated version of last year's letter, that will urge the wolf be delisted in 2011." E-mail from Lara Levison, Dept. of Interior ("DOI"), to certain FWS and DOI personnel (Dec. 6, 2010, 1:33pm), JA 772-73; JA 771 (follow-up letter asking Secretary Salazar to "expedite the delisting of the gray wolf in the Great Lakes.").

Just days later, FWS personnel indicated Salazar had acceded to the Senator's demands:

> [t]his week we learned that Senator Amy Klobuchar (D-MN) was going to introduce legislation to delist the wolf in the western Great Lakes. *Instead, Secretary Salazar agreed that we would have a proposed rule published by April and a final rule completed by the end of 2011 (that presumably would delist WGL wolves).* We've been working on schedules, strategies, and staff needs to accomplish this.

E-mail from Lynn M. Lewis, FWS, to five FWS personnel (Dec. 10, 2010, 3:24pm), JA 786 (emphasis added).[34] The result was a public announcement that the FWS "was seeking to delist wolves in the *Great Lakes*," E-mail from Christine Eustis, FWS, to DOI and FWS personnel (Dec. 9, 2010, 9:46am), JA 776. *See also* JA 778 ("[the FWS] will *always seek to remove wolves from ESA everywhere*." (Eemphasis added). The FWS followed up with a letter to the Senator indicating that the FWS would propose delisting by April 2011, and publish a final rule "by the end of 2011."[35] And the record in this case shows the FWS stuck close to its plan to meet its commitment to the Senator.[36] The December 2010 e-mails between FWS and

---

[34] The record reveals that the FWS also had various communications with congressional staff about the content of the press release announcing the FWS's intent to delist the WGL wolves. JA 772-73; 779.

[35] Letter from Thomas L. Strickland, Assistant Secretary for Fish and Wildlife and Parks, to Hon. Amy Klobuchar, U.S. Senator-M.N. (Dec. 9, 2010), JA 774.

[36] In weighing the pros and cons of various options for the final delisting rule – that arose largely because FWS did not know what wolf species actually existed in the Great Lakes – the FWS listed as the sole "Con" to delisting was that attempting to

Senator's Klobuchar's staff plainly presumed a delisting outcome, even before FWS had announced its *review* of the "Minnesota" listing, which was months before the May 2011 delisting proposal. The timing of these events, and certainly the political pressure that the record reveals, squeezed out any possibility that the "best available science" was controlling the outcome of FWS's "proposal."

This kind of political intrusion into listing decisions is wholly improper under the ESA and precisely what the best available science requirement of the ESA was intended to guard against. *See* H.R. Rep. No. 95-1625 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9463 ("[i]ndividuals charged with the administration of the [ESA] do not have the legal authority to weigh the political importance of an endangered species"). Courts consistently overturn FWS decisions where the agency sacrificed its ESA duties to imperiled species to appease the interests of politicians. For example, in *Save Our Springs v. Babbit*, the court held that the Secretary "acted arbitrarily and capriciously" when he "considered political factors" in making a decision whether to list the Barton Springs salamander as endangered. 27 F. Supp. 2d at 748. Those "political factors" included opposition to the proposed listing by certain congressional representatives, *id.* at 745 – the exact same factors

resolve the issue before issuing a final delisting rule "delays final decision on the WGL DPS beyond commitment to Sen. Klobuchar" and listed as a "Pro" that issuing a final rule without resolving this issue "[r]etains commitment to Sen. Kobuchar [sic]." E-mail from Nelson to FWS personnel, *Attachment: Eastern Options for the Director* (Jul. 13, 2011, 9:02am), JA 936.

the FWS improperly considered in this case. Similarly, in *Western Watershed Project v. U.S. Fish and Wildlife Service*, the District of Idaho vacated and remanded the FWS's decision not to list the sage-grouse under the ESA because its decision had been "taint[ed]" by "political meddling" that led the FWS to "steer the 'best science' to a pre-ordained outcome."[37]

Perhaps most telling is the fact that the FWS pushed ahead with a final decision to create and delist the DPS even after it was confronted with new and conflicting taxonomic information. As FWS prepared to release the Chambers manuscript on which FWS's major wolf taxonomic proposal was based, Chambers, a FWS employee, e-mailed Laura Ragan, another FWS employee, about the timing of the manuscript release and the potential backlash and criticism that would follow from the manuscript. Chambers wrote: "I know the kind of pressure that our management can get from state directors. Once out, the journal may come under pressure, so I want to give them as many days as possible without that kind of distraction." E-mail from Steve Chambers, FWS, to Laura Ragan, FWS, Re: Fw: Chambers et al (Aug. 22, 2011, 3:22 p.m.), JA 1115.

---

[37] 535 F. Supp. 2d 1173, 1176, 1188 (D. Id. 2007); *see also Biodiversity Legal Foundation v. Babbitt*, 943 F. Supp. 23, 25 n.4 (D.D.C. 1997) (suggesting the impropriety of deciding not to list the Archipelago wolf because it was the "[l]east controversial option with the Alaskan delegation to Congress" according to an agency document weighing the pros and cons of listing the species).

At a minimum, the e-mail evidences how extremely politicized the gray wolf delisting is and how much pressure FWS employees feel to respond to state directors and other interested parties. The simple fact is that FWS is not acting based on the best available scientific evidence.

The record in this case tells a clear and disturbing story of political interference. The FWS delisted the WGL wolves because of promises made to members of Congress, ignoring its duty to base listing decisions "solely" on the best available science, and the specific and enumerated factors for listing and delisting decisions prescribed by the ESA, in the process. The FWS's Final Rule can therefore be vacated on that basis alone.

## V.   The Final Rule Was Correctly Overturned Because FWS Ignored Evidence of Continuing Threats to Wolves.

As has been noted throughout this brief, any determination FWS makes to either list or delist an endangered or threatened species is guided by the five potential causes of endangerment to a species set forth in 16 U.S.C. § 1533(a)(1). Three of these risk factors are (i) "disease or predation," (ii) "inadequacy of existing regulatory mechanisms" and (ii) other "manmade factors." In passing the Final Rule, FWS had significant evidence before it of the risk to gray wolves in the proposed DPS as a result of both disease and predation, the inadequacy of state regulations that would be available upon delisting, and the impact of human

factors.  FWS, however, chose to ignore that evidence – a hallmark indicator of arbitrary and capricious agency action.

A.     FWS Ignored Known Threats to the Wolf Population.

The Final Rule contained a significant discussion of the risk of disease to the gray wolf population.  JA 1148-52.  Indeed, FWS recognized "'new disease and parasites have been clearly documented as occurring in wolf populations' and such diseases 'have the potential to become limiting factors acting upon survival, reproduction, and dispersal of large numbers of wolves, and thus may determine the fate of isolated wolf populations.'  Recovery Plan at 23A."  *Jewell,* 76 F. Supp. 3d at 132 (quoting above language).  Despite these risks, and without even suggesting they would be addressed, FWS proceeded to delisting.

An equally, or possibly greater, eye-opening risk which was ignored by FWS is the danger to wolf survival from human depredation.  FWS notes that "the single largest factor in the gray wolf's near extinction in the conterminous United States is human-cause mortality due to illegal killing, 'depredation control' or legal killing, and collisions with motor vehicles."  *Id*. at 132 (citing  JA 1152).  Yet, despite these risks, FWS moved forward with the plan to delist the WGL wolves.

B.     FWS Ignored Inadequacies in State Management Plans.

Before making any listing or delisting decisions, the ESA requires FWS to take into account whether there are sufficient protections offered to the species by

existing state regulations.  16 U.S.C. § 1533(a)(1)(D).  In the case of the gray wolf, however, there is little question that, upon delisting, the hunting, and other legal killing, of wolves will likely increase under state management plans.[38]  The Final Rule therefore violates the express terms of the ESA.

History shows that relying on state management plans will result in a significant reduction of the wolf population as a result of human conduct.  Indeed, before the Final Rule was vacated and the 1978 listing reinstated by the trial court, there was significant evidence illustrating the dire impact of state laws permitting the hunting of wolves in the tri-state (Minnesota, Michigan and Wisconsin) area.  In Minnesota, during the period when the WGL wolves lost federal protections, the state sanctioned two hunting and trapping seasons.  The state's population of wolves fell a precipitous 24 per cent after the 2012-2013 hunting season.[39]  In Wisconsin, as soon as the wolves lost federal protections, "human-caused mortality in 2013 resulted in the first population decline in the state since 1993."  *Id.*, p. 4.  As of April 2014, the population had declined 18 per cent from the previous year.

---

[38] This fact is conceded in several of the *Amici* briefs, which indeed promote the regulatory schemes which permit and encourage hunting of wolves.  *See*, pp. 75-76, 77-79 *infra.*

[39] FWS, Gray Wolf Western Great Lakes DPS Post-Delisting Monitoring Report (September 2014) ("2014 PDMR"), p. 3, (http://www.fws.gov/midwest/wolf/monitoring/pdf/Year1PDMReportSept2014.pdf).

*Id.* These statistics prove what was known and obvious to FWS before passing the final rule: permitting the hunting of an endangered species threatens the future viability of that species.

It is also worth noting that of the six states which make up the proposed DPS outside the Tri-State area (i.e., North Dakota, South Dakota, Illinois, Indiana, Iowa and Ohio), only Illinois has *any* regulations in place aimed at protecting the gray wolf. JA 1167. The other five states do not permit the active hunting of wolves, but also offer no protections in recognition of any need to protect the species. That fact alone creates a risk to the wolf population arising from manmade factors. FWS's regulatory-mechanisms determination violated the ESA because FWS concluded that "[w]olf management plans are only needed for [Minnesota, Wisconsin, and Michigan] for the Service to be assured that WGL wolves will be managed in such a manner that they are not likely to become an endangered species in the foreseeable future." JA 1136. This finding was arbitrary and capricious.

Finally, there remains the risk the individual states will not enforce their wolf management plans. "Legal protection []is only as effective as the public acceptance of laws and regulations needed for wolf management, and the degree of law enforcement devoted to it. Law enforcement is especially needed during fall and winter hunting and trapping seasons, generally September through March." JA

150.  Lack of enforcement is a primary concern with respect to the state management plans in Minnesota, Michigan, and Wisconsin.  As stated in the Final Rule, "[the FWS] reviewed the 2001 Minnesota Plan, the 1999 and 2006 Updated Wisconsin Plan, and the 1997 and 2008 revised Michigan Plan . . . to determine if they will provide sufficient protection and reduce threats.  [The FWS is] primarily concerned with the outcome of the plan's implementation."  JA 1140.

Finally, FWS cannot delist based on its reliance on a state's commitment to protect wolves.  *Defenders of Wildlife v. Jewell*, 68 F. Supp. 3d 193, 209 (D.D.C. 2014), *appeal pending* ("*Wyoming Wolves*") (FWS acted arbitrarily and capriciously in delisting while relying on Wyoming's nonbinding commitment to protect wolves).  Here, as in *Jewell*, FWS has acted arbitrarily and capriciously because the revised Michigan management plan provides no guarantees.  The plan flatly states that wolf hunting by the public could be authorized, depending on the whims of the state legislature.  *See* JA 573("In certain situations, members of the public could be authorized to take wolves in the absence of a designated harvest season [ ], regardless of the State legal classification of wolves. . . .  Game-animal status in Michigan may be designated only by the State Legislature.  In addition, only the State Legislature could authorize the first harvest season."); Minn. Wolf Management Plan (2001), at JA 426 ("In 1999, DNR drafted a wolf management bill. . . .  The 1999 Minnesota Legislature considered significant amendments to

the bill, but ultimately did not pass any wolf management legislation.").  Given

that potential, FWS's reliance on uncertain current state management programs

does not support delisting.

In sum, FWS was aware of significant evidence that shows that the creation

of the DPS and delisting of the gray wolf within that DPS will create a significant

risk to the long term viability of the gray wolf within the DPS due in part to the

lack of adequate existing regulatory schemes in place in the relevant states.  The

decision to delist under those circumstances violates the express terms of the ESA

and is therefore both arbitrary and capricious.  The trial court properly vacated the

rule.

## VI.  The Arguments Posited By The Non-Federal Appellants Do Not Change The Outcome.

In addition to the federal Appellants, other parties and amici have filed five

additional briefs challenging the trial court's holdings.  What is apparent from

those briefs is that each of those parties has concerns wholly distinct from the

mandates of the ESA and therefore outside the scope of this Court's review.

Because the trial court properly focused on enforcing the ESA, none of these other

arguments impacts the outcome of this appeal.[40]

---

[40] In adopting a detailed and complicated briefing schedule for this appeal, the
district court required that intervenors and amici not repeat arguments already
made in previous briefs.  Yet despite the admonitions of the Court, many of the
arguments made in these additional briefs are simply restatements of arguments

A.      <u>Michigan.</u>

The State of Michigan and Michigan Department of Natural Resources

(collectively, "Michigan") submitted a brief which ranges from a policy statement

on wolf management and federal versus state control, to a veiled threat as to what

might happen if the district court's ruling is upheld.  The arguments do not focus

on the law (either the ESA or the APA), how it is enforced, and whether the

conduct of the FWS adheres to the ESA.  Instead, Michigan complains about the

ESA itself, as drafted by Congress, and implicitly threatens the hindrance of its

"cooperation" in further enforcement of the ESA should the Court not rewrite the

statute.

Michigan's main argument is that because it believes the wolf population

within its borders is stable, the FWS need not apply the ESA to wolves in

Michigan.  This is an incorrect statement of the law.  Regardless of the particular

status of any species, the ESA applies to Michigan.

There can be no doubt that the ESA governs an individual state's conduct.

"Any state law or regulation respecting the taking of an endangered species or

threatened species may be more restrictive than the exemptions or permits

provided for in this chapter or in any regulation which implements this chapter **but**

**not less restrictive than the prohibitions so defined**."  15 U.S.C. § 1535(f)

---

made by the federal Appellants and already addressed.  Some briefs are more overt
in doing this (Minnesota) while others (Intervenors) are more subtle.

(emphasis added).  Moreover, the Act's prohibition on takings extends to all private entities and to "any officer, employee, agent, department, or instrumentality of the Federal Government, **of any State**, municipality, or political subdivision of a State, or of any foreign government."  16 U.S.C. § 1532.  "By including the states in the group of actors subject to the Act's prohibitions, Congress implicitly intended to preempt any action of a state inconsistent with and in violation of the ESA." *Strahan v. Coxe*, 127 F.3d 155, 167-68 (1st Cir. 1997).  *See also Man Hing Ivory and Imports, Inc. v Deukmejian*, 702 F.2d 760, 763 (9th Cir. 1983) (ESA preempts state laws that are less restrictive than the prohibitions imposed by federal law).  No state, including Michigan, may pass a law or regulation which is less restrictive than the limitations imposed by the ESA.

When the Final Rule was vacated, Michigan found itself in the same position as 46 other states.  Specifically, the ESA protects gray wolves as an endangered species.  Michigan's wolf management plan clearly permits for the hunting, or, in legal parlance, the "taking" of a protected species.  That plan is therefore both less restrictive than and inconsistent with the ESA.  16 U.S.C. § 1538(a)(1)(B) (holding that it is illegal to "take" an endangered species).  Accordingly, applying the law as written, Michigan's wolf management policy must give way to the ESA.

Michigan also argues that the trial court erred because its holding transfers jurisdiction of Michigan's wolves to the FWS permanently.  This is not only

inaccurate, it illustrates the problem FWS faces in this case.  In fact, there is

nothing permanent about FWS "control" over the wolves in Michigan.  It lasts only

until FWS fulfills its legal obligation to implement protections which result in the

appropriate reinvigoration of the wolf population in its historical range.  Once

FWS takes the steps necessary to legally delist wolves throughout the country,

Michigan will regain jurisdiction over wolf management within its borders.  Until

that time, however, the gray wolf remains a listed species covered by federal law.

Finally, Michigan's arguments highlight the concerns of leaving the

protection of endangered species to the individual states without adequate

protections from the ESA.  Michigan claims that it:

> commits to maintaining a population of at least 200
> wolves, but does not set that figure as an upper limit.
> This is because 200 wolves is likely **not enough** to
> "provide all of the ecological and social benefits valued
> by the public."

Michigan Brief, p. 27 (emphasis added).[41]  In other words, Michigan is only

committed to maintaining the wolf population at a number it admits is probably not

self-sustaining.  Michigan's brief proves its wolf management plan is inadequate.

Moreover, FWS acts in an arbitrary and capricious manner when it relies on

---

[41] It is interesting to note that the 200-wolf level aspired to in Michigan is less than
one third of the total wolves the federal Appellants currently believe are present in
the state of Michigan.  Fed. Defs.' Brief, p. 16.  Michigan's wolf management plan
apparently contemplates the elimination of more than 66% of the wolves currently
located within its borders.

promises by a state that it will "do better" than its existing regulation requires. *Wyoming Wolves*, 68 F. Supp. 3d at 208-09.

Michigan is entitled to its opinion about, and desire to change, any federal law, including the ESA. But until federal law is changed, it binds Michigan. It is unhelpful and specious for Michigan to argue that this Court should reverse the lower court's award of summary judgment simply because Michigan disagrees with the idea that the ESA protects the gray wolf. Michigan's brief therefore provides no reason for the Court to overturn the trial court.

B.     Wisconsin.

On April 23, 2015, this Court issued an order directing the parties to submit a proposed format and schedule for briefing in this matter. That order started off by noting that "these consolidated cases present potential problems of duplicative briefing." Doc. # 1548852. The order further noted that the "court looks with extreme disfavor on repetitious submissions . . ." The State of Wisconsin and the Wisconsin Department of Natural Resources (collectively "Wisconsin") chose to ignore this admonition in its brief, which simply repeats many of the arguments made by the federal Appellants.

The fact is the first two thirds of Wisconsin's brief adds little but moral support for the arguments set forth initially by the federal Appellants. The last

third of the brief is directed at the issue of whether the remedy ordered by the district court was appropriate. The issue of the remedy is addressed *infra.*

C.    Minnesota.

1.    Minnesota's Wolf Management Plan is Flawed.

Minnesota's brief, first and foremost, serves less as a brief on the merits of the underlying ESA claims than an attempt to justify the state's wolf management system. Secondly, it reflects that the emphasis of many states, including Minnesota, is on minority biases and concerns about wolves rather than on the ongoing survival of the species. In short, Minnesota's brief provides nothing this Court need consider in this appeal.

a.    Minnesota's Wolf Management Plan Offers Little, If Any, Protection to Wolves.

Minnesota goes to great lengths to lay out the ways and means in which Minnesota citizens can kill gray wolves in its state. While the state takes great umbrage at the district court labelling two-thirds of the state an "unlimited killing zone", Br., p. 11, it admits that the state's wolf management plan only actively manages in two thirds of the state[42] where killings wolves is allowed *even absent any immediate threat*, "to provide more options to reduce human-wolf conflict." Br., p. 9. The plan includes granting hunting licenses, addressing threats to pets

---

[42] The Zone B referred to Minnesota's brief contains roughly two thirds of the state's area. JA 1157.

and livestock, and the trapping of wolves within one mile of any piece of land on which there is livestock, domestic animals or pets. Br., pp. 9-10. In fact, FWS seemingly agrees that Minnesota's wolf management plan puts wolves at risk. The Final Rule acknowledges that the estimated 450 wolves in Minnesota's "Zone B" face significant risk. JA 1158. But FWS has decided to ignore that and claim this is a permissible state of affairs, in direct conflict with the ESA and precedent interpreting the statute. And this is a clear example of why federal coverage of the gray wolf must remain.

It should be also noted, again, that during the period of time in which the Final Rule was in effect (*i.e.* prior to the district court's vacatur order), Minnesota's gray wolf population fell 24 per cent. *See* 2014 PDMR. Minnesota chooses to remain silent in its brief as to the 2012-2013 hunting season. It is apparent why. Indeed, the trial court found that

> merely stating that a state plan allowing the virtually unregulated killing of nearly one-sixth of all wolves in the state, and the ability to kill any wolf that wanders into sixty-five percent of the State is "consistent with the Recovery Plan" is an unreasonable justification as to why the Minnesota Plan represents an adequate regulatory mechanism to prevent gray wolves from being extirpated again.

76 F. Supp. 3d at 135. The voracious nature of Minnesota's program of killing is strong evidence supporting the district court's determination that Minnesota's

management protocols would not protect wolves if federal protection were removed.

b.    <u>Minnesota's Wolf Management Plan is Inconsistent with the ESA.</u>

Minnesota also manages its wolf management plan from the wrong perspective. For example, "Zone B is managed by MNDNR to provide more options to reduce human-wolf conflict." Br., p. 9. But the ESA is not designed to eliminate conflict between man and animal. It is intended "to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth.* 437 U.S. at 184-85. Because delisting can only occur if there is a finding that regulatory mechanisms are sufficient to protect against the need for continued ESA protections, 16 U.SC. § 1533(a)(1)(D), a post-delisting state management plan that manages the species for human benefit and not in a manner that continues to protect against jeopardy to the species cannot support a decision to delist. Minnesota's emphasis on the reduction of human-wolf conflict flips the regulatory concerns on their head, and emphasizes the dangers of Minnesota state management.[43]

---

[43] The emphasis on reducing human–wolf conflict may reflect why FWS has failed over several decades to adequately return the gray wolf population to a satisfactory level throughout the 48 conterminous United States. It is not, however, a justification for reduction of protections offered by the ESA.

The FWS is limited to five concerns when determining whether to delist or downlist a species. *See*, *supra*, pp. 6-7. None of those reasons is the reduction of human-wolf conflict. Indeed, quite the opposite. The fifth risk factor which FWS must take into account is "other natural or **manmade factors** affecting [the species'] continued existence." 16 U.S.C. § 1533(a)(1)(E). To the extent Minnesota, the FWS, or any other agency seeks to reduce human-wolf conflict by permitting the hunting or harassing of wolves, the policy is directly contrary to the language and intent of the ESA.

2.    <u>The Court Should Not Sever the Final Rule.</u>

Minnesota also argues that the Court should rewrite the Final Rule in order to satisfy its unique concerns. Specifically, it asks this Court to hold that Minnesota wolves should be delisted even if the WGL DPS is illegal. It requests this relief even though there was no proposal by FWS to issue a stand-alone rule for the State of Minnesota. Br., pp. 22-24. This case does not even raise that issue, and so this Court should resist the request to step into the shoes of FWS and write its own rule.

Minnesota presents this argument as one of severance, arguing the Court can sever out Minnesota and delist only the wolves in Minnesota. However, this is not an issue of severance. An agency's rule may be severable where some portions of the rule at issue are valid and others are invalid. *State of N.C. v. F.E.R.C.*, 730

F.2d 790, 796 (D.C. Cir. 1984).  But a rule may not be severed if doing so would

be contrary to law.

Under the ESA, only a species, subspecies, or DPS can be listed or delisted.

16 U.S.C. § 1532(16) (defining a "species" subject to listing).  Here, FWS has

identified the WGL DPS as the relevant entity for purposes of delisting (though, as

noted *supra,* that entity cannot be lawfully delisted because it was never listed and

FWS cannot designate a DPS solely for *removal* of protections).  Minnesota is only

one geopolitically-defined *portion* of the WGL DPS, and thus its state borders

cannot define the scope of an entity for delisting.  *Defenders of Wildlife v. Salazar*,

729 F. Supp. 2d 1207, 1223 (D. Mont. 2010) (FWS cannot delist at state level).

Moreover, a species can only be listed or delisted pursuant to the five factors

enumerated in 16 U.S.C. § 1533(a)(1).   The FWS did not separately delist

Minnesota wolves based on a delisting analysis focused on Minnesota wolves.  It

delisted an entire DPS (illegally, as set out in detail above) of wolves of which

Minnesota was a part.  There is, therefore, no part of the Final Rule that says

wolves in Minnesota are a separate DPS or species.  Accordingly, there is no

provision of the Final Rule which could be severed so that the wolves in Minnesota

stand alone.[44]

---

[44] Black's Law Dictionary defines "sever" as "[t]o separate, as one from another.
To cut off from something; to divide."

Instead, to provide the relief sought by Minnesota, the Court would have to rewrite the Final Rule, change the definition of the DPS, and create a separate rule for Minnesota. In short, the Court would have to undertake agency action. Minnesota has cited no authority for such relief, nor could it.

D.    <u>States Not Within the WGL DPS.</u>

The states of Wyoming, Colorado, Idaho, Kansas, Montana, New Hampshire, North Dakota and Utah (the "Group States *Amici*") have grouped together to argue this Court should amend the ESA. Like Michigan, the Group States *Amici* argue that, based on public policy, FWS should be permitted to ignore the legal requirements imposed by the ESA. That, of course, is the job of the legislature, not this Court.[45] *See*, *supra*, p. 74.

The policy that the Group States *Amici* seek is different from that argued by Michigan. Specifically, they argue that the ESA should permit FWS to create a DPS within an existing species for purposes of delisting the DPS. However, as shown above, the ESA does not permit such action. *Supra,* p. 32-35.

The Group States *Amici* can be summed up by its quote from Wyoming Governor Mead that the "ESA is broken." Br., p. 12. This quote simply emphasizes that the Group States *Amici* want this Court to turn this case, with its

---

[45] The Group States *Amici*'s lengthy discussion of FWS's efforts related to grizzly bears, intended to reinforce this argument, is irrelevant to the issues presented in this appeal.

important and specific issues related to ESA compliance in the Final Rule, into a political referendum on the ESA supported not by the statute, but by policy beliefs. Even if the ESA is "broken," it remains the law.

The Group States *Amici* brief therefore does not raise any issues justifying this Court overruling the lower court's award of summary judgment.

E.    Intervenors Hunter Conservation Coalition.

The brief filed by the Hunter-Intervenors ("Hunters") is policy-based and designed entirely to provide justification for this Court to ignore the basics of the ESA and years of precedent supporting the lower court's order.  The brief is rife with over-generalizations and an admitted reliance on the concept of *reductio ad absurdum*.  Indeed, the positions espoused by the Hunters cannot withstand scrutiny as, if the Court were to consider the other end of the extremes, the same arguments support the outcome in the trial court.

1.    A DPS Does Not Exist Absent Creation by FWS.

Hunters' entire brief is premised on the idea that for every species listed, there are innumerable subpopulations of the species which can be labelled as a DPS, and treated as a separate species, independent of any conduct by FWS or any other agency.  In other words, Hunters' assumption is that a DPS naturally exists. That assumption, however, is not supported by law, either congressional or natural, as discussed in detail *supra*, pp. 40-41.

It is universally accepted that a DPS is not a scientific term, but a statutory one created for the express purpose of the ESA. "By *inventing the term* DPS and then declining to define it, Congress intended to provide agencies with discretion in deciding the composition of a DPS." *Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024, 1033 (9th Cir. 2010). "The ESA does not define 'distinct population segment' (DPS), *nor is it a term used in scientific literature*." *Vermont Wolves*, 386 F. Supp. 2d at 562 (emphasis added). In *Nw. Ecosystem*, a case to which the FWS was a party, the Ninth Circuit noted that "the parties agree that the term [distinct population segment] has no generally accepted scientific meaning." *Nw. Ecosystem*, 475 F.3d at 1141.[46]

It is indisputable, therefore, that a DPS does not exist until the FWS formally creates and recognizes it as such. As has been discussed in detail, in order for FWS to recognize a DPS, the DPS Policy requires a finding that the proposed species meets three requirements. The FWS must find the proposed species (i) distinct, (ii) significant, and (iii) either endangered or threatened. *Supra*, pp. 36-38. Absent those findings, *no DPS exists*.

---

[46] In response to the multitude of court holdings that the term "distinct population segment" was ambiguous, FWS, along with NMFS, created the DPS Policy, along with its three pronged requirement to recognizing a DPS. *Vermont Wolves*, 386 F. Supp.2d at 562. While decisions made under the DPS Policy may be entitled to some deference, FWS's action is not entitled to deference where the decisions made by FWS are not supportable under, and even directly conflict with, the DPS Policy or the ESA itself. *Supra*, p. 53.

Hunters want this Court to accept the theory that the WGL wolves existed as a DPS in nature simply waiting for FWS to come along and give it formal recognition. There is no support for that position. It therefore also follows that delisting a non-existent DPS requires more than simply determining that a portion of an otherwise listed species has recovered. The species must be identified and listed before it can be delisted.

2.  Hunters Argue That FWS Should Not Be Burdened With Following the Law.

A significant part of Hunters' argument is that the trial court's ruling limits FWS's flexibility in managing endangered species. The straw man set up by Hunters is the protection of a biological species of deer and whether, at the time of listing, FWS should be forced to create multiple DPSs or simply list the entire species. The argument ignores the law.

There are three applicable legal principles which Hunters' argument ignores. First, FWS is not supposed to make determinations whether to list a species, biological or otherwise, on the need for flexibility, but on the best available science and the enumerated listing factors in the statute. *Supra*, pp. 58-62. Second, the first prong of the DPS Policy requires that a proposed DPS be distinct, a requirement ignored in the example of deer in Hunters' brief. Third, the DPS is a tool to be used "sparingly". *Supra*, pp. 40-41. Underlying Hunters' argument is the assumption that rather than being used sparingly, a DPS should be used freely.

The ESA's underlying concern is the recovery of endangered and threatened species. The law provides adequate tools for FWS to do its job to promote such recoveries. Rather than promote the job it is legally entrusted to do, both FWS and Hunters seek to provide shortcuts to reduce the difficulty of the task. That has resulted in no less than twelve courts rejecting FWS's piecemeal efforts to remove protections from the gray wolf. That astounding losing streak would cause any corporate counsel, manager, or sports coach to lose his or her job. Yet FWS persists, with the encouragement of outside parties, to pursue unlawful approaches. Hunters' arguments encouraging further illegal behavior must be rejected by this Court.

3.    FWS Is Not "Handcuffed" by Its Listing, Provided It Does Its Job.

Hunters argue that the trial court is applying "handcuffs" to FWS with respect to a listing determination made several years earlier. This argument not only asks the Court to ignore the actual law, it also reflects a fundamental misunderstanding of the ESA. The FWS is not handcuffed, other than into legal compliance with federal law – as are we all.

A species is listed as endangered or threatened only when such a determination is made based on the best available science. Accordingly, at the time any listing decision is made, including that of the gray wolf, such a decision is

supported not by political expedience, not by a "gut reaction," but based instead on science.  If the science supports it, FWS *is obligated* to list a species.

It is then FWS's job to undertake necessary steps to help that species recover.  Through creation of critical habitats, regulations and management, the FWS, with the cooperation of the States, seeks to return that species to health throughout its historical range, thus permitting the species to be delisted.  *Supra*, pp. 48-50.  That is not just an aspiration.  It is a statutory dictate.  FWS is therefore not handcuffed by the determination to list a species. It is instead simply doing its job.

At this point, the gray wolf is not recovered.  There is no nationwide program addressing the recovery of the gray wolf.  Until those benchmarks are met, the protection of the gray wolf must be honored – by FWS, by the courts, and by other stakeholders like the Hunters.

4.      Other Species.

Hunters spend significant space in their brief discussing FWS's use of a DPS as it relates to other species such as the grizzly bear and the sea turtle.  As an initial matter, no precedent is established by the fact that other rules were or were not challenged in a court of law.  The fact that a rule is not challenged does not make the rule legal; it simply makes it unchallenged.  Moreover, the fact that Hunters

believe a change in the law would be expedient does not empower this Court to change the law as written.

Most of Hunters' brief simply amounts to a reiteration of the arguments provided by the Federal Appellants, and Appellees respectfully refer the Court to those discussions *supra*. For the reasons already set forth, the ESA does not permit the creation of a DPS for purposes of delisting a species, no matter how much Appellants and intervenors wish it did.[47]

While the Hunters spend much of their brief on the policy implications of this case, at bottom there is only one policy at issue – that delineated by Congress in enacting the ESA. This Court's duty is to carry that consideration, along with the letter of the law, into its decision making process here. "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *TVA v. Hill*, 437 U.S. at 184. "Congress enacted the ESA to provide 'a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a

---

[47] This is also true for the Hunters' misplaced argument that the trial court's correct analysis prevents citizens from petitioning to delist non-existent DPSs. The ESA permits an "interested person" to petition "to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section[and] the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted" 16 U.S.C. § 1533(b). The statute simply does not create an opportunity for a citizen to petition to remove a species not already listed. That applies to any species, subspecies or DPS which has not yet been determined by FWS to merit ESA protection.

program for the conservation of such endangered species.'" *Oregon Wolves*, 354 F. Supp. 2d at 1159. Allegiance to those principles warrants affirmance of the trial court's grant of summary judgment.

## VII.  Vacatur Was the Proper Remedy.

As has been shown, the Final Rule is arbitrary and capricious for multiple reasons, fails to follow applicable laws and policies, and cannot stand. Given that, the trial court appropriately vacated the Final Rule and reinstated the listing status of the gray wolf that predated the Final Rule, specifically the listing status that has been in place since 1978. The plain language of the APA instructs that courts "*shall . . . hold unlawful and set aside*" agency actions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1) (emphasis added); *see also Bennett v. Spear*, 520 U.S. 154, 175 (1997) (a statute is not "discretionary" where it "uses the imperative 'shall'"). Indeed, the Supreme Court has long recognized that the presumptive remedy in an APA case is vacatur. *See*, *e.g.*, *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (when the agency's action cannot be sustained "then the [agency's] decision must be vacated and the matter remanded to [the agency] for further consideration"); *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A) – which means, of course, any law, and not merely those laws that the agency itself is charged with administering.").

This Circuit has held that under very limited circumstances it is appropriate to remand the defective rule to the agency for corrective action. In

> deciding whether to vacate a flawed agency action, the district court should be guided by two principal factors: (1) the seriousness of the . . . deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur.

*Heartland Regional Medical Center v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (citations and quotations omitted). "Relevant to the choice [to remand or vacate] are the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself change." *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990).

The trial court correctly applied these factors and determined that vacatur was the appropriate remedy. The defect in the Final Rule is not simply the failure of FWS to provide an adequate justification for its action. Instead, it provided all the justification it believed was needed (and adequate), but the district court properly found that the action itself was illegal for multiple reasons.[48] As has been shown in

---

[48] In its brief arguing against vacatur, Wisconsin argues that the rule should be remanded *assuming the problem with the rule was "at most . . . an insufficiency of explanation . . ."* Wisconsin Br., p. 19. As is shown herein, there are deficiencies in the Final Rule much greater than the failure to provide an adequate explanation.

detail, the decision to simultaneously create and delist a DPS violates both the ESA and FWS's DPS Policy. FWS attempted to revise a DPS which did not previously exist and in so doing actually revised a nationwide species listing without undertaking the appropriate procedural steps. The Final Rule relied on two competing but nonetheless equally improper interpretations of the term "significant portion of the range." FWS also ignored evidence it had before it which weighed in favor of not removing ESA protections from gray wolves in the Midwest. And this is just a partial list of the problems with the Final Rule. There is *no* likelihood FWS would be able to justify its deficiencies in the Final Rule upon remand. The first factor therefore not only weighs in favor of vacatur, it is essentially outcome determinative that vacatur is the appropriate remedy.

The second factor also supports vacatur. As noted by the lower court in the *2008 Wolves* case, the disruption associated with reinstating a plan that has been in place since 1978 is "not a substantial concern . . ." 579 F. Supp. 2d at 21. "Little confusion or inefficiency will result from reinstating a regulatory regime that was in place from 1978 to 2007, particularly given the fact that state and federal wolf management authorities have been working in tandem for years." *Id.* As noted by the district court in the order on appeal, that has also been true between 2008, when the 1978 listings were reinstated by the *2008 Wolves* case, and 2011, when the Final

Rule was passed. 76 F. Supp. 3d at 137. It has also presumably been true for the last year plus since the Final Rule was actually vacated by the trial court.

The most important factor, however, against remanding the Final Rule remains the one factor FWS continues to ignore -- the best interests of the gray wolf under the ESA, as recognized by the district court and several courts before it. As has been noted in this brief, the "plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Hill*, 437 U.S. at 184. But a remand without vacatur would serve only to expose this truly endangered species to the whims and risks of having no protection under the ESA. That is an unacceptable risk and contrary to the intent of the ESA. The "ESA's preference for protecting endangered species counsels strongly in favor of vacating the [Final Rule] while FWS revisits its statutory interpretation." *2008 Wolves*, 579 F. Supp. 2d at 21.

The trial court's decision to vacate the Final Rule, based on the multiple identified infirmities in the rule, should be affirmed.

## CONCLUSION

For the foregoing reasons, the order of the district court should be affirmed.

Respectfully submitted this 8th day of June, 2016,

/s/ Elizabeth R. Geise
Elizabeth R. Geise

SCHIFF HARDIN LLP
Elizabeth Runyan Geise (D.C. Bar 965559)
EGeise@schiffhardin.com
901 K Street, NW, Ste. 700
Washington, DC 20001
(202) 778-6400
(202) 778-6460 (facsimile)

Ralph E. Henry (D.C. Bar 982586)
rhenry@humanesociety.org
2100 L Street NW
Washington, DC 20037
(202) 676-2324
(202) 778-2357 (facsimile)

*Counsel for Plaintiffs-Appellees The Humane Society of the United States, Born Free USA, Help Our Wolves Live, and Friends of Animals and Their Environment*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with this Court's order of July 29, 2015 and Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 23,228 words according to the count of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1).

I further certify that this brief complies with Federal Rules of Appellate Procedure 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

/s/ Elizabeth R. Geise
Elizabeth R. Geise

# CERTIFICATE OF SERVICE

I, the undersigned, state that on June 8, 2016, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF System, which will constitute service, via e-mail notice of filing, upon all counsel of record. Paper copies of the brief and Appellees' previously filed Separate Statutory Addendum will be delivered to the Court within the time permitted by the Court's rules.

June 8, 2016

/s/ Molly L. Wiltshire
Molly L. Wiltshire
SCHIFF HARDIN LLP